**Richard E. Weltman, Esq. (rew@weltmosk.com)**
**Michele K. Jaspan, Esq. (mkj@weltmosk.com)**
**WELTMAN & MOSKOWITZ, LLP**
*Attorneys for Farmers Insurance Group Federal Credit Union*
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932
(201) 794-7500

**Order Filed on March 29, 2018
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

-and-

**A. Lysa Simon, Esq. (lsimon@culawyer.com)**
**LAW OFFICES OF A. LYSA SIMON**
9846 White Oak Avenue, Suite 205
Northridge, California 91325
(818) 701-5200

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Case Nos. 17-29752 (VFP) |
| RICHARD S. HOLLEY;<br>BETH A. HOLLEY AKA BETH A.<br>SCIENECA AKA BETH A. CONKLIN | Jointly Administered |
| Debtors. | Chapter 13 |

## ORDER APPROVING STIPULATION FOR ADEQUATE PROTECTION BY AND BETWEEN FARMERS INSURANCE GROUP FEDERAL CREDIT UNION, THE DEBTORS AND THE CHAPTER 13 TRUSTEE

The relief set forth on the following pages, consisting of twenty-six (26) pages of the

Stipulation plus seventy-nine (79) pages of Exhibits, for a total number of one hundred five (105)

pages is hereby **ORDERED**.

 **DATED: March 29, 2018**

_____
**Honorable Vincent F. Papalia**
**United States Bankruptcy Judge**

MICHELE K. JASPAN, NJ SBN 031561986
Weltman & Moskowitz, LLP
18 Columbia Turnpike
Suite 200
Florham Park, NJ 07932
(201) 794-7500

A. LYSA SIMON, CA SBN 94884
LAW OFFICES OF A. LYSA SIMON
9846 White Oak Avenue, Suite 205
Northridge, CA 91325
(818) 701-5200

Attorney for Secured Creditor,
FARMERS INSURANCE GROUP
FEDERAL CREDIT UNION

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re | ) CASE NO. 17-29752 VFP |
| | ) |
| RICHARD S. HOLLEY | ) CHAPTER 13 |
| | ) |
| BETH A. HOLLEY aka | ) STIPULATION FOR ADEQUATE |
| BETH ASCIEMECA aka | ) PROTECTION ORDER |
| BETH A. CONKLIN | ) |
| | ) **No Hearing Scheduled** |
| Debtors | ) **on this Stipulation** |
| | ) |

COMES NOW Creditor, Farmers Insurance Group Federal Credit Union (hereafter the "Credit Union"), represented by counsel admitted *pro hac vice,* A. Lysa Simon, a member of the Law Offices of A. Lysa Simon and local counsel, Michele K. Jaspan, associated with the law firm of Weltman and Moskowitz LLP and Debtors, Richard Holley and Beth A. Holley aka Beth A. Sciemeca aka Beth A. Conklin (hereafter referred to as the "Debtors"), represented by their counsel, Stephen B. McNally, a member of McNally & Associates, LLC, who stipulate as follows:

## I.  RECITALS

## A. INTRODUCTION

1.      The Debtors filed their Petition for Chapter 13 Bankruptcy, on or about September 29, 2017.

2.      Debtor, Richard Holley (hereafter referred to either as the "Debtor" or "Debtor, R. Holley") is an insurance agent.  He sells insurance under the terms and conditions of a written Appointment Agreement with the insurance companies doing business under the trademark name "Farmers Insurance Companies," formerly "Farmers Insurance Group of Companies." Non-exclusively, the companies doing business under said trademark name include: FARMERS INSURANCE EXCHANGE, a reciprocal or interinsurance exchange; TRUCK INSURANCE EXCHANGE, a reciprocal or interinsurance exchange; FIRE INSURANCE EXCHANGE, a reciprocal or interinsurance exchange; MID-CENTURY INSURANCE COMPANY, a California stock corporation; and FARMERS NEW WORLD LIFE INSURANCE COMPANY, a California stock company. As noted above, said insurance companies are being collectively referred to as the "Insurance Companies." The Appointment Agreement is a written contract, which allows the Debtor to sell insurance for Farmers.

3.      The Credit Union is a not-for-profit cooperative corporation, duly organized and existing under and by virtue of the laws of the United States of America.

4.      The Credit Union is a federally chartered credit union.  It is authorized to do business in all of the states of the union as a credit union.  The Credit Union has its principal place of business in the County of Los Angeles, State of California.

5.      The Credit Union is NOT part of Farmers. It is NOT an affiliate of Farmers.

6.      The Credit Union is owned by its members, who are the agents, district managers, employees (and their family members) of Farmers, and a few other small employee business groups (and their family members).

7.      The Credit Union exists for the purpose of providing financial services to its members. The Credit Union gets its name from the common bond of its membership, i.e., the people who work for Farmers, and the agents, etc. who sell insurance for said Insurance Companies.

///

///

## B. CASH VALUE AND RESIDUAL VALUE OF APPOINTMENT AGREEMENT

8.     Debtor, R. Holley's Appointment Agreement has a "cash value" on the residual value of the insurance policies Debtor, R. Holley writes for Farmers. It is also referred to as a "contract value." Said "contract value" of the Appointment Agreement is an asset. It is a general intangible. [See *Helvering vs. Eubank,* 311 U.S. 122, 312, U.S. 713, 61 SCt 609 (1940)]

9.     Debtor, R. Holley has two (2) membership accounts with the Credit Union. Under said memberships, Debtor, R. Holley either directly, or as a guarantor for his wholly owned LLC, has five (5) loans with the Credit Union. They are as follows;

   a.     Two (2) Agency Receivables secured loans (L2104 and L0502);

   b.     One (1) cross collateralized VISA (L7500);

   c.     One (1) commercial real secured loan (L6971) granted to the Debtors' wholly owned LLC; and

   d.     One (1) real estate secured Home Equity Line of Credit (L6700).

10.    The two (2) Agency Receivables Secured Loans (L2104 and L0502) and VISA credit card account (L7500) are each fully secured by the "cash value" of the residual value of Debtor, R. Holley's Appointment Agreement with Farmers, and by the commissions, bonuses, and other remuneration, to which Debtor, R. Holley is entitled under said Appointment Agreement.

11.    Debtor, R. Holley needs to remain a member of the Credit Union in good standing so that he will have access to future agency receivables secured loans and other credit from the Credit Union. Said loans give him flexibility to run his business.

12.    As noted above, in addition to a security interest in the cash value of Debtor, R. Holley's Appointment Agreement, the Credit Union also has a security interest in the monthly commissions he receives, up to the amount of the monthly payments required by the Debtor, R. Holley's Agency Receivable loans and VISA credit card account, with the Credit Union. Said security interest is an interest in cash collateral under 11 U.S.C.

§ 363(a) [See *In re Delco Oil, Inc.,* 599 F.3d 1255, 71 UCC Rep.Serv.2d 302 (C.A.11 (Fla.),2010.)]

13.    This Stipulation is needed for the following purposes: 1) to provide the Credit Union with adequate protection of its security interest; 2) to provide the Credit Union's lien will attach to insurance policies written for the first time, after the date the Debtors filed their petition for bankruptcy; and 3) to provide for payments directly to the Credit Union outside the Debtors' Chapter 13 Plan.

## C.    CREDIT UNION LOANS

### i.    (FIRST) AGENCY SECURED LOAN SUBACCOUNT L0502

14.    Debtor, R. Holley executed and delivered to the Credit Union, on or about February 23, 2017, a written loan agreement/security agreement, entitled Business Loan Receipt, Business Credit and Continuing Security Agreement, Business Loan Payment and Business Credit Agreement Rider, whereby he agreed to pay all sums advanced to him, by the Credit Union, according to the terms and conditions at the time of the advance. Said loan agreement/security agreement is hereafter referred to as the "L0502" subaccount or loan. A copy of Debtor, R. Holley's L0502 loan agreement is attached hereto, marked as Exhibit "1" and is incorporated herein by this reference.

15.    As part of the same transaction as described in the paragraph above, in order to secure payment of all sums due, owing and unpaid by Debtor, R. Holley to the Credit Union, Debtor, R. Holley granted to the Credit Union a security interest in the contract value of his Appointment Agreement with Farmers and in the commissions, bonuses, and other remuneration he receives on a monthly basis under said Appointment Agreement. (Said type of loan is referred to as an referred to as an "Agency Secured Loan," or "Contract Value" by Credit Union personnel. Said type of loan is sometimes referred to as a "Book of Business" loan by Farmers Insurance agents.)

16.    The Credit Union's security interest in the contract value of Debtor, R. Holley's Appointment Agreement with Farmers, has been duly perfected at all times relevant hereto, by the recording of a UCC Financing Statement with the New Jersey

STIPULATION FOR ADEQUATE
PROTECTION ORDER

Secretary of State. Proof of perfection is attached hereto, marked as Exhibit "2" and is incorporated herein by this reference.

17.    The amounts owed on the "L0502" subaccount, are as follows:

Principal owed is the sum of $53,134.16, plus interest in the sum of $90.14, as of February 12, 2018, with additional interest accruing at the default rate stated in the written loan agreement. (The accrued interest was calculated on the contract rate and not the default rate.) The default rate is the rate at which the Credit Union charges high risk loans, such as a loan on which a debtor has filed bankruptcy.  It is the rate of eighteen percent (18%) per annum.  (Prior to the default, the rate of interest under the contract was the rate of seven and seventy-four hundredths percent (7.74%) per annum.) The written agreement also provides for late fees at the rate of five percent (5%) of each payment, not paid within ten (10) days of the date it is due.  Payments under the contract are at the rate of $662.00 per month, and are due on the 5th day of each month.

**18.    The term of the loan under the contract exceeds the term of Debtor, R. Holley's bankruptcy. Debtor, R. Holley was current at the time the Debtors filed their petition for bankruptcy.**

19.    The L0502 subaccount written agreement includes the following clauses:

"**DEFAULT RATE:** Default Rate: In the event of default, you understand and agree that Finance Charges will accrue at an ANNUAL PERCENTAGE RATE (APR) of 18% until you repay your entire Loan."

"**DEFAULT:** 13. DEFAULT. You will be in default if you do not make a payment of the amount required when it is due or, if payment is subject to demand, when demanded. You will be in default if you break any promise you made under this Agreement or if anyone is in default under any security agreement made in connection with a Loan under this Agreement. You will be in default if you, a Guarantor, a partner or a majority owner dies, files for bankruptcy or similar proceeding, or becomes insolvent. You will be in default, if you or a Guarantor make any false or misleading statements in

any credit application, financial statement or similar document or if any statement becomes misleading due to a change in circumstance and you fail to correct that statement, or if you merge. dissolve, reorganize, or your legal existence is terminated. You will be in default if the value of your property is impaired or substantially declines in value or if something happens that we believe may substantially reduce your ability to repay what you owe or if we otherwise reasonably believe that we are insecure. You will be in default if for any reason we are unable to perfect our security interest in any collateral you have given us as security for a loan. You will be in default if any of your property is repossessed, confiscated, forfeited or used in such a manner or for a purpose so as to make it subject to forfeiture or confiscation. You will also be in default under this Agreement if you are in default under any other loan agreement with us."

"DEFAULT: You will also be in default if you fail to make your scheduled monthly payments by Folio Deductions or in the event your Appointment Agreement with the Farmers Insurance Group of Companies is voluntarily or involuntarily terminated. You further understand that if you are in Default because you have not paid your minimum scheduled payments on time, then we may exercise our rights under the Agreement and this Rider within a period of two (2) months following your payment default, although our delay beyond two (2) months will not demand a  waiver of our rights under the Agreement or this Rider."

"APPOINTMENT AGREEMENT RECEIVABLES AS SECURITY: You also agree to grant to us a security interest in the following described property, all such property to be collectively included, without limitation, in the term "security": 1) your present and future Appointment Agreement Receivables; and 2) all other rights to the payment of money now owned or hereafter acquired by you, whether due or to become due and whether or not earned

STIPULATION FOR ADEQUATE
PROTECTION ORDER

by performance including, without limitation, all present and future receivables, money, accounts, contract rights, production and service commissions, folio checks, claims, income, commissions, bonuses, chattel paper, instruments and general intangibles, whether from the Farmers Insurance Group of Companies or any other source of payments owing to you or your benefit."

"ASSIGNMENT OF APPOINTMENT AGREEMENT RECEIVABLES AS SECURITY: You hereby assign to us the right to receive your present and future Appointment Agreement Receivables and any other present and future rights to payment you may have under your Appointment Agreement from the Farmers Insurance Group of Companies or any other source due you. You understand that this assignment is additional security for advances to you from us under the Agreement and this Rider and that you may not cancel or modify this Assignment except upon written authorization from us."

"APPOINTMENT OF US AS YOUR AGENT AND IRREVOCABLE ATTORNEY-IN-FACT: IN ADDITION TO OUR REMEDIES UNDER THE UNIFORM COMMERCIAL CODE AND OTHER LAWS (WHICH REMEDIES SHALL BE CUMULATIVE), YOU APPOINT US AS YOUR TRUE, LAWFUL AGENT AND IRREVOCABLE ATTORNEY-IN-FACT TO: 1) ENDORSE YOUR NAME ON ANY CHECKS, DRAFTS OR OTHER INSTRUMENTS DUE TO US FROM THE FARMERS INSURANCE GROUP OF COMPANIES; 2) DEMAND, RECEIVE AND ENFORCE PAYMENTS OWING TO YOU OR YOUR BENEFIT REGARDLESS OF THE SOURCE OF THE PAYMENTS OWING TO YOU OR YOUR BENEFIT; 3) GIVE RECEIPTS, RELEASES, SATISFACTION FOR AND TO SUE FOR ALL MONIES DUE, OR TO BECOME DUE TO YOU OR YOUR BENEFIT WITH

THE SAME FORCE AND EFFECT AS YOU COULD DO IF THE AGREEMENT OR THIS RIDER HAD NOT BEEN EXECUTED; 4) SIGN AND FILE ANY AND ALL DOCUMENTS WE DEEM NECESSARY TO PERFECT OUR INTEREST IN ANY APPOINTMENT AGREEMENT AND APPOINTMENT AGREEMENT RECEIVABLES; AND 5) TERMINATE YOUR APPOINTMENT AGREEMENT AND TO PROVIDE A "NOTIFICATION TO THE FARMERS INSURANCE GROUP OF COMPANIES IN THE EVENT OF YOUR DEFAULT OF YOUR LOAN SECURED BY APPOINTMENT AGREEMENT RECEIVABLES" IF YOU ARE IN DEFAULT OF THIS LOAN."

"NOTIFICATION TO THE FARMERS INSURANCE GROUP OF COMPANIES IN THE EVENT OF YOUR DEFAULT OF YOUR LOAN SECURED BY YOUR APPOINTMENT AGREEMENT RECEIVABLES: IF YOU ARE IN DEFAULT, WE ARE AUTHORIZED, AS YOUR AGENT AND YOUR ATTORNEY-IN-FACT, AND PURSUANT TO OUR SECURITY INTEREST HEREIN AS TO YOUR APPOINTMENT AGREEMENT RECEIVABLES, TO TENDER YOUR RESIGNATION FROM YOUR APPOINTMENT AGREEMENT WITH THE FARMERS INSURANCE GROUP OF COMPANIES AND NOTIFY THE FARMERS INSURANCE GROUP OF COMPANIES OF: 1) YOUR DEFAULT OF THIS LOAN YOU HAVE WITH US 2) THE TERMINATION OF YOUR APPOINTMENT AGREEMENT WITH THE FARMERS INSURANCE GROUP OF COMPANIES; AND 3) YOUR DIRECTION FOR PAYMENT TO US OF ALL APPOINTMENT AGREEMENT RECEIVABLES AND ANY OTHER AMOUNTS OTHERWISE OWING TO YOU FROM THE FARMERS INSURANCE GROUP OF COMPANIES."

20.    The collateral securing the Credit Union's agency secured loan at the time Debtor, R. Holley filed his petition for bankruptcy had a value, which exceeds the amounts owed to the Credit Union on the three (3) subaccounts secured by said collateral.

21.    It is acknowledged that unless the Court approves this Stipulation, the Credit Union's lien will NOT attach to the contract value created by insurance policies written for the first time after the Debtors filed their petition for bankruptcy. [*In re Ryerson*, 739 F.2d 1423, 1426 (9th Cir. 1984)] As such, even if the contract value of Debtor, R. Holley's Appointment Agreement stays more or less the same, the Credit Union's lien attaches to less and less of it. Therefore, without this Stipulation, the Credit Union will lack adequate protection of what is now a fully secured debt.

**22.    For the reasons indicated above, WITHOUT this Stipulation, the Credit Union lacks adequate protection of its security interest in its collateral. Moreover, without this Stipulation, Debtor, R. Holley will have caused the Credit Union a loss and will not be eligible for any future Appointment Agreement Receivable secured loans from the Credit Union, or any Credit Union services or benefits, except the right to maintain a basic share account and to vote at the Credit Union's annual meetings.**

23.    The Credit Union's security interest as indicated above, is **both** against the contract value of Debtor, R. Holley's Appointment Agreement and against the monthly commissions, bonuses and other remunerations, to which Debtor, R. Holley is entitled under his Appointment Agreement. The contract value of the Appointment Agreement, and the commissions, bonuses, etc., paid under it are "cash collateral" under 11 U.S.C. § 363(c)(2). The amount of the monthly payments required by the Credit Union on the L0502 account, from the cash collateral is the sum of $662.00.

**24.    Debtor, R. Holley acknowledges that he does not have the right to use said cash collateral without either a stipulation from the Credit Union or after a**

noticed motion, on which the Credit Union is ensured adequate protection and a Court Order allowing Debtor, R. Holley to do so.

25.    Debtor, R. Holley has made all of his postpeitition payments on his L0502 subaccount.

## ii.    (SECOND) AGENCY SECURED LOAN SUBACCOUNT L2104

26.    Debtor, R. Holley executed and delivered to the Credit Union, on or about June 21, 2017, a separate second written loan agreement/security agreement, entitled "Business Loan Receipt, Business Credit and Continuing Security Agreement, Business Loan Payment and Business Credit Rider," whereby he agreed to pay all sums advanced to him, by the Credit Union, according to the terms and conditions at the time of the advance. Said loan agreement/security agreement is hereafter referred to as the "L2104 subaccount." A copy of Debtor, R. Holley's L2104 loan agreement is attached hereto, marked as Exhibit "3" and is incorporated herein by this reference.

27.    As part of the same transaction as described in the paragraph above, in order to secure payment of all sums due, owing and unpaid by Debtor, R. Holley to the Credit Union, Debtor, R. Holley granted to the Credit Union a security interest in the contract value of his Appointment Agreement with Farmers and in the commissions, bonuses, and other remuneration he receives on a monthly basis under said Appointment Agreement. Said loan is also an Agency Secured Loan.

28.    The Credit Union's security interest in the contract value of Debtor, R. Holley's Appointment Agreement with Farmers, has been duly perfected at all times relevant hereto, by the recording of a UCC Financing Statement with the New Jersey Secretary of State.   (See Exhibit "2" proof of perfection.)

29.    The amounts owed on the L2104 Agency Secured(Contract Value) loan are as follows:

///

STIPULATION FOR ADEQUATE
PROTECTION ORDER

Principal owed is the sum of $12,441.43, plus interest in the sum of $21.79, as of February 12, 2018, with additional interest accruing at the default rate stated in the written loan agreement. (The accrued interest was calculated on the contract rate and not the default rate.) The default rate is the rate at which the Credit Union charges high risk loans, such as a loan on which a debtor has filed bankruptcy. It is the rate of eighteen percent (18%) per annum. (Prior to the default, the rate of interest under the contract was the rate of seven and ninety-nine hundredths percent (7.99%) per annum.) The written agreement also provides for late fees at the rate of five percent (5%) of each payment, not paid within ten (10) days of the date it is due. Payments under the contract are at the rate of $139.00 per month, and are due on the 5th day of each month.

**30.    The term of the loan under the contract exceeds the term of the Debtors' bankruptcy. Debtor, R. Holley was current on said loan at the time the Debtors filed their petition for bankruptcy.**

31.    The L2104 subaccount written agreement includes the following same clauses as the L0502 subaccount written agreement.

32.    It is again acknowledged that unless the Court approves this Stipulation, the Credit Union's lien will NOT attach to the contract value created by insurance policies written for the first time after the Debtors filed their petition for bankruptcy. [*In re Ryerson*, 739 F.2d 1423, 1426 (9th Cir. 1984)] As such, even if the contract value of Debtor, R. Holley's Appointment Agreement stays more or less the same, the Credit Union's lien attaches to less and less of it. Therefore, without this Stipulation, the Credit Union will lack adequate protection of what is now a fully secured debt.

**33.    For the reasons indicated above, WITHOUT this Stipulation, the Credit Union lacks adequate protection of their security interest in its collateral. Moreover, without this Stipulation Debtor, R. Holley will have caused the Credit Union a loss and will not be eligible for any future Appointment Agreement Receivable secured loans from the Credit Union, or any Credit Union services or**

**benefits, except the right to maintain a basic share account and to vote at the Credit Union's annual meetings.**

34.    The Credit Union's collateral on the L2104 subaccount, is the same collateral as secured the L0502 subaccount, i.e., the contract value of Debtor, R. Holley's Appointment Agreement and the monthly commissions, bonuses and other remunerations, to which Debtor, R. Holley is entitled under his Appointment Agreement. The contract value of the Appointment Agreement, and the commissions, bonuses, etc., paid under it are "cash collateral" under 11 U.S.C. § 363(c)(2). The amount of the monthly payments required by the Credit Union on the L2104 account, from the cash collateral is the sum of $139.00.

**35.    Debtor, R. Holley acknowledges that he does not have the right to use said cash collateral without either a stipulation from the Credit Union or after a noticed motion, on which the Credit Union is ensured adequate protection and a Court Order allowing Debtor, R. Holley to do so.**

36.    Debtor, R. Holley's postpetition payments have been made on his L2104 subaccount.

### iii.    VISA CREDIT CARD ACCOUNT L7500 SUBACCOUNT

37.    The amounts owed on the VISA Credit Card Account, which are cross collateralized by Debtor, R. Holley's Contract Value in Debtor, R. Holley's Appointment Agreement, through his Agency Secured (Contract Value) loans (L0502 and L2104). The Credit Union internally refers to said account as an "L7500." A copy of the written agreement is attached hereto, marked as Exhibit "4" and is incorporated herein by this reference.

38.    The amounts owed on the VISA Credit Card Account are as follows:

**L7500 Subaccount.** Principal owed is the sum of $18,731.27, plus interest in the sum of $139.65, as of February 12, 2018, with additional interest accruing at the default rate stated in the written loan agreement. (The accrued interest was calculated on the contract rate and not the default rate.) The default rate is the rate at which the Credit Union charges

high risk loans, such as a loan on which a debtor has filed bankruptcy. It is the rate of eighteen percent (18%) per annum. (Prior to the default, the rate of interest under the contract was the rate of eight and ninety-nine hundredths percent (8.99%) per annum.) The written agreement also provides for late fees at the rate $25.00 on each payment that is past due. Late fees have accrued in the sum of $100.00 as of February 12, 2018. Payments under the contract are at the rate of $379.00 per month, and are due on the 5th day of each month. A copy of Debtor, R. Holley's L7500 agreement is attached hereto, marked as Exhibit "4" and is incorporated herein by this reference. The loan is secured through cross collateral clauses by the contract value, commissions, bonuses and other remuneration in Debtor, R. Holley's Insurance Companies Appointment Agreement.

**39.    The term of the loan under the contract exceeds the term of Debtor, R. Holley's bankruptcy. Debtor, R. Holley is due for his October 20, 2017 L7500 payment.**

40.    The L7500 subaccount written agreement includes the following clauses: "DEFAULT: You will be in default if: 1) you do not pay your minimum scheduled payments on time; 2) you fail to live up to or otherwise breach any of the terms and conditions of this Agreement or any other loan or line of credit (except any loan, line of credit or other agreement secured by real property or where otherwise prohibited by federal or state law or regulation) you may have with us; 3) your creditworthiness is impaired; 4) the value of the security is impaired; 5) you die, become insolvent or are the subject of bankruptcy or receivership proceedings; or 6) there is a change of ownership of all or any part of the security. If you are in default, we may terminate this Agreement and demand immediate payment of the entire loan without notice to you. In the event of your default, and upon termination of your credit privileges, with proper notice you understand and agree that INTEREST

CHARGES may accrue at an ANNUAL PERCENTAGE RATE of 18% until you repay your entire loan."

### iv.    RESIDENTIAL MORTGAGE ACCOUNT L6700  SUBACCOUNT

41.    On or about July 23, 2013, both Debtors entered into a written Note secured through a recorded Mortgage with the Credit Union.  Under said agreement the Debtors granted the Credit Union a security interest in real property commonly known as 27 Mill Lane, Branchville (Suffix County) New Jersey, 07826. The mortgage was duly recorded as instrument 20130722010171100 on July 22, 2013, in Book 9157, Page 949, Page 1 of 13, with the County Recorder's Office for Sussex County, New Jersey.   The Credit Union internally refers to said loan as an L6700. A copy of the written Note and the recorded Mortgage is attached hereto, marked as Exhibit "5" and is incorporated herein by this reference.

42.    The amounts owed on the Residential Mortgage are as follows:

**L6700  Subaccount.** Principal owed is the sum of $74,530.06, plus interest in the sum of $2,186.56, as of February 12, 2018, with additional interest accruing at the rate of twelve percent (12%) per annum. The written agreement also provides for late fees at the rate five percent (5%) of the over due payment, when it is fifteen (15) days or more late. In this case the  late fees are accruing at the rate of $43.75 per late payment. Late fees have accrued in the sum of $131.25 as of February 12, 2018.  Payments under the contract are at the rate of $875.00 per month, and are due on the 1st day of each month.

**43.    The term of the loan under the contract exceeds the term of the Debtors' bankruptcy. The Debtors are due for their November 1, 2017 L6700 payment.**

### v.    COMMERCIAL REAL ESTATE LOAN L6971  SUBACCOUNT

44.    On or about May 31, 2017, the Debtors through their LLC, JMH Investments, entered into a written Promissory Note secured by a Mortgage, Assignment of Rents, etc. with the Credit Union.  Debtor, R. Holley personally guaranteed said agreement.   Under

said agreement Debtor, R. Holley granted the Credit Union a security interest in real property commonly known as 91 Trinity Street, Newton (Sussex County) New Jersey 07860.  The mortgage was duly recorded as instrument 2017061301020920, on June 13, 2017, in Book 9504, Page 250, with the County Recorder's Office for Sussex County, New Jersey.  A copy of the written Promissory Note and the recorded  Mortgage, Assignment of Rents, etc. is attached hereto, marked as Exhibit "6" and is incorporated herein by this reference.  The Credit Union internally refers to said loan as an L6971.

45.    The amounts owed on the Commercial Real Estate Loan are as follows:

**L6971 Subaccount.** Principal owed is the sum of $121,103.19, plus interest in the sum of $119.45, as of February 12, 2018, with additional interest accruing at the rate of nine and five tenths percent (9.5%) per annum. (Said rate is a default interest rate.  The contract rate is the rate of four and five tenths (4.5%) per annum.  Interest so far has been calculated on the non-defaulted interest rate.) The written agreement also provides for late fees at the rate five percent (5%) of the over due payment, when it is fifteen (15) days or more late. Payments under the contract are at the rate of $682.56 per month, and are due on the 5th day of each month.

46.    The written Promissory Note provided for a default interest rate equal to five percent (5%) above the non-default interest rate.

**47.    The term of the loan under the contract exceeds the term of Debtor, R. Holley's bankruptcy. The Debtors LLC is current on its L6971 account.**

**F.    EFFECT OF THE DEBTORS' BANKRUPTCY ON THE CONTRACT VALUE SECURED LOANS**

48.    It is acknowledged that **UNLESS** the Court approves this Stipulation, the Credit Union's lien will NOT attach to the contract value created by insurance policies written for the first time after the Debtors filed their petition for bankruptcy. [*In re Ryerson*, 739 F.2d 1423, 1426 (9th Cir. 1984)] As such, even if the contract value of Debtor, R.

STIPULATION FOR ADEQUATE
PROTECTION ORDER

Holley's Appointment Agreement stays more or less the same, the Credit Union's lien attaches to less and less of it. Therefore, without this Stipulation, the Credit Union will lack adequate protection of what is now a fully secured debt. The same is true on the Insurance Company loans.

**49.    For the reasons indicated above, WITHOUT this Stipulation, the Credit Union will lack adequate protection of its security interest in its collateral.**

**50.    Moreover, without this Stipulation, Debtor, R. Holley will have caused the Credit Union a loss and will not be eligible for any future Appointment Agreement Receivable secured loans from the Credit Union, or any Credit Union services or benefits, except the right to maintain a basic share account and to vote at the Credit Union's annual meetings.**

51.    The Credit Union's security interest, as indicated above on the L0502, L2104 and L7500 accounts, is **both** against the contract value of Debtor, R. Holley's Appointment Agreement and against the commission, bonus and other remuneration paid to the Debtors, and/or on their behalf, up to the amount owed on the monthly payments, if this stipulation is approved. If there is a default, the Credit Union is entitled to all commissions, bonuses, and other remuneration to which the Debtor is entitled. The commissions, bonuses, etc., as well as the contract value of the Appointment Agreement are "**cash collateral**" under 11 U.S.C. § 363(c)(2).   The amount of the monthly +-+payments required by the Credit Union on the contract secured debt is the sum of $1,180.00.

52.    The Debtors acknowledge that they do not have the right to use said cash collateral without either a stipulation from the Credit Union or after a noticed motion, on which the Credit Union is ensured adequate protection and a Court Order allowing the Debtors to do so.

53.    Debtor, R. Holley is not current on his L7500 subaccount. If this stipulation is approved, the Credit Union will waive the fact the Debtor used the Credit Union's cash collateral, without consent or a Court order allowing the Debtors to do so previously.

STIPULATION FOR ADEQUATE
PROTECTION ORDER

54.    The Debtors' bankruptcy schedules and plan acknowledge the Debtors' debt to the Credit Union.  However, the Debtor understated the amounts owed to the Credit Union on the fully secured loan and understated the value of the Credit Union's collateral.

## II.    STIPULATION

IT IS HEREBY STIPULATED as follows:

55.    The paragraphs set forth in the Recital Section are incorporated herein and are acknowledged to be true and correct.

56.    The Credit Union's lien and security interest shall continue to attach to the contract value of all commissions, bonuses, etc., to which Debtor, R. Holley is entitled, earned by reason of policies written through Debtor, R. Holley's Farmers Insurance Agency, both before and after the filing of the Debtors' current Bankruptcy, and in any future bankruptcy the Debtors may file.

57.    If the contract value of Debtor, R. Holley's Appointment Agreement with Farmers declines below two hundred percent (200%) of the amount that the Debtor, R. Holley owes the Credit Union, Debtor, R. Holley's VISA (L7500) and Debtor, R. Holley's two (2) Insurance Company secured loans (L0502 and L2104) will be deemed to be in default.

58.    The Debtors shall make each of their five (5) subaccount payments outside their Chapter 13 Plan, directly to the Credit Union by folio deductions, i.e. direct deposits from Farmers to the Credit Union. The Credit Union shall apply the payments in accordance with the terms of the written loan agreements, as modified by this Stipulation.

59.    Debtor, R. Holley's Appointment Agreement with Farmers had a contract value sufficient to protect the Credit Union's debt when the Debtors filed their petition for bankruptcy. If the contract value of Debtor, R. Holley's Appointment Agreement with Farmers declines by more than $20,000.00, of its value when the Debtors filed their petition for bankruptcy Debtor, R. Holley's VISA (L7500) and two (2) Insurance Company secured loans (L0502 and L2104) will be deemed to have a post bankruptcy default.

60.    Debtor, R. Holley will email to **the Credit Union at** collections@figfcu.org by the 5th day of each month a  true and correct copy of his Statement of Operations on his Farmers' Appointment Agreement.  Said Statement of Operations shall non-exclusively include the following information obtained by Debtor, R. Holley through his access to information from Farmers:

a.    Farmers' (estimated) current contract value of Debtor R. Holley's Appointment Agreement;

b.    the amount of monthly commissions earned by Debtor R. Holley in the current month;

c.    the amount commissions paid by Farmers to Debtor, R. Holley year-to-day;

d.    the amount of bonuses, to which the Debtor is entitled from Farmers;

e.    the amount of bonuses paid by Farmers to Debtor R. Holley year-to-date;

f.    the amount of any other remuneration, to which Debtor R. Holley is entitled; and

g.    the amount of all other remuneration paid to the Debtor year-to-date.

61.    The Debtors shall cure their L6700 loan agreement by making one and one third payments required by their written loan agreement, over the next twelve (12) months at the rate of $1,163.75 each month.  The first increased payment will be due on March 1, 2018.

62.    The direct payments required under this Stipulation shall begin on March 1, 2018, and continue thereafter until all sums due, owing and unpaid to the Credit Union are paid in full.

63.    The Credit Union shall add to the loans its actual attorneys' fees and costs incurred in connection with said subaccount.  It is estimated that as of February 12, 2018 the Credit Union's actual attorneys' fees and costs are approximately the sum of $4,000.00. As further involvement is needed by the Credit Union's attorney, there will be additional attorneys' fees and costs added to the L0502 and L2104 subaccounts.

64.    While the Debtors are in their current Chapter 13 proceeding, i.e., case number 17-29752-VFP, the Credit Union will not modify any term or condition of the Debtors' loan agreements with the Credit Union, except as provided for in this Stipulation, without court permission.

65.    In consideration of the Debtors entering into this Stipulation, subject to the Court approving this Stipulation, as long as there is no new default on any of the debt owed to the Credit Union by the Debtors, nor any future breach of any term or condition of the written loan agreements, as modified by this Stipulation for Adequate Protection Order, the **Credit Union agrees** to the following:

a.    The Credit Union will not invoke the default interest rate on the written loan agreements, regardless of what happens to or in the Debtors' Bankruptcy, notwithstanding the fact the Debtors have filed bankruptcy, and doing so is a default under the terms of the written agreements.

b.    The Credit Union will not need to file a motion for relief from the automatic stay to liquidate its collateral, because under the terms of this agreement, the Credit Union's lien is attaching to the cash value of the Debtor's Appointment Agreement derived from policies written for the first time after the Debtors filed their Petition for Bankruptcy or on either of the Debtors' Note secured by the mortgage, the Debtor, R. Holley's Appointment Agreement secured loans, or the Commercial Real Property loan.

c.    The Credit Union will consent to the Debtors using the Credit Union's cash collateral **ABOVE** the amounts needed to make the payments on the Debtors' Credit Union debt. (The Credit Union does **NOT** consent to the Defendant using said $3,026.31 per month of the Credit Union's cash collateral. Once the Residential Mortgage is current, the said amount will be reduced to the sum of $2,737.56.)

STIPULATION FOR ADEQUATE
PROTECTION ORDER

66.     It is acknowledged and agreed that as the lienholder, the Credit Union shall continue to be authorized to obtain copies of any and all Farmers Insurance Companies' Statements of Operations on Debtor, R. Holley's Appointment Agreement and take all steps necessary to maintain the perfection of the Credit Union's lien, including non-exclusively filing with the appropriate Secretary of State and/or county recorder's office and/or any other governmental agency, any and all documents to extend the perfection of the Credit Union's lien, e.g., UCC Continuation Statements.

67.     If the Debtors fail to make any payment to the Credit Union, on or before the date that it is due, or otherwise default under any term or condition of this Stipulation and/or any term or condition of the written loan agreements on the L0502, L2104, L7500, L6700, and L6971 Credit Union subaccounts, the Credit Union's waivers set forth in this Stipulation will be **retroactively** null and void.

68.     If the Debtors fail to pay any payment to the Credit Union, on or before the date that it is due, or otherwise default under any term or condition of this Stipulation and/or any term or condition of the written agreements on the L0502, L2104, L7500, L6700, and L6971 subaccounts, before the Credit Union can take any steps to enforce its rights against its collateral, the Credit Union shall cause to be mailed to the Debtors at their last known address (with a copy to their attorney of record, Stephen B. McNally, as long as the Debtors are in their present bankruptcy), by first class mail, postage prepaid, a written Ten (10) Day Notice of Default and opportunity to cure, for any breach other than a breach caused by a decline in the contract value of Debtor's Appointment Agreement with Farmers. (Once the Debtors' bankruptcy has been dismissed or discharged, Stephen B. McNally, will no longer represent the Debtors with regard to this stipulation, unless he indicates in a written notice to the Credit Union and the Credit Union's attorney that he intends to continue to represent the Debtors.)

69.     If for any reason, the Debtor, R. Holley's Appointment Agreement with Farmers is terminated, while there is still an automatic stay in place, the Credit Union shall

file with the Court a motion for relief so indicating and shall be granted relief from the automatic stay, allowing the Credit Union to demand payment for all amounts due at that time from Farmers and to be paid the outstanding balance owed on its fully secured loan from the liquidated value of the Debtor's Appointment Agreement with Farmers, and to apply said liquidated funds to the amounts due, owing and unpaid by Debtor to the Credit Union and Farmers, if any.

70.    In the case of a default due to a decline in the contract value of the Debtor, R. Holley's Appointment Agreement by the sum of $20,000.00 or more, the Credit Union will send a letter to the Debtors, giving the Debtors thirty (30) days to pay down the amount outstanding on Debtor, R. Holley's L0502, L2104, and L7500 subaccounts by the amount that the contract value of the Debtor, R. Holley's appointment agreement has declined, or to increase Debtor, R. Holley's contract value by writing new policies accepted by Farmers, so that the contract value of Debtor, R. Holley's Appointment Agreement continues to provide the Credit Union with adequate protection of the debt secured by it.

71.    Any notices to the Debtors will be sent to the Debtors addressed as follows: 27 Mill Lane, Branchville, NJ 07826. A copy of any notice shall also be sent to the Debtors' attorney of record, Stephen B. McNally, at McNally & Associates, LLC, 93 Main Street, Suite 201, Newton, NJ, 07860, while the Debtors are in their bankruptcy.

72.    If the Debtors or Debtors' counsel wish to have the Notice of Default sent to a different address, written notice so stating must be sent to the Credit Union at Farmers Insurance Group Federal Credit Union, P.O. Box 36911, Los Angeles, CA 90036, AND to the Credit Union's California counsel, A. Lysa Simon, at the Law Offices of A. Lysa Simon, 9846 White Oak Avenue, Suite 205, Northridge, CA 91325. If the Credit Union or the Credit Union's attorney changes where they would like correspondence, payments or notices sent, the Credit Union and/or the Credit Union's attorney will so advise the Debtors and their attorney in writing.

73.    If the Debtors do not cure a default under this Stipulation, within the applicable time period from the date of the mailing of the written notice of default, the Credit Union shall cause a Declaration to be filed with the Court, without further notice to the Debtors or to the Debtors' counsel. Said Declaration shall state that there has been a default under the terms and conditions of this Stipulation and a failure to cure.

74.    If there is an uncured or incurable default on any of the L2104, L8100 and/or L7500 subaccounts, an order for relief from the automatic stay shall be entered against the Debtors and their estate on the contract value secured loans only. Said order shall include a provision that the Debtor, R. Holley's Appointment Agreement shall be terminated, and shall further state that the companies operating under the trademark name: "Farmers Insurance Group of Companies" shall turn over to the Credit Union, a sum sufficient from the contract value of the Debtor's Appointment Agreement, to pay the Credit Union the outstanding balances owed on the L2104, L0502 and L7500 subaccounts, including any and all attorneys' fees and costs incurred by the Credit Union, as permitted by the written agreements and by the Uniform Commercial Code, on the Debtor, R. Holley's secured L2104, L0502 and L7500 subaccounts. Further, relief from the automatic stay shall also be granted to allow the Credit Union and Farmers to enforce this Court's order and the Credit Union and Insurance Companies' rights under the L2104 written agreement in Federal and/or State Court, and to enable the Credit Union the right to proceed with an action to collect said contract value directly from Farmers and to retain such sums, as permitted under the laws of the State of California. Given that said loans are business loans, the venue for said loans shall be Los Angeles, California. In said case, the order granting relief from the automatic stay shall be entered without further notice or hearing.

75.    If there is an uncured or incurable default on the Residential Mortgage (L6700), relief from the automatic stay shall be entered against the Debtors and their estate on the Debtors' residence on the Mill Road real property, allowing the Credit Union

to proceed with a foreclosure action and sale and have the right to possession of said real property.

76.    If there is an uncured or incurable default on the Commercial Real Estate Loan (L6971) relief from the automatic stay shall granted against the Debtors and their estate on with regard to the Debtors' interest on the Trinity real property, allowing the Credit Union to proceed with a foreclosure action and sale and have the right to possession of said real property. Said foreclosure and/or an action for possession shall be in the state of New Jersey, under the laws of the state of New Jersey.

77.    Any relief from the automatic stay that is granted will include a waiver under Federal Rules of Bankruptcy Procedure, Rule 4001(a)(3).

78.    The Debtors waive their right to appeal any Order for Relief from the Automatic Stay granted pursuant to the terms of this Stipulation for Adequate Protection Order.

79.    The Debtors hereby agree to prospective relief, i.e., this Stipulation for Adequate Protection Order applies in the above-entitled Bankruptcy, and to any subsequent bankruptcy which the Debtors may file, so long as there is an outstanding balance due, owing and unpaid on the Debtors' L2104, L0502, L7500, L6700, and/or L6971 subaccounts.

80.    The Debtors' L2104, L0502, L7500, L6700, and/or L6971 subaccounts owed to the Credit Union shall not be discharged by the Debtors' current Bankruptcy or in any other Bankruptcy the Debtors may file.  The Debtors waive their right to a discharge under 11 U.S.C. §523(a)(10) in the Debtors' present bankruptcy and in any subsequent bankruptcy the Debtors may file on their existing Credit Union debt. Said debt would not otherwise be dischargeable in the Debtors' current bankruptcy because said subaccounts are each secured debt, on which the term of the loans exceed the term of the Debtors' Chapter 13 bankruptcy.

81.    Once the Debtors' bankruptcy is either dismissed or discharged, as long as there is no new default of the written agreements as modified by this Stipulation for Adequate Protection Order, the Credit Union will treat the Debtors, as though they had not filed their 2017 bankruptcy.

82.    This agreement shall be interpreted without regard to its author.

83.    The Debtors waive their right to a hearing on this Stipulation and their right to appeal any order of the Court approving it.

84.    This Stipulation may be signed in counterparts. A facsimile or electronic signature shall be treated as an original.

IT IS SO STIPULATED.

Dated: 3/14/18 _____

Dated: 3/14/18 _____

_____
Richard Holley, Debtor

_____
Beth Ann Holley, Debtor

Dated: _____

FARMERS INSURANCE GROUP
FEDERAL CREDIT UNION

(please see next page)
_____
By:  RAMIL AGUILAR,
      Collections Supervisor

**_Approved as to form and content:_**

Dated:  3/23/18

LAW OFFICES OF A. LYSA SIMON

/s/ A. Lysa Simon
_____
A. LYSA SIMON,
Attorney for Secured Creditor,
Farmers Insurance Group Federal Credit Union

81.    Once the Debtors' bankruptcy is either dismissed or discharged, as long as there is no new default of the written agreements as modified by this Stipulation for Adequate Protection Order, the Credit Union will treat the Debtors, as though they had not filed their 2017 bankruptcy.

82.    This agreement shall be interpreted without regard to its author.

83.    The Debtors waive their right to a hearing on this Stipulation and their right to appeal any order of the Court approving it.

84.    This Stipulation may be signed in counterparts. A facsimile or electronic signature shall be treated as an original.

IT IS SO STIPULATED.

Dated:_____          Dated:_____

Please see previous page                  please see previous page
_____          _____
Richard Holley, Debtor                    Beth Ann Holley, Debtor

Dated:___3/23/2018_____

FARMERS INSURANCE GROUP
FEDERAL CREDIT UNION

By: RAMIL AGUILAR,
      Collections Supervisor    74C9CDB89B37443...

**_Approved as to form and content_**:

Dated:__3/23/18_____

LAW OFFICES OF A. LYSA SIMON


        /s/ a. Lysa Simon
_____
A. LYSA SIMON,
Attorney for Secured Creditor,
Farmers Insurance Group Federal Credit Union

Dated: 3/27/18

Weltman & Moskowitz, LLP

Michele K Jaspan
Attorney for Secured Creditor,
Farmers Insurance Group Federal Credit Union

Dated: _____

McNally & Associates, LLC

Stephen B. McNally
Attorney for Debtors, Richard Holley and Beth Ann Holley

The Chapter 13 Trustee has ~~no opposition~~ (no position) to this Stipulation.

Dated: 3/20/18

Marie Ann Greenberg, Chapter 13 Trustee

Joseph D. Portelira, JR
Attorney for Trustee

STIPULATION FOR ADEQUATE
PROTECTION ORDER

DocuSign Envelope ID: 93EF28C4-0A17-47CC-AA77-0FD9620AEBF9



**FARMERS INSURANCE**
**FEDERAL CREDIT UNION**
P.O. Box 35911 • Los Angeles, CA 90036-0911



## Business Loan Receipt

The terms and conditions of this Business Loan Receipt supplements and/or amends the terms and conditions of the Business Credit and Continuing Security Agreement. To the extent that any term or condition is inconsistent with the Business Credit and Continuing Security Agreement, the terms and conditions of this document shall govern. The use by the borrower of the credit rights documented herein constitutes acceptance of these terms and conditions.

### BORROWER INFORMATION

| BORROWER NAME | MEMBER/ACCOUNT NUMBER | DATE |
|---|---|---|
| RICHARD B. HOLLEY | ████████0502 | 2/24/2017 |

### AMOUNTS ADVANCED AND INTEREST TERMS

| DAILY PERIODIC RATE | INTEREST RATE | TYPE | NEW BALANCE |
|---|---|---|---|
| 0.02121 % | 7.740 % | ☒ FIXED ☐ VARIABLE | $ 55,000.00 |

| AMOUNT ADVANCED | LINE OF CREDIT LIMIT | REMAINING LIMIT |
|---|---|---|
| $ 55,000.00 | $ | $ |

☐ **Obligatory Advances** - If checked, we are obliged to advance funds up to the available credit limit on loans with a credit limit unless you or any guarantor is in default under any agreement with us.

☐ **Revolving Loan** - As amounts are repaid they may be re-borrowed, if permitted by the Credit Union, until the Credit Limit is reached.

The interest rate for your loan will vary as follows:
Variable Rate Loans Only: The APR may increase if there is an increase in the Wall Street Journal (Index) Prime Rate. We will add a margin of 0.000% and will use the most recent Index Value available to us as of the last day of the calendar quarter prior to any APR adjustment. The APR will change quarterly on the first day of Feb, May, Aug and Nov to reflect any change in the Index Value. The maximum APR is 18%, the floor is .75%. The maximum annual rate change is 2%. If the APR increases, this may result in additional payments.

We may change the interest rate of any fixed rate Loan with an established credit limit after giving you _____ days (if not completed, ninety (90) days shall apply) advance written notice. Any change to the interest rate charged for a Loan with an established credit limit will apply to future advances and at our discretion and subject to any requirements of applicable law, will also apply to unpaid balances.

### REPAYMENT TERMS

This Loan must be repaid as follows:
Applicable to Lines of Credit Only: Minimum Monthly Payment shall be 2% of the unpaid, outstanding balance of your Account after your most recent advance in increments of $250, but not less than $20.

| Installment Repayment Terms: | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|
| | 179 | $ 519.00 | Beginning    4/5/2017 |
| | 1 | $ 390.15 | 03/05/2032 |

☒ Notice to Borrower: This is a demand note and so may be collected by the Credit Union
  ☒ at any time
  ☐ other (describe): _____
A new note mutually agreed upon and subsequently issued may carry a higher or lower rate of interest.

### FEES AND ADDITIONAL TERMS AND CONDITIONS

Default Rate: In the event of default, you understand and agree that Finance Charges will accrue at an ANNUAL PERCENTAGE RATE (APR) of 18% until you repay your entire Loan.

Vehicle Loan Default Rate: In the event of default, you understand and agree that Finance Charges will accrue at an ANNUAL PERCENTAGE RATE (APR) of 18% until you repay your entire Loan. You also understand that you will be in default if you do not have our security interest shown on the title within 60 days. At 90 days your APR will increase to 18% until you have completed the legal registration.

Late Fees: If your payment is more than 10 days late, you will be charged a late charge of 5% of the Payment Due, but not less than $1.00.

Prepayment: If you pay off early you will not have to pay a penalty.

Agency Secured UCC Search and Filing Fee: $50.00

This Loan shall be governed by and construed in accordance with the laws of the state of  CALIFORNIA

### DESCRIPTION OF COLLATERAL

AS A CONDITION FOR THIS LOAN, THIS LOAN AND THE BUSINESS CREDIT AND CONTINUING SECURITY AGREEMENT WHICH IT IS SUBJECT TO, ARE SECURED BY YOUR SHARES, ALL PROPERTY SECURING OTHER LOANS RECEIVED IN THE PAST OR IN THE FUTURE, AND THE PROPERTY DESCRIBED ON PAGE 2.

© CUNA MUTUAL GROUP, 2004, 05, ALL RIGHTS RESERVED

10403891-VXB08-C-1-012816 (VXB082)-e

**EXHIBIT 1** PAGE 1 OF 10

DocuSign Envelope ID: 93EF28C4-0A17-47CC-AA77-0FD9620AEBF9

Specific Pledge of Share/Deposits (in addition to the statutory lien referenced in the body of the Business Credit and Continuing Security Agreement):

| PLEDGE OF SHARES AND/OR DEPOSITS  $ | ACCOUNT NUMBER | PLEDGE OF SHARES AND/OR DEPOSITS  $ | ACCOUNT NUMBER |
|---|---|---|---|
| | | | |

**Option 1:**
Unless items below are checked, a security interest is granted in all assets of the Borrower(s), excepting, Borrower's principal residence, but including all accounts (including all health care receivables), instruments, documents, deposit accounts, inventory, machinery, equipment, fixtures, chattel paper and general intangibles including letter-of-credit rights.

**Option 2:**
The security interest(s) granted by the borrower will be limited to the checked items:

- [ ] All Inventory
- [ ] All General Intangibles
- [ ] All Instruments
- [ ] All Letter-of-Credit Rights
- [ ] All Deposit Accounts
- [ ] Vehicle
  - Year _____
  - Make _____
  - Model _____
  - VIN # _____
- [x] Other collateral description
  - Appointment Agreement Receivables
  - _____
  - _____

- [ ] All Chattel Paper
- [ ] All Accounts
- [ ] All Documents
- [ ] All Equipment
- [ ] All Fixtures located at _____
  - _____
  - _____
  - _____
  - _____

**Option 3:**
- [ ] No additional collateral - any existing collateral previously granted by other security agreements covering future obligations remains effective (no other box may be checked if this box is checked)

The security interests described above include all of the indicated property now owned or hereafter acquired and all accessions, additions, replacements and proceeds, as described in more detail in the body of the Business Credit and Continuing Security Agreement.

| SIGNATURES |
|---|

By signing this Business Loan Receipt, the borrower certifies to the Credit Union that there has been no material adverse change in the borrower's financial condition as disclosed to the Credit Union in borrower's most recent written financial statement.

If an Entity (Form of Organization)

Borrower  RICHARD S. HOLLEY _____

Form of Organization (if applicable) SOLE PROPRIETORSHIP _____

Borrower _____

Form of Organization (if applicable) _____

Agreed to By or on behalf of above Borrower(s):

By: X  RICHARD STEWART HOLLEY _____ (Seal)

Printed Name: —RICHARD STEWART HOLLEY— _____
9ED81FE3786F471

Title: _____  Date: 2/24/2017

By: X _____ (Seal)

Printed Name: _____

Title: _____  Date: _____

**CONCURRENCE OF NON-BORROWING SPOUSE - FOR LOUISIANA SOLE PROPRIETORSHIPS:** In accordance with Louisiana Civil Code Article 2347, the borrower's spouse signing below concurs with the granting of a security interest in the community property and assets subject to this Agreement and other related documents to secure the present and future indebtedness and obligations as described in Section 11 of the Business Credit and Continuing Security Agreement.

By: X _____

Printed Name: _____

Date: _____

| FOR CREDIT UNION USE ONLY    Employee Initials: _____ | Date mailed or delivered: _____ |
|---|---|

1040369T-VXB08-C-1-012616 (VXB082)-s

EXHIBIT 1 PAGE 2 OF 10

DocuSign Envelope ID: 93EF28C4-0A17-47CC-AA77-0FD9620AEBF9

 **FARMERS INSURANCE FEDERAL CREDIT UNION**
P.O. Box 36911 • Los Angeles, CA 90036-0911

 **LOANLINER.**

## BUSINESS CREDIT AND CONTINUING SECURITY AGREEMENT

This Business Credit and Continuing Security Agreement ("Agreement") includes this Agreement and may include a Business Credit Agreement Rider ("Rider") and Business Loan Receipt. If a Rider and/or Business Loan Receipt are executed by you, their terms and conditions are incorporated into this Agreement as if set forth herein in full. "You", "you", "your" and "borrower" mean the person(s) or entity(ies) designated as a "Borrower" in the Signature section of this agreement. "Credit Union", "we", "our" and "us" mean the Credit Union whose name appears on this Agreement or anyone to whom the Credit Union transfers its rights under this Agreement.

**NOTICE TO COSIGNER:  YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR PAYMENT OF THIS LOAN.  IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.**

**1.  HOW THIS AGREEMENT WORKS.** This is an agreement to advance funds to you or on your behalf now or in the future. We anticipate that, from time to time, you will borrow money (called "Loans") under this Agreement. We are not required to make Loans to you under this Agreement and can refuse a request for a Loan at any time, unless we have expressly agreed on the Business Loan Receipt, to make obligatory advances.

**2.  CREDIT LIMIT.** We may, but do not have to, establish a credit limit for certain Loans. If a credit limit is set, you promise not to exceed the established credit limit. If you exceed the credit limit, you promise to repay immediately the amount which exceeds the credit limit. Even if we allow you to exceed your credit limit, you understand that this does not require us to allow you to exceed the limit in the future.

**3.  REPAYMENT.** You (jointly, severally and in solido if more than one) promise to repay all amounts advanced to you or on your behalf along with other charges and interest. You will be advised of the required payment terms for a Loan on the Business Loan Receipt. Payments for a Loan will be due on the dates indicated in the Business Loan Receipt or on demand on or after the due date stated on the Receipt. Payments must include any amount past due and any amount by which you have exceeded any credit limit you have been given. You may repay all or part of what you owe at any time without any prepayment penalty. Even if you prepay, you will still be required to make the regularly scheduled payments unless we agree in writing to a change in the payment schedule. Unless otherwise required by law, payments will be applied to amounts owed under this Agreement, in the manner the Credit Union chooses.

**4.  INTEREST AND OTHER CHARGES.** Interest will be computed separately for each separate Loan under this Agreement. To compute interest charges, the unpaid balance for each day since your last payment (or since a Loan if you have not yet made a payment) is multiplied by the applicable daily periodic rate as established by the Credit Union and stated on the Business Loan Receipt for that Loan. The sum of these amounts is the interest owed. The balance used to compute interest charges is the unpaid balance each day after payments and credits to that balance have been subtracted and any additions to the balance have been made. In addition to interest, we may charge other charges which are disclosed on the Business Loan Receipt and in other sections of this Agreement. If the interest rate is a variable interest rate, the Business Loan Receipt explains how the variable interest rate works. The interest payable by you under this Agreement shall never exceed the amount permitted by law. If it would exceed that amount because of the way interest is described in the Business Loan Receipt or Rider to this Agreement, the amount of interest payable by you will be considered reduced to the maximum permitted by law and any amount you pay in excess of that amount shall reduce the principal amount of the Loan.

**5.  POWERS, PURPOSE AND AUTHORITY; COMMERCIAL PURPOSE.** You agree and warrant that if you are an entity you are duly and validly organized under the name of and in the form indicated in the Signatures section of this Agreement. You promise that each Loan made to you under this Agreement will only be used for commercial or business purposes, and not for the purchase or improvement of residential real estate or for personal, family, or household purposes. You promise that unless you have disclosed otherwise to us, in writing, you have not in the past or present operated or held property under any other name. You also promise that you have the authority and all due authorization to enter into and to agree to all provisions of this Agreement and to agree to all provisions of the documents related to this Agreement. You certify and agree that this Agreement, and any Rider, Business Loan Receipt, or other agreement or instrument we require you to execute in connection with this Agreement are legal, valid, and binding obligations that are enforceable against you and your successors, assigns and representatives.

**6.  FINANCIAL CONDITION.** You promise and warrant that the financial information you have provided to us accurately and completely reflects your financial condition and you understand that the Credit Union in advancing funds has relied upon the information provided by you. You promise to promptly provide us with written notice of any material change in your financial condition. Unless already disclosed to us, in writing, you promise and warrant that you are not the subject of any pending litigation or bankruptcy proceedings, outstanding claims, any investigations or proceedings, and that you do not have any outstanding tax liabilities or any other outstanding unpaid obligations. You also certify that you have no material contingent obligations, except those that have been disclosed to us in writing.

**7.  BORROWER'S PROMISES**

a.  Access to records, premises, and collateral. Upon reasonable advance written notice, you promise to promptly provide us or our representatives access to and permit them to examine, inspect and copy all or any part of your books and records wherever such books and records may be located or stored. If requested, you will make them available at your main office. You promise to promptly provide us or our representatives access to, and allow us or them to inspect your premises and collateral.

b.  Additional indebtedness. Other than your indebtedness to us, you agree not to incur, guaranty or become obligated on any additional indebtedness, except as we may expressly permit in advance, in writing, and except in the case of accounts payable as necessary in the ordinary course of your business.

c.  Execution of additional documents. You agree to execute and deliver any document or agreement we may request in order to document or secure a Loan. You grant us an irrevocable power of attorney coupled with an interest, to sign or otherwise act on your behalf in order to secure a Loan or facilitate the repossession of property securing a Loan.

© CUNA MUTUAL GROUP, 2004, 06, 07, ALL RIGHTS RESERVED                    10403891-BX810-C-1-041215 (BX810G)-a

EXHIBIT 1 PAGE 3 OF 10

DocuSign Envelope ID: 93EF28C4-0A17-47CC-AA77-0FD9620AEBF9

d.    **Updating credit information.** You promise that you will promptly give us written notice if there is a material change in your financial condition, if you become the subject of litigation, a claim, an investigation or proceeding or if any action against you arises that may materially affect your financial condition. You promise to promptly give us written notice if you change your name, there is a change in your ownership, management, or form of organization, or if any other information you provided to us changes. Upon our request, you also agree to promptly provide us updated financial information or any other information we may request.

e.    **Notification prior to change of name, change of location, change of State of residence or bulk sale of assets.** Except for the sale of assets in the ordinary course of business to buyers who qualify as buyers in the ordinary course of business, you agree to give us sixty (60) days advance written notice before you sell, lease, transfer or in any other way dispose of all or a material portion of your assets. You also agree to give us sixty (60) days advance written notice before you move the location of your principal offices, change your state of residence, change the state whose laws you are organized under or change your organizational name.

f.    **Compliance with laws.** You promise that you are in compliance with and will continue to comply with all laws and obligations applicable to you and to your property. You may in good faith dispute any law and refuse to comply with it pending the outcome of your challenge and any appeals provided that you are following appropriate procedures for challenging the law and you have set aside adequate reserves to pay all losses, costs and expenses.

g.    **Liens on Property.** Except as disclosed to us in writing, and except for property taxes that are not yet due and payable, you certify that all of your properties, including any collateral securing this Agreement, are owned free and clear of all liens or security interests, and you promise there are no security documents or financing statements relating to your properties.

**8.    SALE OF LOANS.** You agree that we may sell all or part of any Loan made under this Agreement and that we may share any information about you in order to facilitate such a sale. You waive any right to notice of sale or resale. You waive any right of set-off or counterclaim that you may have against us or any purchaser of an interest in a Loan. You agree that any purchaser of an interest in a Loan may enforce its interest in a Loan against you regardless of any personal claims and defenses you may have against us.

**9.    PLEDGE OF SHARES/STATUTORY LIEN.** You pledge and grant as security for this Agreement and all other obligations you may have now or in the future all shares and dividends and, if any, all deposits and interest in all accounts you have with us now and in the future. If a specific dollar amount is pledged for a Loan, as agreed on a Business Loan Receipt, we will freeze shares in that account to the extent of the outstanding balance of the Loan or, if greater, the amount of the pledge if the Loan is a revolving loan. If we do not apply your shares to satisfy your obligation, we reserve the right to place an administrative freeze on your share accounts in order to protect our statutory lien rights against your accounts and we may apply them to the amount you owe us at a later time, if we choose. Otherwise, your pledged shares may be withdrawn unless you are in default. In addition to your pledge of shares, we may also have what is known as a statutory lien on all individual and joint accounts you have with us. A statutory lien means we have the right under federal law and many state laws to claim an interest in your accounts. We can enforce a statutory lien against your shares and dividends, and if any, interest and deposits, in all individual and joint accounts you have with us to satisfy any outstanding financial obligation that is due and payable to us. We may exercise our right to enforce this lien without further notice to you, to the extent permitted by law. For all borrowers: The statutory lien and/or your pledge will allow us to apply the funds in your account(s) to what you owe when you are in default. The statutory lien and your pledge do not apply to any Individual Retirement Account or any other account that would lose special tax treatment under state or federal law if given as security.

**10.    THE SECURITY FOR THIS AGREEMENT.** You give us a security interest in all property described in a Business Loan Receipt or the Rider, issued to you when you receive a Loan, wherever the property is located and whether you presently own the property or acquire it at a later time. This property, along with the items mentioned below, is sometimes referred to as "collateral". The security interest you give includes, with respect to the collateral:

·    All accessions. Accessions are things which are attached to or installed in the property now or in the future.
·    All replacements for the property.
·    All additions to the property.
·    All Proceeds. Proceeds include, but are not limited to, any money you receive from selling the property or from dividends or stock splits, from insurance you have on the property, or from other third parties and insurers who are responsible for damage or destruction to the property.

If the value of the property declines, you promise to give us more property in an amount or value determined in our sole judgment to be suitable as security, if asked to do so.

**11.    WHAT THE SECURITY INTEREST COVERS/CROSS COLLATERALIZATION.** The security interest in property you give as security will secure all amounts owed under this Agreement, and under any receipt, voucher or any other document you receive at the time of the Loan including any extensions, renewals, modifications, or refinancings and all other loans and obligations you have with us now or in the future, including overdrafts, except any loan which was secured by your principal residence. Property securing other loans you have with us will also secure this Agreement if the security agreement given to secure that loan covers future obligations.

**12.    DISCLAIMER OF CERTAIN SECURITY INTERESTS.** We disclaim any security interest in household goods in which we are forbidden by law from taking a security interest.

**13.    DEFAULT.** You will be in default if you do not make a payment of the amount required when it is due or, if payment is subject to demand, when demanded. You will be in default if you break any promise you made under this Agreement or if anyone is in default under any security agreement made in connection with a Loan under this Agreement. You will be in default if you, a Guarantor, a partner or a majority owner dies, files for bankruptcy or similar proceeding, or becomes insolvent. You will be in default if you or a Guarantor make any false or misleading statements in any credit application, financial statement or similar document or if any statement becomes misleading due to a change in circumstance and you fail to correct that statement, or if you merge, dissolve, reorganize, or your legal existence is terminated. You will be in default if the value of your property is impaired or substantially declines in value or if something happens that we believe may substantially reduce your ability to repay what you owe or if we otherwise reasonably believe that we are insecure. You will be in default if for any reason we are unable to perfect our security interest in any collateral you have given us as security for a Loan. You will be in default if any of your property is repossessed, confiscated, forfeited or used in such a manner or for a purpose so as to make it subject to forfeiture or confiscation. You will also be in default under this Agreement if you are in default under any other loan agreement with us.

**14.    ACTIONS AFTER DEFAULT.** When you are in default and after any notice of default and expiration of any right you may have under applicable state law to cure your default, we can require immediate payment (acceleration) of the entire unpaid balance under

**EXHIBIT 1** PAGE 4 OF 10

DocuSign Envelope ID: 93EF28C4-0A17-47CC-AA77-0FD9620AEBF9

this Agreement. When you are in default any commitment or obligation we may have under this Agreement or any related document shall immediately terminate, including any obligation to advance additional funds. You waive any right you have to demand for payment, notice of dishonor, notice of intent to accelerate, and notice of acceleration or notice of demand for payment.

If immediate payment is demanded, you will continue to pay interest until what you owe has been repaid, at the applicable interest rates in effect or, if applicable, at the default rate disclosed on the Business Credit Agreement Rider or Business Loan Receipt. If a demand for immediate payment has been made, your shares and/or deposits can be applied towards what you owe as provided in the Section called PLEDGE OF SHARES/STATUTORY LIEN. We can also exercise any other legal rights we may have when you are in default.

You agree that we have the right to the extent permitted by applicable law to take possession of any property given as security for any Loan or this Agreement, without judicial process, if this can be done without breach of the peace. If we ask, you promise to deliver the property at a time and place we choose. If the property is a motor vehicle or boat, you agree that we may obtain a key or other device necessary to unlock and operate it, when you are in default. We will not be responsible for any other property not covered by this Agreement that you leave inside the property or that is attached to such property. We will make a reasonable effort to return that property to you or make it available for you to claim if you timely demonstrate that we hold property which is not subject to our security interest. We will not have any obligation to hold or maintain any such property for more than fifteen (15) days from the date that we take possession of any collateral upon which we hold a security interest and may thereafter liquidate such property and/or dispose of such property that appears to be of little monetary value. The proceeds, if any, from any such liquidation/disposal shall be paid into your share or other Credit Union accounts.

After we have possession of the property, we can sell it and apply the money to any amounts you owe us. Unless the property is perishable, is subject to rapid decline in value or is regularly sold on a recognized market, we will give you at least ten (10) days advance notice of any public disposition or the date after which a private disposition will be held unless you have waived this right after you are in default. Unless we are required by law, we are not subject to any marshalling requirement in the sale of collateral or election of remedies. You agree we may use our judgment as to what is a reasonable means for disposing of the property so long as we act in good faith.

Our expenses for taking possession of and selling the property and enforcing our obligations under this Agreement will be deducted from the money received from the sale. Those costs may include, but are not limited to, the cost of storing the property, preparing it for sale, marketing costs, attorney's fees, the cost of collection, and any court costs and other fees and commissions that we may be required to pay public officials to the extent permitted under state law or awarded under the Bankruptcy Code. The rest of the sale money will be applied to what you owe under this Agreement and other loans and obligations owed to us.

You must pay any amount that remains unpaid after the sale proceeds, net of our costs and expenses, have been applied to any unpaid balance under this Agreement and other loans and obligations owed to us. You agree to pay interest on that remaining amount at the highest rate of interest of any Loan under this Agreement or, if applicable, at the default rate stated on the Business Credit Agreement Rider or Business Loan Receipt, until the remaining amount has been paid. Unless otherwise required by law, we will continue to have the right to apply amounts received to any amounts owed to us under this Agreement in the manner the Credit Union chooses.

You further agree that, to the extent permitted by applicable law, we may appoint a receiver or request the appointment of a receiver, who may be our employee or an agent, to take possession of part or all of the property in order to protect, preserve and maintain the property pending disposition. The receiver may collect rents, payments and other proceeds from the property and pay it to us to reduce your obligation to us under this Agreement. The costs of receivership shall become part of amounts obligated under this Agreement and may at our option be added to the balance of any Loan. If permitted by applicable law, the receiver may serve without bond.

We may direct account debtors and obligors on any property consisting of account, chattel paper, general intangibles or other similar property to make payment directly to us. We may also demand, foreclose, settle and do whatever is necessary to realize on the property.

**15. OWNERSHIP, CONTROL AND LOCATION OF THE PROPERTY.** You promise and warrant that you own all property you give as security or if the Loan is to buy the property, you promise and warrant you will use the Loan for that purpose. You promise and warrant that no one else has any interest in or claim against the property that you have not already disclosed to us in writing. Except for inventory sold in the ordinary course of your business, you promise not to sell, lease, transfer or otherwise dispose of the property. Unless you are in default, you may sell your inventory in the ordinary course of your business, but only to buyers who are buyers in the ordinary course of your business. A "bulk sale" of assets is a sale, lease or other transfer of a material portion of your assets which is not a sale in the ordinary course of your business and you may not conduct a bulk sale without our prior written consent, except as limited by applicable law. You may not transfer the property to satisfy all or part of a debt. You promise not to use the property as security for a loan with another creditor until the Loans are repaid or allow any other security interest or lien to attach to the property either by your actions or by operation of law. Unless we have agreed otherwise in writing, you promise that all of the property (or records of the property in the case of accounts, chattel paper and general intangibles) shall be located at your principal place of business as shown in our records. If property is in the possession of a third party pursuant to the terms of a written agreement between you and us, you agree to join with us in notifying the third party of our security interest in the property and obtaining an acknowledgement from the third party that it is holding the property for our benefit. You agree to cooperate with us in obtaining control of any of the following types of collateral:  (i) deposit accounts held by you with a third party; (ii) investment property; (iii) letter-of-credit rights; (iv) electronic chattel paper; and (v) any such property we designate as requiring our control.

**16. ACCOUNTS, CHATTEL PAPER AND GENERAL INTANGIBLES.** You promise that you know of no impediments to the enforceability of the obligations in the property given as security consisting of accounts, chattel paper and general intangibles. You promise not to settle or extend payment for any account without our permission except for normal settlements or extensions made in the ordinary course of business. You also agree not to agree to an offset of an obligation owed to you that is property you have given as security.

**17. INSURANCE, TAXES AND FEES.** You promise to obtain and maintain from insurers, in amounts acceptable to us, any insurance we may require, or as may be required by applicable law, including but not limited to hazard insurance for property damage, public liability, worker's compensation, business interruption, rent loss and, subject to applicable law life and disability insurance for designated individuals. Upon our request, you agree to assign or pledge to us such insurance and to name us as a loss payee or beneficiary. Upon our request, you promise to promptly provide us with proof of coverage or authorize your insurers to release information to us concerning such coverages. If you do not purchase the required insurance, we may purchase it and charge you for any premiums for the insurance. You also promise to require your insurer to provide us with ten (10) days advance written notice

10403891-BX810-C-1-041215 (BX8106)-e

EXHIBIT 1 PAGE 5 OF 10

DocuSign Envelope ID: 93EF28C4-0A17-47CC-AA77-0FD9820AEBF9

prior to canceling or changing any such insurance. If you cancel any insurance that we require and get a refund, we have a right to the refund and can apply it towards what you owe. If property given as security for this Agreement is lost or damaged, we can use the insurance settlement to repair the property or apply it towards what you owe. We may receive payments in connection with the insurance from a company that provides the insurance. You authorize us to endorse any draft or check which may be payable to you in order for us to collect any refund or benefits due under your insurance policy. You also promise to pay all taxes and fees (such as registration fees) due on property securing this Agreement.

**18.  RECOVERY OF EXPENSES.** We may monitor Loans for the purpose of determining whether you and other borrowers have complied with all of the requirements of this Agreement and other related documents, or we may engage others to do so on our behalf. If you do not pay all taxes and fees on property securing this Agreement when due or keep it insured, we may pay these obligations, but we are not required to do so. We may charge to you the cost of determining compliance with insurance requirements. While we are under no obligation to do so, we also may make any payment or incur any costs or expenses on your behalf in order to insure, maintain and preserve any collateral, and prevent claims against you or against any collateral securing this Agreement. Any payment so made may at our option be added to the balance of any Loan made under this Agreement. We may at any time demand payment for such costs or may require repayment by increasing the amount of the periodic payment for the Loan, increasing the number of payments for the Loan or by requiring a balloon payment of the amount plus accrued interest on the final payment date of a Loan.

**19.  PROTECTING THE SECURITY INTEREST.** If your state issues a title for the property securing this Agreement, you promise to have our security interest shown in a first position on the title. We may have to file what is called a financing statement (including any amendments or modifications thereof) to protect our security interest from the claims of others and you authorize us to file any financing statements we feel appropriate. You also promise to do whatever we think is necessary to protect our security interest in the property.

Borrower hereby irrevocably authorizes the Lender to execute (on behalf of the Borrower), if applicable, and file against the Borrower one or more financing, continuation or amendment statements pursuant to the UCC in form satisfactory to the Lender, and the Borrower will pay the cost of preparing and filing the same in all jurisdictions in which such filing is deemed by the Lender to be necessary or desirable in order to perfect, preserve and protect its security interests.

**20.  USE OF PROPERTY.** Until the Loan has been paid off, you promise you will: (1) Use the property carefully and keep it in good repair; (2) Obtain our written permission before making major changes to the property or changing the address where the property is kept; (3) Inform us in writing before changing your address; (4) Allow us to inspect the property; (5) Promptly notify us if the property is damaged, stolen or abused; (6) Not use the property for any unlawful purpose.

**21.  COLLECTION COSTS AND ATTORNEY'S FEES.** Subject to applicable law, you agree to pay all our costs and expenses, including collection agency charges and attorney's fees, incurred in collecting, enforcing and protecting our rights under this Agreement, including attorney's fees incurred at trial, in any bankruptcy proceedings (including efforts to modify any automatic stay or injunction or object to any proposed plan), and any appellate proceedings. For borrowers in South Carolina, in addition to the aforementioned costs and expenses, you agree to pay attorney's fees of 20% of the unpaid balance of all loans in default or such greater amount as may be reasonable. All expenses so incurred shall be secured by the collateral securing this Agreement.

**22.  CHANGE IN TERMS AND TERMINATION.** We have the right to change the terms of this Agreement after giving you ninety (90) days advance written notice. We can terminate all or any part of our obligations to extend credit. If any, at any time, and we are not required to provide you with advance notice before terminating our obligation to extend credit hereunder. You may terminate this Agreement at any time by giving us reasonable advance written notice. However, your obligations under this Agreement continue whether we have terminated our obligation to extend credit under this Agreement or you have terminated this Agreement. Your termination of this Agreement will terminate any commitment we have made to extend credit to you.

**23.  DELAY IN ENFORCING RIGHTS AND CHANGES IN THIS AGREEMENT.** We can delay enforcing any of our rights under this Agreement any number of times without losing the ability to exercise our rights later. We can enforce this Agreement against your estate, legal representatives, successors or assigns. If we change any term of this Agreement, you agree that the remaining terms of this Agreement will continue to apply.

**24.  HEIRS, SUCCESSORS AND ASSIGNS.** You may not assign any rights under this Agreement without prior written permission from us which we may withhold in our sole discretion if we choose. Your heirs, successors and assigns as permitted by us, and our successors and assigns are subject to the respective duties and obligations imposed by this Agreement.

**25.  PROMPT PERFORMANCE.** Time is of the essence in the performance of all duties and obligations of this Agreement.

**26.  INTEGRATION AND SEVERABILITY.** This Agreement is a final expression of the agreement between you and the Credit Union. This Agreement may not be contradicted by evidence of any oral agreement. If any provision of this Agreement or any related document is found to be for whatever reason unenforceable, this Agreement or related document shall be construed such that the violating provision shall be made enforceable. If this Agreement or related document cannot be so construed, the violating provision shall be considered stricken. In any case, the unenforceability of any particular provision shall not render unenforceable any other part of this Agreement, and the remaining obligations of this Agreement shall be binding and fully enforceable.

**27.  NOTICE ABOUT UNENFORCEABLE ORAL PROMISES.** No oral agreements or commitments to loan money, extend credit, or to forbear from enforcing repayment of a debt, including oral promises to renew or extend such a debt, can be made by any representative of the Credit Union, and such promises may be unenforceable under the laws of the state where the Loan is made.

**28.  WAIVER OF EXEMPTIONS FROM SEIZURE.** To the maximum extent permitted by law, you waive all exemptions provided under the laws of the state in which you reside, have your place of business or where your property may be located at the time of or following your default, that exempt such property from seizure.

**29.  WAIVER OF JURY TRIAL.** In the event of any action to enforce the terms of this agreement, you consent to the jurisdiction of the state or federal court where the Credit Union brings the action. You also waive any trial by jury and waive any objection to venue of any action instituted under this agreement and consent to the granting of any legal or equitable relief as is deemed appropriate by the court.

10403891-BXB10-C-1-041215 (BXB106)-e

EXHIBIT 1 PAGE 6 OF 10

DocuSign Envelope ID: 93EF28C4-0A17-47CC-AA77-0FD9820AEBF9

## Signatures

The undersigned personally or on behalf of the Borrower(s), as applicable, acknowledge(s) and expressly confirms that the Borrower(s):

1.  Have received and read the Business Credit and Continuing Security Agreement.
2.  Grant the Credit Union a security interest in all individual and joint share and/or deposit accounts of the Borrower(s) now and in the future to secure any amounts owed to the Credit Union. When the Borrower(s) is in default, the Credit Union is authorized to apply the balance of these accounts to any amounts due. Shares and deposits in an Individual Retirement Account, and any other account that would lose special tax treatment under state or federal law if given as security, if clearly identified, are not subject to the security interest given in Borrower's shares and deposits.
3.  Agree that any security interest granted in collateral under this Agreement, shall secure all present loans the Credit Union has made to the Borrower(s) as well as all future loans made to the Borrower(s).
4.  Have executed this Agreement under seal as of the date shown below.

Obligated only as owner of collateral*

Borrower RICHARD R. HOLLEY

Form of Organization (if applicable) SOLE PROPRIETORSHIP

☐

Borrower

Form of Organization (if applicable)

☐

Borrower

Form of Organization (if applicable)

☐

Borrower

Form of Organization (if applicable)

☐

* A Borrower designated as "obligated only as owner of collateral" agrees to grant us a security interest in the collateral given as security for this Agreement, but is not personally liable for repayment of loans and credit extended under this Agreement. All property you give as security will secure all amounts owed under this Agreement, and all other loans and obligations you have with us now or in the future, including overdrafts, whether or not made under this Agreement, except any loan which was secured by your principal residence. Property securing other loans you have with us will also secure this Agreement if that security covered future obligations.

Agreed to by or on behalf of above Borrower(s):

By: X _RICHARD STEWART HOLLEY_____ (Seal)

Printed Name: RICHARD STEWART HOLLEY

Title: _____    Date: 2/24/2017

By: X_____ (Seal)

Printed Name: _____

Title: _____    Date: _____

By: X_____ (Seal)

Printed Name: _____

Title: _____    Date: _____

By: X_____ (Seal)

Printed Name: _____

Title: _____    Date: _____

EXHIBIT 1 PAGE 7 OF 10

DocuSign Envelope ID: 93EF28C4-0A17-47CC-AA77-0FD9620AEBF9



**FARMERS INSURANCE**
**FEDERAL CREDIT UNION**
P.O. Box 35911 • Los Angeles, CA 90035-0911



## Business Credit Agreement Rider

This Business Credit Agreement Rider ("Rider") is incorporated into and is part of your Business Credit and Continuing Security Agreement. It contains additional important terms and conditions regarding credit transactions subject to the Business Credit and Continuing Security Agreement. Please thoroughly read this information before signing any Loan documents. Any questions about this information should be directed to the appropriate credit union staff. Please keep this Rider attached to your Business Credit and Continuing Security Agreement and retain for future reference.

**ADDITIONAL TERMS AND SECURITY TERMS**

(Applicable To Appointment Agreement Receivables as Security)

As you are giving us a security interest in your Appointment Agreement Receivables, your Loan is also subject to the following additional terms.

NOTICE TO BORROWER: YOU UNDERSTAND THAT IF YOU SIGN THIS BUSINESS CREDIT AND CONTINUING SECURITY AGREEMENT("AGREEMENT") AND THIS RIDER, YOU MAY BE SUBJECT TO GRANTING TO US A SECURITY INTEREST IN YOUR "APPOINTMENT AGREEMENT RECEIVABLES", YOUR APPOINTMENT AGREEMENT AND AGENCY APPOINTMENT WITH THE FARMERS INSURANCE GROUP OF COMPANIES MAY BE TERMINATED BY US WITHOUT ANY COURT ACTION OR ANY FURTHER PERMISSION FROM YOU OR NOTICE FROM US IF YOU DO NOT MAKE YOUR PAYMENTS IN ACCORDANCE WITH THE TERMS OF THE AGREEMENT OR THIS RIDER OR IF YOU ARE OTHERWISE IN DEFAULT OF THE AGREEMENT OR THIS RIDER. YOU UNDERSTAND THAT WE MAY ALSO TAKE ALL FOLIO AND FOLIO DEDUCTIONS OTHERWISE DUE YOU UNDER YOUR APPOINTMENT AGREEMENT, LIQUIDATE AND TAKE THE CONTRACT VALUE OTHERWISE DUE YOU UNDER YOUR APPOINTMENT AGREEMENT AND TAKE ALL OTHER RIGHTS TO THE PAYMENT OF MONEY NOW OWNED OR HEREAFTER ACQUIRED BY YOU WHETHER DUE OR TO BECOME DUE AND WHETHER OR NOT EARNED BY PERFORMANCE.

The term "Farmers Insurance Group of Companies" includes: the insuring entities that are parties to the Agent Appointment Agreement.

The term "Appointment Agreement" means your Agent Appointment Agreement or your Corporate Agent Appointment Agreement if you are an Agent and/or your District Manager Appointment Agreement if you are a District Manager, as applicable, with the Farmers Insurance Group of Companies.

The term "Appointment Agreement Receivables" includes, without limitation, all rights to the payment of money now owned or hereafter acquired by you, whether due or to become due and whether or not earned by performance under your Appointment Agreement or other source of payment including, without limitation: 1) Your current and future Folio and Folio Deductions; 2) Your interest in the Contract Value under your Appointment Agreement; and 3) all other rights to the payment of money now owned or hereafter acquired by you, whether due or to become due and whether or not earned by performance including, without limitation, all receivables, money, accounts, contract rights, production and service commissions, folio checks, claims income, commissions, bonuses, chattel paper, instruments and general intangibles, whether from the Farmers Insurance Group of Companies or any other source of payments arising to you or your benefit under the Farmers Insurance Group of Companies Appointment Agreement.

The term "Folio" includes, without limitations, all receivables, money, accounts, contract value, contract rights, production and service commissions, folio checks, claims, income, commissions, bonuses and any and all other amounts owed to you and any and all rights to payments now owned or hereafter acquired by you and whether due or to become due and whether or not earned by performance under your Appointment Agreement.

© CUNA MUTUAL GROUP, 2004, ALL RIGHTS RESERVED                                                                    K04M83 (BXB200)-s

EXHIBIT 1 PAGE 8 OF 10

DocuSign Envelope ID: 93EF28C4-0A17-47CC-AA77-0FD9620AEBF9

The term "Folio Deductions" means: That portion of any amount owed to you from the Farmers Insurance Group of Companies in an amount equal to your Scheduled Payment under the Agreement, or as otherwise provided therein.

The term "Contract Value" hereunder has the same meaning in the Agent Appointment Agreement.

Terms not specifically defined herein have the meanings provided for under the Uniform Commercial Code.

LOAN PROCEEDS FOR APPOINTMENT AGREEMENT PURPOSES: By signing the Agreement and this Rider and providing Appointment Agreement Receivables as security hereunder, you attest, under penalty of perjury that the sole purpose of this Loan is for specified Appointment Agreement purposes and all Loan proceeds will be used solely for Appointment Agreement purposes.

APPOINTMENT AGREEMENT RECEIVABLES AS SECURITY: You also agree to grant to us a security interest in the following described property, all such property to be collectively included, without limitation, in the term "security": 1) your present and future Appointment Agreement Receivables; and 2) all other rights to the payment of money now owned or hereafter acquired by you, whether due or to become due and whether or not earned by performance including, without limitation, all present and future receivables, money, accounts, contract rights, production and service commissions, folio checks, claims, income, commissions, bonuses, chattel paper, instruments and general intangibles, whether from the Farmers Insurance Group of Companies or any other source of payments owing to you or your benefit.

ASSIGNMENT OF APPOINTMENT AGREEMENT RECEIVABLES AS SECURITY: You hereby assign to us the right to receive your present and future Appointment Agreement Receivables and any other present and future rights to payment you may have under your Appointment Agreement from the Farmers Insurance Group of Companies or any other source due you. You understand that this assignment is additional security for advances to you from us under the Agreement and this Rider and that you may not cancel or modify this Assignment except upon written authorization from us.

METHOD OF PAYMENT FOR LOANS WITH YOUR APPOINTMENT AGREEMENT RECEIVABLES AS SECURITY: You agree that your unpaid balance shall be repaid by Folio Deductions and that Folio Deductions may not be terminated by you until your unpaid balance under the Agreement is $0.00. In the event of your default under the Agreement or this Rider, your Folio Deductions shall be that portion of any commission or other payment in an amount equal to your unpaid balance under the Agreement. Pursuant to the Agreement, and a Loan Advice from us to the Farmers Group of Insurance Companies and a Contract Value Certification (or similar form acceptable to us) executed by a representative of the Farmers Insurance Group of Companies, Folio Deductions shall be paid on your behalf directly by the Farmers Insurance Group of Companies to us. You understand and agree that any payment made to us by the Farmers Insurance Group of Companies for Folio, Folio Deductions or Contract Value shall constitute payment for the Folio, Folio Deductions or Contract Value, as applicable, for all purposes under your Appointment Agreement including, without limitation, the payment of consideration for any non-competition covenant made by you.

ADJUSTMENT OF FOLIO DEDUCTIONS: You further authorize us as your agent and Attorney-In-Fact to request adjustments in your Folio Deductions, if necessary, to an amount sufficient at all times to make your Scheduled Payments under the Agreement. You authorize the Farmers Insurance Group of Companies to pay all sums due you for Folio, Folio Deductions and Contract Value to us. The Farmers Insurance Group of Companies is also authorized to initiate withdrawals and/or adjustments (debits) for any deposit entries (credits) made in error to your account(s). We are authorized to honor the refund requests (debit adjustments) initiated by the Farmers Insurance Group of Companies.

DEFAULT: You will also be in default if you fail to make your scheduled monthly payments by Folio Deductions or in the event your Appointment Agreement with the Farmers Insurance Group of Companies is voluntarily or involuntarily terminated. You further understand that if you are in Default because you have not paid your minimum scheduled payments on time, then we may exercise our rights under the Agreement and this Rider within a period of two (2) months following your payment default, although our delay beyond two (2) months will not demand a waiver of our rights under the Agreement or this Rider.

DocuSign Envelope ID: 93EF28C4-0A17-47CC-AA77-0FD9620AEBF9

APPOINTMENT OF US AS YOUR AGENT AND IRREVOCABLE ATTORNEY-IN-FACT: IN ADDITION TO OUR REMEDIES UNDER THE UNIFORM COMMERCIAL CODE AND OTHER LAWS (WHICH REMEDIES SHALL BE CUMULATIVE), YOU APPOINT US AS YOUR TRUE, LAWFUL AGENT AND IRREVOCABLE ATTORNEY-IN-FACT TO: 1) ENDORSE YOUR NAME ON ANY CHECKS, DRAFTS OR OTHER INSTRUMENTS DUE TO US FROM THE FARMERS INSURANCE GROUP OF COMPANIES; 2) DEMAND, RECEIVE AND ENFORCE PAYMENTS OWING TO YOU OR YOUR BENEFIT REGARDLESS OF THE SOURCE OF THE PAYMENTS OWING TO YOU OR YOUR BENEFIT; 3) GIVE RECEIPTS, RELEASES, SATISFACTION FOR AND TO SUE FOR ALL MONIES DUE, OR TO BECOME DUE, TO YOU OR YOUR BENEFIT WITH THE SAME FORCE AND EFFECT AS YOU COULD DO IF THE AGREEMENT OR THIS RIDER HAD NOT BEEN EXECUTED; 4) SIGN AND FILE ANY AND ALL DOCUMENTS WE DEEM NECESSARY TO PERFECT OUR INTEREST IN ANY APPOINTMENT AGREEMENT AND APPOINTMENT AGREEMENT RECEIVABLES; AND 5) TERMINATE YOUR APPOINTMENT AGREEMENT AND TO PROVIDE A "NOTIFICATION TO THE FARMERS INSURANCE GROUP OF COMPANIES IN THE EVENT OF YOUR DEFAULT OF YOUR LOAN SECURED BY APPOINTMENT AGREEMENT RECEIVABLES" IF YOU ARE IN DEFAULT OF THIS LOAN.

NOTIFICATION TO THE FARMERS INSURANCE GROUP OF COMPANIES IN THE EVENT OF YOUR DEFAULT OF YOUR LOAN SECURED BY YOUR APPOINTMENT AGREEMENT RECEIVABLES: IF YOU ARE IN DEFAULT, WE ARE AUTHORIZED, AS YOUR AGENT AND YOUR ATTORNEY-IN-FACT, AND PURSUANT TO OUR SECURITY INTEREST HEREIN AS TO YOUR APPOINTMENT AGREEMENT RECEIVABLES, TO TENDER YOUR RESIGNATION FROM YOUR APPOINTMENT AGREEMENT WITH THE FARMERS INSURANCE GROUP OF COMPANIES AND NOTIFY THE FARMERS INSURANCE GROUP OF COMPANIES OF: 1) YOUR DEFAULT OF THIS LOAN YOU HAVE WITH US 2) THE TERMINATION OF YOUR APPOINTMENT AGREEMENT WITH THE FARMERS INSURANCE GROUP OF COMPANIES; AND 3) YOUR DIRECTION FOR PAYMENT TO US OF ALL APPOINTMENT AGREEMENT RECEIVABLES AND ANY OTHER AMOUNTS OTHERWISE OWING TO YOU FROM THE FARMERS INSURANCE GROUP OF COMPANIES.

DISCLOSURE AND EXCHANGE OF INFORMATION WITH THE FARMERS INSURANCE GROUP OF COMPANIES: In order to effect, administer and/or enforce your Loan with us, you authorize us to disclose and exchange information concerning your Loan, your Appointment Agreement and your Appointment Agreement Receivables with the Farmers Insurance Group of Companies. Pursuant thereto, and without limiting the foregoing, you authorize us to obtain copies, from time to time, of any and all Farmers Insurance Group of Companies Statements of Operations on your Appointment Agreement.

FOLIO, FOLIO DEDUCTIONS AND CONTRACT VALUE AS SECURITY: If Appointment Agreement Receivables are pledged or otherwise assigned as security for this Loan, you understand that your Loan balance must not exceed the maximum allowable amount you can borrow against your contract value. If your Loan balance exceeds, at any time, the maximum allowable amount you can borrow against your Contract Value, you will reduce your Loan Balance to that amount or provide additional security acceptable to us.

ACKNOWLEDGMENT OF APPOINTMENT AGREEMENT RECEIVABLES AS A PROPERTY RIGHT: You acknowledge that your Appointment Agreement Receivables are a property right for which no further services on your part are required and which you may assign and have assigned to us.

OTHER PROVISIONS: Before signing, see State Specific Notices on the following page of this Business Credit Agreement Rider, if applicable.

## Signatures

The undersigned personally or on behalf of the Borrower(s), as applicable, acknowledge(s) and expressly confirms that the Borrower(s) have received and read the Business Credit Agreement Rider and understand it is incorporated to the Business Credit and Continuing Security Agreement.

BORROWER    RICHARD STEWART HOLLEY    X _RICHARD STEWART HOLLEY_____ DATE __2/24/2017__

BORROWER    X _____ DATE _____

BORROWER    X _____ DATE _____

BORROWER    X _____ DATE _____

K04M83 (BXB200)-e

EXHIBIT 1 PAGE 10 OF 10

ẅ **UCC Report**

 ## State of NEW JERSEY UCC

**Original Filing Number: 52103894**
**Filing Type: INITIAL FILING**
**Filing Date: 3/2/2017**
**Filing Agency: SECRETARY OF STATE/UCC DIVISION**
**Filing Agency Address: 315 W STATE ST, TRENTON, NJ 08618**
    Debtor Party(s):
        Debtor: RICHARD S HOLLEY
        Debtor Address: ████████████████████████████
        Debtor SSN/FEIN: ████████████████

    Secured Party(s):
        Secured: FARMERS INSURANCE GROUP FEDERAL CREDIT UNION
        Secured Address: PO BOX 36911, LOS ANGELES, CA 90036-0911

    Filing(s):
        Filing: INITIAL FILING
        Filing Number: 52103894
        Filing Date: 3/2/2017

    Collateral(s):
        Description: 03/02/2017 52103894 - ACCOUNT(S);CONTRACT RIGHTS;NEGOTIABLE INSTRUMENTS

EXHIBIT 2 PAGE 1 OF 1

DocuSign Envelope ID: 7A909494-44DF-43A6-9AAD-99B83DF3F3FF



FARMERS INSURANCE
**FEDERAL CREDIT UNION**
P.O. Box 36911 • Los Angeles, CA 90036-0911



## Business Loan Receipt

The terms and conditions of this Business Loan Receipt supplements and/or amends the terms and conditions of the Business Credit and Continuing Security Agreement. To the extent that any term or condition is inconsistent with the Business Credit and Continuing Security Agreement, the terms and conditions of this document shall govern. The use by the borrower of the credit rights documented herein constitutes acceptance of these terms and conditions.

### BORROWER INFORMATION

| BORROWER NAME | | MEMBER/ACCOUNT NUMBER | DATE |
|---|---|---|---|
| RICHARD S. HOLLEY | | 2104 | 6/20/2017 |

### AMOUNTS ADVANCED AND INTEREST TERMS

| DAILY PERIODIC RATE | INTEREST RATE | TYPE | | NEW BALANCE |
|---|---|---|---|---|
| 0.02189 % | 7.990 % | ☒ FIXED ☐ VARIABLE | | $12,777.00 |

| AMOUNT ADVANCED | LINE OF CREDIT LIMIT | REMAINING LIMIT |
|---|---|---|
| $12,777.00 | | $0.00 |

☐ **Obligatory Advances** - If checked, we are obliged to advance funds up to the available credit limit on loans with a credit limit unless you or any guarantor is in default under any agreement with us.

☐ **Revolving Loan** - As amounts are repaid they may be re-borrowed, if permitted by the Credit Union, until the Credit Limit is reached.

The interest rate for your loan will vary as follows:
Variable Rate Loans Only: The APR may increase if there is an increase in the Wall Street Journal (Index) Prime Rate. We will add a margin of 0.000% and will use the most recent Index Value available to us as of the last day of the calendar quarter prior to any APR adjustment. The APR will change quarterly on the first day of Feb, May, Aug and Nov to reflect any change in the Index Value. The maximum APR is 18%, the floor is .75%. The maximum annual rate change is 2%. If the APR increases, this may result in additional payments.

We may change the interest rate of any fixed rate Loan with an established credit limit after giving you _____ days (if not completed, ninety (90) days shall apply) advance written notice. Any change to the interest rate charged for a Loan with an established credit limit will apply to future advances and at our discretion and subject to any requirements of applicable law, will also apply to unpaid balances.

### REPAYMENT TERMS

This Loan must be repaid as follows:
Applicable to Lines of Credit Only: Minimum Monthly Payment shall be 2% of the unpaid, outstanding balance of your Account after your most recent advance in increments of $250, but not less than $20.

| Installment Repayment Terms: | Number of Payments | Amount of Payments | When Payments Are Due | |
|---|---|---|---|---|
| | 143 | $ 139.00 | Beginning | 8/5/2017 |
| | 1 | $ 76.61 | | 7/5/2029 |

☒ Notice to Borrower: This is a demand note and so may be collected by the Credit Union
  ☒ at any time
  ☐ other (describe)_____
A new note mutually agreed upon and subsequently issued may carry a higher or lower rate of interest.

### FEES AND ADDITIONAL TERMS AND CONDITIONS

Default Rate: In the event of default, you understand and agree that Finance Charges will accrue at an ANNUAL PERCENTAGE RATE (APR) of 18% until you repay your entire Loan.

Vehicle Loan Default Rate: In the event of default, you understand and agree that Finance Charges will accrue at an ANNUAL PERCENTAGE RATE (APR) of 18% until you repay your entire Loan. You also understand that you will be in default if you do not have our security interest shown on the title within 60 days. At 90 days your APR will increase to 18% until you have completed the legal registration.

Late Fees: If your payment is more than 10 days late, you will be charged a late charge of 5% of the Payment Due, but not less than $1.00.

Prepayment: If you pay off early you will not have to pay a penalty.

Agency Secured UCC Search and Filing Fee: $50.00

This Loan shall be governed by and construed in accordance with the laws of the state of  CALIFORNIA

### DESCRIPTION OF COLLATERAL

**AS A CONDITION FOR THIS LOAN, THIS LOAN AND THE BUSINESS CREDIT AND CONTINUING SECURITY AGREEMENT WHICH IT IS SUBJECT TO, ARE SECURED BY YOUR SHARES, ALL PROPERTY SECURING OTHER LOANS RECEIVED IN THE PAST OR IN THE FUTURE, AND THE PROPERTY DESCRIBED ON PAGE 2.**

© CUNA MUTUAL GROUP, 2004, 05, ALL RIGHTS RESERVED        Page 1 of 2        10403691-VXB08-C-1-012616 (VXB082)-e

**EXHIBIT 3** PAGE 1 OF 10

DocuSign Envelope ID: 7A909484-44DF-43A6-9AAD-99B83DF3F3FF

Specific Pledge of Share/Deposits (in addition to the statutory lien referenced in the body of the Business Credit and Continuing Security Agreement):

| PLEDGE OF SHARES AND/OR DEPOSITS $ | ACCOUNT NUMBER | PLEDGE OF SHARES AND/OR DEPOSITS $ | ACCOUNT NUMBER |
|---|---|---|---|
| | | | |

**Option 1:**
Unless items below are checked, a security interest is granted in all assets of the Borrower(s), excepting, Borrower's principal residence, but including all accounts (including health care receivables), instruments, documents, deposit accounts, inventory, machinery, equipment, fixtures, chattel paper and general intangibles including letter-of-credit rights.

**Option 2:**
The security interest(s) granted by the borrower will be limited to the checked items:

☐ All Inventory
☐ All General Intangibles
☐ All Instruments
☐ All Letter-of-Credit Rights
☐ All Deposit Accounts
☐ Vehicle
   Year _____
   Make _____
   Model _____
   VIN # _____
☒ Other collateral description
   Appointment Agreement Receivables
_____
_____
_____

☐ All Chattel Paper
☐ All Accounts
☐ All Documents
☐ All Equipment
☐ All Fixtures located at _____
_____
_____
_____
_____

**Option 3:**
☐ No additional collateral - any existing collateral previously granted by other security agreements covering future obligations remains effective (no other box may be checked if this box is checked)

The security interests described above include all of the indicated property now owned or hereafter acquired and all accessions, additions, replacements and proceeds, as described in more detail in the body of the Business Credit and Continuing Security Agreement.

| SIGNATURES |
|---|

By signing this Business Loan Receipt, the borrower certifies to the Credit Union that there has been no material adverse change in the borrower's financial condition as disclosed to the Credit Union in borrower's most recent written financial statement.

If an Entity (Form of Organization)

Borrower  RICHARD S. HOLLEY _____

Form of Organization (if applicable)  SOLE PROPRIETORSHIP _____

Borrower _____

Form of Organization (if applicable) _____

Agreed to By or on behalf of above Borrower(s):

By: X  _RICHARD STEWART HOLLEY_____  (Seal)

Printed Name:  ─6F291FE37B8F471─
─ RICHARD STEWART HOLLEY ─

Title: _____  Date: 6/21/2017

By: X _____  (Seal)

Printed Name: _____

Title: _____  Date: _____

**CONCURRENCE OF NON-BORROWING SPOUSE - FOR LOUISIANA SOLE PROPRIETORSHIPS:** In accordance with Louisiana Civil Code Article 2347, the borrower's spouse signing below concurs with the granting of a security interest in the community property and assets subject to this Agreement and other related documents to secure the present and future indebtedness and obligations as described in Section 11 of the Business Credit and Continuing Security Agreement.

By: X _____

Printed Name: _____

Date: _____

| FOR CREDIT UNION USE ONLY    Employee initials: _____ | Data mailed or delivered: _____ |
|---|---|

EXHIBIT 3 PAGE 2 OF 10

DocuSign Envelope ID: 7A909494-44DF-43A6-9AAD-99B83DF3F3FF





## BUSINESS CREDIT AND CONTINUING SECURITY AGREEMENT

This Business Credit and Continuing Security Agreement ("Agreement") includes this Agreement and may include a Business Credit Agreement Rider ("Rider") and Business Loan Receipt. If a Rider and/or Business Loan Receipt are executed by you, their terms and conditions are incorporated into this Agreement as if set forth herein in full. "You", "you", "your" and "borrower" mean the person(s) or entity(ies) designated as a "Borrower" in the Signature section of this agreement. "Credit Union", "we", "our" and "us" mean the Credit Union whose name appears on this Agreement or anyone to whom the Credit Union transfers its rights under this Agreement.

**NOTICE TO COSIGNER:  YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR PAYMENT OF THIS LOAN.  IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.**

**1.  HOW THIS AGREEMENT WORKS.** This is an agreement to advance funds to you or on your behalf now or in the future. We anticipate that, from time to time, you will borrow money (called "Loans") under this Agreement. We are not required to make Loans to you under this Agreement and can refuse a request for a Loan at any time, unless we have expressly agreed on the Business Loan Receipt, to make obligatory advances.

**2.  CREDIT LIMIT.** We may, but do not have to, establish a credit limit for certain Loans. If a credit limit is set, you promise not to exceed the established credit limit. If you exceed the credit limit, you promise to repay immediately the amount which exceeds the credit limit. Even if we allow you to exceed your credit limit, you understand that this does not require us to allow you to exceed the limit in the future.

**3.  REPAYMENT.** You (jointly, severally and in solido if more than one) promise to repay all amounts advanced to you or on your behalf along with other charges and interest. You will be advised of the required payment terms for a Loan on the Business Loan Receipt. Payments for a Loan will be due on the dates indicated in the Business Loan Receipt or on demand on or after the due date stated on the Receipt. Payments must include any amount past due and any amount by which you have exceeded any credit limit you have been given. You may repay all or part of what you owe at any time without any prepayment penalty. Even if you prepay, you will still be required to make the regularly scheduled payments unless we agree in writing to a change in the payment schedule. Unless otherwise required by law, payments will be applied to amounts owed under this Agreement, in the manner the Credit Union chooses.

**4.  INTEREST AND OTHER CHARGES.** Interest will be computed separately for each separate Loan under this Agreement. To compute interest charges, the unpaid balance for each day since your last payment (or since a Loan if you have not yet made a payment) is multiplied by the applicable daily periodic rate as established by the Credit Union and stated on the Business Loan Receipt for that Loan. The sum of these amounts is the interest owed. The balance used to compute interest charges is the unpaid balance each day after payments and credits to that balance have been subtracted and any additions to the balance have been made. In addition to interest, we may charge other charges which are disclosed on the Business Loan Receipt and in other sections of this Agreement. If the interest rate is a variable interest rate, the Business Loan Receipt explains how the variable interest rate works. The interest payable by you under this Agreement shall never exceed the amount permitted by law. If it would exceed that amount because of the way interest is described in the Business Loan Receipt or Rider to this Agreement, the amount of interest payable by you will be considered reduced to the maximum permitted by law and any amount you pay in excess of that amount shall reduce the principal amount of the Loan.

**5.  POWERS, PURPOSE AND AUTHORITY; COMMERCIAL PURPOSE.** You agree and warrant that if you are an entity you are duly and validly organized under the name of and in the form indicated in the Signatures section of this Agreement. You promise that each Loan made to you under this Agreement will only be used for commercial or business purposes, and not for the purchase or improvement of residential real estate or for personal, family, or household purposes. You promise that unless you have disclosed otherwise to us, in writing, you have not in the past or present operated or held property under any other name. You also promise that you have the authority and all due authorization to enter into and to agree to all provisions of this Agreement and to agree to all provisions of the documents related to this Agreement. You certify and agree that this Agreement, and any Rider, Business Loan Receipt, or other agreement or instrument we require you to execute in connection with this Agreement are legal, valid, and binding obligations that are enforceable against you and your successors, assigns and representatives.

**6.  FINANCIAL CONDITION.** You promise and warrant that the financial information you have provided to us accurately and completely reflects your financial condition and you understand that the Credit Union in advancing funds has relied upon the information provided by you. You promise to promptly provide us with written notice of any material change in your financial condition. Unless already disclosed to us, in writing, you promise and warrant that you are not the subject of any pending litigation or bankruptcy proceedings, outstanding claims, any investigations or proceedings, and that you do not have any outstanding tax liabilities or any other outstanding unpaid obligations. You also certify that you have no material contingent obligations, except those that have been disclosed to us in writing.

**7.  BORROWER'S PROMISES**

**a.**  _Access to records, premises, and collateral._ Upon reasonable advance written notice, you promise to promptly provide us or our representatives access to and permit them to examine, inspect and copy all or any part of your books and records wherever such books and records may be located or stored. If requested, you will make them available at your main office. You promise to promptly provide us or our representatives access to, and allow us or them to inspect your premises and collateral.

**b.**  _Additional indebtedness._ Other than your indebtedness to us, you agree not to incur, guaranty or become obligated on any additional indebtedness, except as we may expressly permit in advance, in writing, and except in the case of accounts payable as necessary in the ordinary course of your business.

**c.**  _Execution of additional documents._ You agree to execute and deliver any document or agreement we may request in order to document or secure a Loan. You grant us an irrevocable power of attorney coupled with an interest, to sign or otherwise act on your behalf in order to secure a Loan or facilitate the repossession of property securing a Loan.

© CUNA MUTUAL GROUP, 2004, 06, 07, ALL RIGHTS RESERVED    10403991-BXB10-C-1-041215 (BXB106)-e

EXHIBIT 3 PAGE 3 OF 10

DocuSign Envelope ID: 7A909494-44DF-43A6-9AAD-99B83DF3F3FF

d.    Updating credit information. You promise that you will promptly give us written notice if there is a material change in your financial condition, if you become the subject of litigation, a claim, an investigation or proceeding or if any action against you arises that may materially affect your financial condition. You promise to promptly give us written notice if you change your name, there is a change in your ownership, management, or form of organization, or if any other information you provided to us changes. Upon our request, you also agree to promptly provide us updated financial information or any other information we may request.

e.    Notification prior to change of name, change of location, change of State of residence or bulk sale of assets. Except for the sale of assets in the ordinary course of business to buyers who qualify as buyers in the ordinary course of business, you agree to give us sixty (60) days advance written notice before you sell, lease, transfer or in any other way dispose of all or a material portion of your assets. You also agree to give us sixty (60) days advance written notice before you move the location of your principal offices, change your state of residence, change the state whose laws you are organized under or change your organizational name.

f.    Compliance with laws. You promise that you are in compliance with and will continue to comply with all laws and obligations applicable to you and to your property. You may in good faith dispute any law and refuse to comply with it pending the outcome of your challenge and any appeals provided that you are following appropriate procedures for challenging the law and you have set aside adequate reserves to pay all losses, costs and expenses.

g.    Liens on Property. Except as disclosed to us in writing, and except for property taxes that are not yet due and payable, you certify that all of your properties, including any collateral securing this Agreement, are owned free and clear of all liens or security interests, and you promise there are no security documents or financing statements relating to your properties.

8.    SALE OF LOANS. You agree that we may sell all or part of any Loan made under this Agreement and that we may share any information about you in order to facilitate such a sale. You waive any right to notice of sale or resale. You waive any right of set-off or counterclaim that you may have against us or any purchaser of an interest in a Loan. You agree that any purchaser of an interest in a Loan may enforce its interest in a Loan against you regardless of any personal claims and defenses you may have against us.

9.    PLEDGE OF SHARES/STATUTORY LIEN. You pledge and grant as security for this Agreement and all other obligations you may have now or in the future all shares and dividends and, if any, all deposits and interest in all accounts you have with us now and in the future. If a specific dollar amount is pledged for a Loan, as agreed on a Business Loan Receipt, we will freeze shares in that account to the extent of the outstanding balance of the Loan or, if greater, the amount of the pledge if the Loan is a revolving loan. If we do not apply your shares to satisfy your obligation, we reserve the right to place an administrative freeze on your share accounts in order to protect our statutory lien rights against your accounts and we may apply them to the amount you owe us at a later time, if we choose. Otherwise, your pledged shares may be withdrawn unless you are in default. In addition to your pledge of shares, we may also have what is known as a statutory lien on all individual and joint accounts you have with us. A statutory lien means we have the right under federal law and many state laws to claim an interest in your accounts. We can enforce a statutory lien against your shares and dividends, and if any, interest and deposits, in all individual and joint accounts you have with us to satisfy any outstanding financial obligation that is due and payable to us. We may exercise our right to enforce this lien without further notice to you, to the extent permitted by law. For all borrowers: The statutory lien and/or your pledge will allow us to apply the funds in your account(s) to what you owe when you are in default. The statutory lien and your pledge do not apply to any Individual Retirement Account or any other account that would lose special tax treatment under state or federal law if given as security.

10.    THE SECURITY FOR THIS AGREEMENT. You give us a security interest in all property described in a Business Loan Receipt or the Rider, issued to you when you receive a Loan, wherever the property is located and whether you presently own the property or acquire it at a later time. This property, along with the items mentioned below, is sometimes referred to as "collateral". The security interest you give includes, with respect to the collateral:

- All accessions. Accessions are things which are attached to or installed in the property now or in the future.
- All replacements for the property.
- All additions to the property.
- All Proceeds. Proceeds include, but are not limited to, any money you receive from selling the property or from dividends or stock splits, from insurance you have on the property, or from other third parties and insurers who are responsible for damage or destruction to the property.

If the value of the property declines, you promise to give us more property in an amount or value determined in our sole judgment to be suitable as security, if asked to do so.

11.    WHAT THE SECURITY INTEREST COVERS/CROSS COLLATERALIZATION. The security interest in property you give as security will secure all amounts owed under this Agreement, and under any receipt, voucher or any other document you receive at the time of the Loan including any extensions, renewals, modifications, or refinancings and all other loans and obligations you have with us now or in the future, including overdrafts, except any loan which was secured by your principal residence. Property securing other loans you have with us will also secure this Agreement if the security agreement given to secure that loan covers future obligations.

12.    DISCLAIMER OF CERTAIN SECURITY INTERESTS. We disclaim any security interest in household goods in which we are forbidden by law from taking a security interest.

13.    DEFAULT. You will be in default if you do not make a payment of the amount required when it is due or, if payment is subject to demand, when demanded. You will be in default if you break any promise you made under this Agreement or if anyone is in default under any security agreement made in connection with a Loan under this Agreement. You will be in default if you, a Guarantor, a partner or a majority owner dies, files for bankruptcy or similar proceeding, or becomes insolvent. You will be in default, if you or a Guarantor make any false or misleading statements in any credit application, financial statement or similar document or if any statement becomes misleading due to a change in circumstance and you fail to correct that statement, or if you merge, dissolve, reorganize, or your legal existence is terminated. You will be in default if the value of your property is impaired or substantially declines in value or if something happens that we believe may substantially reduce your ability to repay what you owe or if we otherwise reasonably believe that we are insecure. You will be in default if for any reason we are unable to perfect our security interest in any collateral you have given us as security for a Loan. You will be in default if any of your property is repossessed, confiscated, forfeited or used in such a manner or for a purpose so as to make it subject to forfeiture or confiscation. You will also be in default under this Agreement if you are in default under any other loan agreement with us.

14.    ACTIONS AFTER DEFAULT. When you are in default and after any notice of default and expiration of any right you may have under applicable state law to cure your default, we can require immediate payment (acceleration) of the entire unpaid balance under

10403891-BXB10-C-1-041215 (BXB106)-e

EXHIBIT 3 PAGE 4 OF 10

DocuSign Envelope ID: 7A909494-44DF-43A6-9AAD-99B83DF3F3FF

this Agreement. When you are in default any commitment or obligation we may have under this Agreement or any related document shall immediately terminate, including any obligation to advance additional funds. You waive any right you have to demand for payment, notice of dishonor, notice of intent to accelerate, and notice of acceleration or notice of demand for payment.

If immediate payment is demanded, you will continue to pay interest until what you owe has been repaid, at the applicable interest rates in effect or, if applicable, at the default rate disclosed on the Business Credit Agreement Rider or Business Loan Receipt. If a demand for immediate payment has been made, your shares and/or deposits can be applied towards what you owe as provided in the Section called PLEDGE OF SHARES/STATUTORY LIEN. We can also exercise any other legal rights we may have when you are in default.

You agree that we have the right to the extent permitted by applicable law to take possession of any property given as security for any Loan or this Agreement, without judicial process, if this can be done without breach of the peace. If we ask, you promise to deliver the property at a time and place we choose. If the property is a motor vehicle or boat, you agree that we may obtain a key or other device necessary to unlock and operate it, when you are in default. We will not be responsible for any other property not covered by this Agreement that you leave inside the property, or that is attached to such property. We will make a reasonable effort to return that property to you or make it available for you to claim if you timely demonstrate that we hold property which is not subject to our security interest. We will not have any obligation to hold or maintain any such property for more than fifteen (15) days from the date that we take possession of any collateral upon which we hold a security interest and may thereafter liquidate such property and/or dispose of such property that appears to be of little monetary value. The proceeds, if any, from any such liquidation/disposal shall be paid into your share or other Credit Union accounts.

After we have possession of the property, we can sell it and apply the money to any amounts you owe us. Unless the property is perishable, is subject to rapid decline in value or is regularly sold on a recognized market, we will give you at least ten (10) days advance notice of any public disposition or the date after which a private disposition will be held unless you have waived this right after you are in default. Unless we are required to by law, we are not subject to any marshalling requirement in the sale of collateral or election of remedies. You agree we may use our judgment as to what is a reasonable means for disposing of the property so long as we act in good faith.

Our expenses for taking possession of and selling the property and enforcing your obligations under this Agreement will be deducted from the money received from the sale. Those costs may include, but are not limited to, the cost of storing the property, preparing it for sale, marketing costs, attorney's fees, the cost of collection, and any court costs and other fees and commissions that we may be required to pay public officials to the extent permitted under state law or awarded under the Bankruptcy Code. The rest of the sale money will be applied to what you owe under this Agreement and other loans and obligations owed to us.

You must pay any amount that remains unpaid after the sale proceeds, net of our costs and expenses, have been applied to any unpaid balance under this Agreement and other loans and obligations owed to us. You agree to pay interest on that remaining amount at the highest rate of interest of any Loan under this Agreement or, if applicable, at the default rate stated on the Business Credit Agreement Rider or Business Loan Receipt, until the remaining amount has been paid. Unless otherwise required by law, we will continue to have the right to apply amounts received to any amounts owed to us under this Agreement in the manner the Credit Union chooses.

You further agree that, to the extent permitted by applicable law, we may appoint a receiver or request the appointment of a receiver, who may be our employee or an agent, to take possession of part or all of the property in order to protect, preserve and maintain the property pending disposition. The receiver may collect rents, payments and other proceeds from the property and pay it to us to reduce your obligation to us under this Agreement. The costs of receivership shall become part of amounts obligated under this Agreement and may at our option be added to the balance of any Loan. If permitted by applicable law, the receiver may serve without bond.

We may direct account debtors and obligors on any property consisting of account, chattel paper, general intangibles or other similar property to make payment directly to us. We may also demand, foreclose, settle and do whatever is necessary to realize on the property.

15. OWNERSHIP, CONTROL AND LOCATION OF THE PROPERTY. You promise and warrant that you own all property you give as security or if the Loan is to buy the property, you promise and warrant you will use the Loan for that purpose. You promise and warrant that no one else has any interest in or claim against the property that you have not already disclosed to us in writing. Except for inventory sold in the ordinary course of your business, you promise not to sell, lease, transfer or otherwise dispose of the property. Unless you are in default, you may sell your inventory in the ordinary course of your business, but only to buyers who are buyers in the ordinary course of your business. A "bulk sale" of assets is a sale, lease or other transfer of a material portion of your assets which is not a sale in the ordinary course of your business and you may not conduct a bulk sale without our prior written consent, except as limited by applicable law. You may not transfer the property to satisfy all or part of a debt. You promise not to use the property as security for a loan with another creditor until the Loans are repaid or allow any other security interest or lien to attach to the property either by your actions or by operation of law. Unless we have agreed otherwise in writing, you promise that all of the property (or records of the property in the case of accounts, chattel paper and general intangibles) shall be located at your principal place of business as shown in our records. If property is in the possession of a third party pursuant to the terms of a written agreement between you and us, you agree to join with us in notifying the third party of our security interest in the property and obtaining an acknowledgement from the third party that it is holding the property for our benefit. You agree to cooperate with us in obtaining control of any of the following types of collateral: (i) deposit accounts held by you with a third party; (ii) investment property; (iii) letter-of-credit rights; (iv) electronic chattel paper; and (v) any such property we designate as requiring our control.

16. ACCOUNTS, CHATTEL PAPER AND GENERAL INTANGIBLES. You promise that you know of no impediments to the enforceability of the obligations in the property given as security consisting of accounts, chattel paper and general intangibles. You promise not to settle or extend payment for any account without our permission except for normal settlements or extensions made in the ordinary course of business. You also agree not to agree to an offset of an obligation owed to you that is property you have given as security.

17. INSURANCE, TAXES AND FEES. You promise to obtain and maintain from insurers, in amounts acceptable to us, any insurance we may require, or as may be required by applicable law, including but not limited to hazard insurance for property damage, public liability, worker's compensation, business interruption, rent loss and, subject to applicable law life and disability insurance for designated individuals. Upon our request, you agree to assign or pledge to us such insurance and to name us as a loss payee or beneficiary. Upon our request, you promise to promptly provide us with proof of coverage or authorize your insurers to release information to us concerning such coverages. If you do not purchase the required insurance, we may purchase it and charge you for any premiums for the insurance. You also promise to require your insurer to provide us with ten (10) days advance written notice

10403091-BXB10-C-1-041215 (BXB106)-a

EXHIBIT 3 PAGE 5 OF 10

DocuSign Envelope ID: 7A909494-44DF-43A6-9AAD-99B83DF3F3FF

prior to canceling or changing any such insurance. If you cancel any insurance that we require and get a refund, we have a right to the refund and can apply it towards what you owe. If property given as security for this Agreement is lost or damaged, we can use the insurance settlement to repair the property or apply it towards what you owe. We may receive payments in connection with the insurance from a company that provides the insurance. You authorize us to endorse any draft or check which may be payable to you in order for us to collect any refund or benefits due under your insurance policy. You also promise to pay all taxes and fees (such as registration fees) due on property securing this Agreement.

**18.  RECOVERY OF EXPENSES.** We may monitor Loans for the purpose of determining whether you and other borrowers have complied with all of the requirements of this Agreement and other related documents, or we may engage others to do so on our behalf. If you do not pay all taxes and fees on property securing this Agreement when due or keep it insured, we may pay these obligations, but we are not required to do so. We may charge to you the cost of determining compliance with insurance requirements. While we are under no obligation to do so, we also may make any payment or incur any costs or expenses on your behalf in order to insure, maintain and preserve any collateral, and prevent claims against you or against any collateral securing this Agreement. Any payment so made may at our option be added to the balance of any Loan made under this Agreement. We may at any time demand payment for such costs or may require repayment by increasing the amount of the periodic payment for the Loan, increasing the number of payments for the Loan or by requiring a balloon payment of the amount plus accrued interest on the final payment date of a Loan.

**19.  PROTECTING THE SECURITY INTEREST.** If your state issues a title for the property securing this Agreement, you promise to have our security interest shown in a first position on the title. We may have to file what is called a financing statement (including any amendments or modifications thereof) to protect our security interest from the claims of others and you authorize us to file any financing statements we feel appropriate. You also promise to do whatever we think is necessary to protect our security interest in the property.

Borrower hereby irrevocably authorizes the Lender to execute (on behalf of the Borrower), if applicable, and file against the Borrower one or more financing, continuation or amendment statements pursuant to the UCC in form satisfactory to the Lender, and the Borrower will pay the cost of preparing and filing the same in all jurisdictions in which such filing is deemed by the Lender to be necessary or desirable in order to perfect, preserve and protect its security interests.

**20.  USE OF PROPERTY.** Until the Loan has been paid off, you promise you will: (1) Use the property carefully and keep it in good repair; (2) Obtain our written permission before making major changes to the property or changing the address where the property is kept; (3) Inform us in writing before changing your address; (4) Allow us to inspect the property; (5) Promptly notify us if the property is damaged, stolen or abused; (6) Not use the property for any unlawful purpose.

**21.  COLLECTION COSTS AND ATTORNEY'S FEES.** Subject to applicable law, you agree to pay all our costs and expenses, including collection agency charges and attorney's fees, incurred in collecting, enforcing and protecting our rights under this Agreement, including attorney's fees incurred at trial, in any bankruptcy proceedings (including efforts to modify any automatic stay or injunction or object to any proposed plan), and any appellate proceedings. For borrowers in South Carolina, in addition to the aforementioned costs and expenses, you agree to pay attorney's fees of 20% of the unpaid balance of all loans in default or such greater amount as may be reasonable. All expenses so incurred shall be secured by the collateral securing this Agreement.

**22.  CHANGE IN TERMS AND TERMINATION.** We have the right to change the terms of this Agreement after giving you ninety (90) days advance written notice. We can terminate all or any part of our obligations to extend credit, if any, at any time, and we are not required to provide you with advance notice before terminating our obligation to extend credit hereunder. You may terminate this Agreement at any time by giving us reasonable advance written notice. However, your obligations under this Agreement continue whether we have terminated our obligation to extend credit under this Agreement or you have terminated this Agreement. Your termination of this Agreement will terminate any commitment we have made to extend credit to you.

**23.  DELAY IN ENFORCING RIGHTS AND CHANGES IN THIS AGREEMENT.** We can delay enforcing any of our rights under this Agreement any number of times without losing the ability to exercise our rights later. We can enforce this Agreement against your estate, legal representatives, successors or assigns. If we change any term of this Agreement, you agree that the remaining terms of this Agreement will continue to apply.

**24.  HEIRS, SUCCESSORS AND ASSIGNS.** You may not assign any rights under this Agreement without prior written permission from us which we may withhold in our sole discretion if we choose. Your heirs, successors and assigns as permitted by us, and our successors and assigns are subject to the respective duties and obligations imposed by this Agreement.

**25.  PROMPT PERFORMANCE.** Time is of the essence in the performance of all duties and obligations of this Agreement.

**26.  INTEGRATION AND SEVERABILITY.** This Agreement is a final expression of the agreement between you and the Credit Union. This Agreement may not be contradicted by evidence of any oral agreement. If any provision of this Agreement or any related document is found to be for whatever reason unenforceable, this Agreement or related document shall be construed such that the violating provision shall be made enforceable. If this Agreement or related document cannot be so construed, the violating provision shall be considered stricken. In any case, the unenforceability of any particular provision shall not render unenforceable any other part of this Agreement, and the remaining obligations of this Agreement shall be binding and fully enforceable.

**27.  NOTICE ABOUT UNENFORCEABLE ORAL PROMISES.** No oral agreements or commitments to loan money, extend credit, or to forbear from enforcing repayment of a debt, including oral promises to renew or extend such a debt, can be made by any representative of the Credit Union, and such promises may be unenforceable under the laws of the state where the Loan is made.

**28.  WAIVER OF EXEMPTIONS FROM SEIZURE.** To the maximum extent permitted by law, you waive all exemptions provided under the laws of the state in which you reside, have your place of business or where your property may be located at the time of or following your default, that exempt such property from seizure.

**29.  WAIVER OF JURY TRIAL.** In the event of any action to enforce the terms of this agreement, you consent to the jurisdiction of the state or federal court where the Credit Union brings the action. You also waive any trial by jury and waive any objection to venue of any action instituted under this agreement and consent to the granting of any legal or equitable relief as is deemed appropriate by the court.

EXHIBIT 3 PAGE 6 OF 10

DocuSign Envelope ID: 7A909494-44DF-43A6-9AAD-99B83DF3F3FF

## Signatures

The undersigned personally or on behalf of the Borrower(s), as applicable, acknowledge(s) and expressly confirms that the Borrower(s):

1.  Have received and read the Business Credit and Continuing Security Agreement.
2.  Grant the Credit Union a security interest in all individual and joint share and/or deposit accounts of the Borrower(s) now and in the future to secure any amounts owed to the Credit Union. When the Borrower(s) is in default, the Credit Union is authorized to apply the balance of these accounts to any amounts due. Shares and deposits in an Individual Retirement Account, and any other account that would lose special tax treatment under state or federal law if given as security, if clearly identified, are not subject to the security interest given in Borrower's shares and deposits.
3.  Agree that any security interest granted in collateral under this Agreement, shall secure all present loans the Credit Union has made to the Borrower(s) as well as all future loans made to the Borrower(s).
4.  Have executed this Agreement under seal as of the date shown below.

Obligated only as owner of collateral*

Borrower RICHARD S. HOLLEY _____

Form of Organization (if applicable) SOLE PROPRIETORSHIP _____

☐

Borrower _____

Form of Organization (if applicable) _____

☐

Borrower _____

Form of Organization (if applicable) _____

☐

Borrower _____

Form of Organization (if applicable) _____

☐

* A Borrower designated as "obligated only as owner of collateral" agrees to grant us a security interest in the collateral given as security for this Agreement, but is not personally liable for repayment of loans and credit extended under this Agreement. All property you give as security will secure all amounts owed under this Agreement, and all other loans and obligations you have with us now or in the future, including overdrafts, whether or not made under this Agreement, except any loan which was secured by your principal residence. Property securing other loans you have with us will also secure this Agreement if that security covered future obligations.

Agreed to by or on behalf of above Borrower(s):

By: X _RICHARD STEWART HOLLEY_____ (Seal)

Printed Name: _RICHARD STEWART HOLLEY_____

Title: _____  Date: 6/21/2017

By: X _____ (Seal)

Printed Name: _____

Title: _____  Date: _____

By: X _____ (Seal)

Printed Name: _____

Title: _____  Date: _____

By: X _____ (Seal)

Printed Name: _____

Title: _____  Date: _____

10403891-BXB10-C-1-041215 (BXB10B)-e

**EXHIBIT 3** PAGE 7 OF 10

DocuSign Envelope ID: 7A909494-44DF-43A6-9AAD-99B83DF3F3FF



**FARMERS INSURANCE**
**FEDERAL CREDIT UNION**
P.O. Box 36911 • Los Angeles, CA 90036-0911



Business Credit
Agreement Rider

This Business Credit Agreement Rider ("Rider") is incorporated into and is part of your Business Credit and Continuing Security Agreement. It contains additional important terms and conditions regarding credit transactions subject to the Business Credit and Continuing Security Agreement. Please thoroughly read this information before signing any Loan documents. Any questions about this information should be directed to the appropriate credit union staff. Please keep this Rider attached to your Business Credit and Continuing Security Agreement and retain for future reference.
ADDITIONAL TERMS AND SECURITY TERMS

(Applicable To Appointment Agreement Receivables as Security)

As you are giving us a security interest in your Appointment Agreement Receivables, your Loan is also subject to the following additional terms.

NOTICE TO BORROWER: YOU UNDERSTAND THAT IF YOU SIGN THIS BUSINESS CREDIT AND CONTINUING SECURITY AGREEMENT("AGREEMENT") AND THIS RIDER, YOU MAY BE SUBJECT TO GRANTING TO US A SECURITY INTEREST IN YOUR "APPOINTMENT AGREEMENT RECEIVABLES", YOUR APPOINTMENT AGREEMENT AND AGENCY APPOINTMENT WITH THE FARMERS INSURANCE GROUP OF COMPANIES MAY BE TERMINATED BY US WITHOUT ANY COURT ACTION OR ANY FURTHER PERMISSION FROM YOU OR NOTICE FROM US IF YOU DO NOT MAKE YOUR PAYMENTS IN ACCORDANCE WITH THE TERMS OF THE AGREEMENT OR THIS RIDER OR IF YOU ARE OTHERWISE IN DEFAULT OF THE AGREEMENT OR THIS RIDER. YOU UNDERSTAND THAT WE MAY ALSO TAKE ALL FOLIO AND FOLIO DEDUCTIONS OTHERWISE DUE YOU UNDER YOUR APPOINTMENT AGREEMENT, LIQUIDATE AND TAKE THE CONTRACT VALUE OTHERWISE DUE YOU UNDER YOUR APPOINTMENT AGREEMENT AND TAKE ALL OTHER RIGHTS TO THE PAYMENT OF MONEY NOW OWNED OR HEREAFTER ACQUIRED BY YOU WHETHER DUE OR TO BECOME DUE AND WHETHER OR NOT EARNED BY PERFORMANCE.

The term "Farmers Insurance Group of Companies" includes: the insuring entities that are parties to the Agent Appointment Agreement.

The term "Appointment Agreement" means your Agent Appointment Agreement or your Corporate Agent Appointment Agreement if you are an Agent and/or your District Manager Appointment Agreement if you are a District Manager, as applicable, with the Farmers Insurance Group of Companies.

The term "Appointment Agreement Receivables" includes, without limitation, all rights to the payment of money now owned or hereafter acquired by you, whether due or to become due and whether or not earned by performance under your Appointment Agreement or other source of payment including, without limitation: 1) Your current and future Folio and Folio Deductions; 2) Your interest in the Contract Value under your Appointment Agreement; and 3) all other rights to the payment of money now owned or hereafter acquired by you, whether due or to become due and whether or not earned by performance including, without limitation, all receivables, money, accounts, contract rights, production and service commissions, folio checks, claims income, commissions, bonuses, chattel paper, instruments and general intangibles, whether from the Farmers Insurance Group of Companies or any other source of payments arising to you or your benefit under the Farmers Insurance Group of Companies Appointment Agreement.

The term "Folio" includes, without limitations, all receivables, money, accounts, contract value, contract rights, production and service commissions, folio checks, claims, income, commissions, bonuses and any and all other amounts owed to you and any and all rights to payments now owned or hereafter acquired by you and whether due or to become due and whether or not earned by performance under your Appointment Agreement.

© CUNA MUTUAL GROUP, 2004, ALL RIGHTS RESERVED

K04MB3 (BXB200)-e

EXHIBIT 3 PAGE 8 OF 10

DocuSign Envelope ID: 7A909494-44DF-43A6-9AAD-99B83DF3F3FF

The term "Folio Deductions" means: That portion of any amount owed to you from the Farmers Insurance Group of Companies in an amount equal to your Scheduled Payment under the Agreement, or as otherwise provided therein.

The term "Contract Value" hereunder has the same meaning in the Agent Appointment Agreement.

Terms not specifically defined herein have the meanings provided for under the Uniform Commercial Code.

LOAN PROCEEDS FOR APPOINTMENT AGREEMENT PURPOSES: By signing the Agreement and this Rider and providing Appointment Agreement Receivables as security hereunder, you attest, under penalty of perjury that the sole purpose of this Loan is for specified Appointment Agreement purposes and all Loan proceeds will be used solely for Appointment Agreement purposes.

APPOINTMENT AGREEMENT RECEIVABLES AS SECURITY: You also agree to grant to us a security interest in the following described property, all such property to be collectively included, without limitation, in the term "security": 1) your present and future Appointment Agreement Receivables; and 2) all other rights to the payment of money now owned or hereafter acquired by you, whether due or to become due and whether or not earned by performance including, without limitation, all present and future receivables, money, accounts, contract rights, production and service commissions, folio checks, claims, income, commissions, bonuses, chattel paper, instruments and general intangibles, whether from the Farmers Insurance Group of Companies or any other source of payments owing to you or your benefit.

ASSIGNMENT OF APPOINTMENT AGREEMENT RECEIVABLES AS SECURITY: You hereby assign to us the right to receive your present and future Appointment Agreement Receivables and any other present and future rights to payment you may have under your Appointment Agreement from the Farmers Insurance Group of Companies or any other source due you. You understand that this assignment is additional security for advances to you from us under the Agreement and this Rider and that you may not cancel or modify this Assignment except upon written authorization from us.

METHOD OF PAYMENT FOR LOANS WITH YOUR APPOINTMENT AGREEMENT RECEIVABLES AS SECURITY: You agree that your unpaid balance shall be repaid by Folio Deductions and that Folio Deductions may not be terminated by you until your unpaid balance under the Agreement is $0.00. In the event of your default under the Agreement or this Rider, your Folio Deductions shall be that portion of any commission or other payment in an amount equal to your unpaid balance under the Agreement. Pursuant to the Agreement, and a Loan Advice from us to the Farmers Group of Insurance Companies and a Contract Value Certification (or similar form acceptable to us) executed by a representative of the Farmers Insurance Group of Companies, Folio Deductions shall be paid on your behalf directly by the Farmers Insurance Group of Companies to us. You understand and agree that any payment made to us by the Farmers Insurance Group of Companies for Folio, Folio Deductions or Contract Value shall constitute payment for the Folio, Folio Deductions or Contract Value, as applicable, for all purposes under your Appointment Agreement including, without limitation, the payment of consideration for any non-competition covenant made by you.

ADJUSTMENT OF FOLIO DEDUCTIONS: You further authorize us as your agent and Attorney-In-Fact to request adjustments in your Folio Deductions, if necessary, to an amount sufficient at all times to make your Scheduled Payments under the Agreement. You authorize the Farmers Insurance Group of Companies to pay all sums due you for Folio, Folio Deductions and Contract Value to us. The Farmers Insurance Group of Companies is also authorized to initiate withdrawals and/or adjustments (debits) for any deposit entries (credits) made in error to your account(s). We are authorized to honor the refund requests (debit adjustments) initiated by the Farmers Insurance Group of Companies.

DEFAULT: You will also be in default if you fail to make your scheduled monthly payments by Folio Deductions or in the event your Appointment Agreement with the Farmers Insurance Group of Companies is voluntarily or involuntarily terminated. You further understand that if you are in Default because you have not paid your minimum scheduled payments on time, then we may exercise our rights under the Agreement and this Rider within a period of two (2) months following your payment default, although our delay beyond two (2) months will not demand a waiver of our rights under the Agreement or this Rider.

K04M83 (BXB200)-e

EXHIBIT 3 PAGE 9 OF 10

DocuSign Envelope ID: 7A909494-44DF-43A6-9AAD-99B83DF3F3FF

APPOINTMENT OF US AS YOUR AGENT AND IRREVOCABLE ATTORNEY-IN-FACT: IN ADDITION TO OUR REMEDIES UNDER THE UNIFORM COMMERCIAL CODE AND OTHER LAWS (WHICH REMEDIES SHALL BE CUMULATIVE), YOU APPOINT US AS YOUR TRUE, LAWFUL AGENT AND IRREVOCABLE ATTORNEY-IN-FACT TO: 1) ENDORSE YOUR NAME ON ANY CHECKS, DRAFTS OR OTHER INSTRUMENTS DUE TO US FROM THE FARMERS INSURANCE GROUP OF COMPANIES; 2) DEMAND, RECEIVE AND ENFORCE PAYMENTS OWING TO YOU OR YOUR BENEFIT REGARDLESS OF THE SOURCE OF THE PAYMENTS OWING TO YOU OR YOUR BENEFIT; 3) GIVE RECEIPTS, RELEASES, SATISFACTION FOR AND TO SUE FOR ALL MONIES DUE, OR TO BECOME DUE, TO YOU OR YOUR BENEFIT WITH THE SAME FORCE AND EFFECT AS YOU COULD DO IF THE AGREEMENT OR THIS RIDER HAD NOT BEEN EXECUTED; 4) SIGN AND FILE ANY AND ALL DOCUMENTS WE DEEM NECESSARY TO PERFECT OUR INTEREST IN ANY APPOINTMENT AGREEMENT AND APPOINTMENT AGREEMENT RECEIVABLES; AND 5) TERMINATE YOUR APPOINTMENT AGREEMENT AND TO PROVIDE A "NOTIFICATION TO THE FARMERS INSURANCE GROUP OF COMPANIES IN THE EVENT OF YOUR DEFAULT OF YOUR LOAN SECURED BY APPOINTMENT AGREEMENT RECEIVABLES" IF YOU ARE IN DEFAULT OF THIS LOAN.

NOTIFICATION TO THE FARMERS INSURANCE GROUP OF COMPANIES IN THE EVENT OF YOUR DEFAULT OF YOUR LOAN SECURED BY YOUR APPOINTMENT AGREEMENT RECEIVABLES: IF YOU ARE IN DEFAULT, WE ARE AUTHORIZED, AS YOUR AGENT AND YOUR ATTORNEY-IN-FACT, AND PURSUANT TO OUR SECURITY INTEREST HEREIN AS TO YOUR APPOINTMENT AGREEMENT RECEIVABLES, TO TENDER YOUR RESIGNATION FROM YOUR APPOINTMENT AGREEMENT WITH THE FARMERS INSURANCE GROUP OF COMPANIES AND NOTIFY THE FARMERS INSURANCE GROUP OF COMPANIES OF: 1) YOUR DEFAULT OF THIS LOAN YOU HAVE WITH US 2) THE TERMINATION OF YOUR APPOINTMENT AGREEMENT WITH THE FARMERS INSURANCE GROUP OF COMPANIES; AND 3) YOUR DIRECTION FOR PAYMENT TO US OF ALL APPOINTMENT AGREEMENT RECEIVABLES AND ANY OTHER AMOUNTS OTHERWISE OWING TO YOU FROM THE FARMERS INSURANCE GROUP OF COMPANIES.

DISCLOSURE AND EXCHANGE OF INFORMATION WITH THE FARMERS INSURANCE GROUP OF COMPANIES: In order to effect, administer and/or enforce your Loan with us, you authorize us to disclose and exchange information concerning your Loan, your Appointment Agreement and your Appointment Agreement Receivables with the Farmers Insurance Group of Companies. Pursuant thereto, and without limiting the foregoing, you authorize us to obtain copies, from time to time, of any and all Farmers Insurance Group of Companies Statements of Operations on your Appointment Agreement.

FOLIO, FOLIO DEDUCTIONS AND CONTRACT VALUE AS SECURITY: If Appointment Agreement Receivables are pledged or otherwise assigned as security for this Loan, you understand that your Loan balance must not exceed the maximum allowable amount you can borrow against your contract value. If your Loan balance exceeds, at any time, the maximum allowable amount you can borrow against your Contract Value, you will reduce your Loan Balance to that amount or provide additional security acceptable to us.

ACKNOWLEDGMENT OF APPOINTMENT AGREEMENT RECEIVABLES AS A PROPERTY RIGHT: You acknowledge that your Appointment Agreement Receivables are a property right for which no further services on your part are required and which you may assign and have assigned to us.

OTHER PROVISIONS: Before signing, see State Specific Notices on the following page of this Business Credit Agreement Rider, if applicable.

## Signatures

The undersigned personally or on behalf of the Borrower(s), as applicable, acknowledge(s) and expressly confirms that the Borrower(s) have received and read the Business Credit Agreement Rider and understand it is incorporated to the Business Credit and Continuing Security Agreement.

BORROWER    RICHARD STEWART HOLLEY    X _RICHARD STEWART HOLLEY_ __ DATE 6/21/2017
                                                     6F061FE3786F471...

BORROWER    X_____ DATE_____

BORROWER    X_____ DATE_____

BORROWER    X_____ DATE_____

K04M83 (BXB200)-e

EXHIBIT 3 PAGE 10 OF 10

## FIGFCU VISA® SELECT CREDIT CARD DISCLOSURE

### Interest Rates and Finance Charges

| | |
|---|---|
| **Annual Percentage Rate (APR) for Purchases** <br> For Purchases A Non-variable monthly periodic rate will be charged and the ANNUAL PERCENTAGE RATE (corresponding to the monthly periodic rate) may change/be higher, based on your credit qualifications. | **8.99% - 18.00%*** The minimum ANNUAL PERCENTAGE RATE (APR) is as low as **8.99%**, with a monthly periodic rate of .749% and the maximum ANNUAL PERCENTAGE RATE (APR) is **18.00%** with a maximum monthly periodic rate of 1.50%. The ANNUAL PERCENTAGE RATE (APR) you pay is based on your credit worthiness. |
| **APR for Cash Advances** | 8.99%-18.00% Subject to credit worthiness |
| **APR for Balance Transfer Advances**\*\* | 8.99%-18.00% Subject to credit worthiness |
| **Penalty APR and When it Applies** | 18.00%* <br> This APR may be applied to your account if you; <br> 1) Make your payment 60 days late or <br> 2) A returned payment causes your account to become 60 days late |
| **How to Avoid Paying Interest on Purchases** | Your due date is at least 21 days after the close of each billing cycle. <br> We will not charge you interest on purchases if you pay your entire balance by the due date each month and your previous balance is zero or a credit balance. |
| **Minimum Finance Charge** | $.50 if Finance charges are due on account. |
| **For Credit Card Tips from the Consumer Financial Protection Bureau** | To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at *http://www.consumerfinance.gov/learnmore* |

### Fees

| | |
|---|---|
| **Annual Fee / Set Up / Maintenance** | $0 |
| **Transaction Fees** <br> • Balance Transfers <br> • Cash Advance <br> • Foreign Transactions | <br> Up to 2% of amount transferred <br> Up to 2% of advance <br> Up to 1% of each foreign transaction amount in U.S. Dollars |
| **Penalty Fees** <br> • Late Payment <br> • Over Limit <br> • Returned Payment | <br> Up to $30.00 <br> Up to $20.00 <br> Up to $35.00 |
| **Other Fees** <br> • Sales Draft <br> • Picture Card <br> • Replacement Card (non-picture card) | <br> $10.00 <br> $10.00 (new and reissue) <br> $5.00 (first replacement is FREE) |

*Contract Rates are based on FICO Score. Actual Rate for each particular Card Holder are specified in Credit Card Addendum. Card Holder may request a "Rate Review", limited to every six months and subject to prevailing rates. Penalty APR, is triggered when account becomes sixty (60) days late, see agreement for details. **Balance Transfers; the balance transfer amount of our FIGFCU credit cards, will retain the current rate, (i.e. Visa Platinum 10.99%, MasterCard Gold 11.99%, MasterCard Classic 13.99%). Billing Rights: Information on your rights to dispute transactions is provided in your account agreement and disclosure. Rates, APRs, and Penalty APRs are current as of 04/01/2013 and are subject to change.



**Farmers Insurance Group**
**Federal Credit Union**

**800.877.2345**
**www.figfcu.com**



K001571 - 0513

---

**FARMERS INSURANCE GROUP**
**FEDERAL CREDIT UNION**

**VISA® SELECT CREDIT CARD AGREEMENT AND DISCLOSURE**

In this Agreement and Disclosure the words you, your and yours mean each and all of those who apply for the card or who sign or use the VISA SELECT CREDIT CARD. We, us, our and ours mean FARMERS INSURANCE GROUP FEDERAL CREDIT UNION. Card means the VISA SELECT CREDIT CARD issued to you and any duplicates and renewals we may issue. Account means your VISA SELECT account with us.

*See Visa Select Rates Summary on Back Page*

**PAYMENT:** You promise to pay us in lawful money of the United States at our office or at the address set forth on your periodic statement, all sums advanced to you or any person you permit to use this Account based on the terms and at the rates set forth herein. Payments will continue until you have paid in full the unpaid balance, INTEREST CHARGE and any other fees and charges.

**ANNUAL PERCENTAGE RATE and MONTHLY PERIODIC RATE:** The APR for the Visa Select is 8.99% non-variable rate, which corresponds to a Monthly Periodic Rate of .75% to maximum APR of 18.00% non-variable rate, which corresponds to a Monthly Periodic Rate of 1.50%. The ANNUAL PERCENTAGE RATE you pay is based on your credit worthiness and payment history. Contract Rates are based on FICO Score. Actual Rate for each particular Card Holder is specified in Credit Card Addendum. Cardholder may request a "Rate Review", limited to every six months and subject to prevailing rates. Penalty APR, is triggered when account becomes sixty (60) days late.

**FINANCE CHARGES:** The FINANCE CHARGES for a billing cycle will be the sum of the following components:

**CASH ADVANCE FEE:** One (1) component of the FINANCE CHARGE is the Cash Advance Fee. Cash Advance transactions are subject to a Cash Advance Fee equal to 2% of the total dollar amount of Cash Advance transactions which are posted to your Account during the billing cycle, not to exceed the maximum rate permitted to federal credit unions during the billing cycle.

**MONTHLY PERIODIC FINANCE CHARGE:** The second (2) component of the FINANCE CHARGE is the Monthly Periodic FINANCE CHARGE. The Monthly Periodic FINANCE CHARGE for each billing cycle will be calculated by multiplying the Average Adjusted Daily Balance (see below) for your Account for the billing cycle by the Monthly Periodic Rate for your Account. This will be posted for each individual balance type.

**CALCULATION OF THE AVERAGE ADJUSTED DAILY BALANCE:** We calculate your Average Adjusted Daily Balance (the balance which is subject to the Monthly Periodic Rate) as follows: The Average Adjusted Daily Balance for your Account is the average of the adjusted daily balances for each day of the billing cycle.

To calculate the Adjusted Daily Balance each day, we take the following steps: We take the outstanding balance (all amounts you owe) at the start of the day. Then, in the sequence in which the

5/1/13 2:06 PM

EXHIBIT 4 PAGE 1 OF 6

amounts post to your Account, we add the amounts of all debits and subtract the amounts of all payments and credits which post to your Account that day. Payments are applied first to any unpaid FINANCE CHARGE from previous billing cycles, then to Late Charges, then to any Over Limit Charge, and then to the balance of your Account. Credits are applied first to the particular type of debit which is being credited, if any, and then to the balance of your Account. After applying payments and credits, we subtract any amount of the FINANCE CHARGE, Late Charges, and Over Limit Charge that remains unpaid. Then, we also subtract the amount of any Cash Advance transaction that posts to your Account on that day or on any previous day in the same billing cycle. The result is the Adjusted Daily Balance for that day.

We add together all the Adjusted Daily Balances for each day in the billing cycle and divide the total by the number of days in the billing cycle. The result is the Average Adjusted Daily Balance for that billing cycle.

Note that Cash Advance transactions, which are posted to your Account during a billing cycle, are not included in the Average Adjusted Daily Balance for that cycle, and are, therefore, not subject to the Monthly Periodic Rate during that cycle. However, they are included in the New Balance shown on the statement for that cycle, and are, therefore, also included in the outstanding balance at the start of the first day of the next billing cycle.

Note also, that if the total of the payments and credits which is posted to your Account by the Payment Due Date shown on a statement is equal to or exceeds the New Balance shown on that statement, we will not apply the Monthly Periodic Rate to your Account on your next statement.

Finally, if your statement shows a Previous Balance that is zero or is a credit balance, we will not apply the Monthly Periodic Rate to your Account on that statement.

MINIMUM PAYMENT: You must pay at least the Current Amount Due by the Payment Due Date shown on your statement. By separate agreement, you may authorize us to charge the Current Amount Due automatically to your savings or checking account with us. You may, of course, pay more frequently, pay more, or pay the total New Balance in full and you will reduce your FINANCE CHARGES by doing so. You may authorize us to charge the total New Balance automatically to your savings or checking account with us. The Minimum Payment will be either (a) 2% of your total New Balance, or $30.00, whichever is greater, or (b) your total New Balance, if it is less than $30.00, plus (c) any portion of the Minimum Payment(s) shown on your prior statement(s), which remains unpaid. In addition, at any time your Total New Balance exceeds your Credit Limit, you must pay the excess as well as any Over Limit Charge. Lastly, any Late Charge must also be paid. Payments made by 5:00 p.m. of your due date will not be charged a late fee. If your current card balance represents multiple balances with different rates, payments will be applied to the portion of the card balance with the highest interest rate first. If we change our mailing address or method of handling your payments, we will not charge a late fee for 60 days – if that change causes a material delay in the crediting of your payment.

PERIODIC STATEMENT: Your statement will be sent out no less

than 21 days before your due date. Your due date will be the 20th of each calendar month. Should your due date fall on a non-business or payment posting day, the payment will not be considered late until AFTER the first business/posting day that a payment may be posted. Your statement will include two calculations for amortization of payments: 1) Based on minimum payment how long it will take you to pay off your balance if you continue to make only the minimum payment amount. 2) The payment amount that would be required to pay off your balance in 36 months.

PENALTY FEES: Penalty fees will not exceed the dollar amount for incurred infraction. This will prohibit charging penalty fees that exceed the dollar amount associated with your violation. Your Credit Card will not incur inactivity fees. You will not be billed multiple fees based on a single transaction and/or violation.

LATE CHARGES: If your minimum periodic payment is not received by us by the Payment Due Date as described above, your Account will be assessed a Late Charge of up to $30.00. If you incur a late charge and have not had any previous late payments within the past six (6) months, your late fee will be up to $25.00. If a repeat during the past six (6) billing cycles your payment was late, the late fee will be up to $30.00. If your minimum payment amount is less than the previously noted amounts, your late payment fee will be the same amount as your minimum payment amount.

AUTHORIZATION FOR OVER LIMIT COVERAGE: You may request Over Limit Coverage on your credit card(s). If you go over limit, you will incur a fee of up to $20.00. If the amount that you go over limit is less than $20, then the fee will be the amount by which you go over limit. This may increase your Annual Percentage Rate (APR). The Credit Union charges one fee per billing cycle, even if you go over your limit multiple times in the same billing cycle. Requesting the Over Limit Coverage does not guarantee the approval of the transaction. The transaction may be declined if your account is past due or significantly over your credit limit at the time of the transaction. Your Account will continue to be charged up to $20.00 for up to two subsequent billing cycles if your balance is not reduced below your limit.

CASH ADVANCE: The maximum Cash Advance available on your Visa Select Card Account is the amount available on your credit limit, subject to the terms and conditions of this Agreement.

CREDIT LIFE AND/OR DISABILITY INSURANCE: If credit insurance is offered on the Account and you request it, the premium will be calculated monthly by multiplying the premium rate by the outstanding balance on the Account. We will add the premium amount to the Account balance on the Billing Cycle Closing Date. The purchase of this insurance is entirely voluntary and is not required for credit approval. You acknowledge receiving a copy of the credit insurance documents which contain current rates and other information.

USING THE CARD: To make a purchase or Cash Advance, there are alternative procedures to be followed. You may present the Card or Card Number to a participating VISA CREDIT CARD plan merchant, to use or to another financial institution, and sign the sales or credit slip. You may complete the transaction by using your Personal Identification Number (PIN) in conjunction with the Card in an Automated Teller Machine or other type of electronic

terminal that provides access to the VISA CREDIT CARD system. You may receive a Cash Advance by initiating a transfer from your VISA CREDIT CARD credit line through PC-TIED/Home Banking or PONLINE/Voice Response. The Card may be used for transactions performed on the Internet.

UNAUTHORIZED USE: You may be liable for up to $50.00 of unauthorized use of your Card. You will not be liable for unauthorized use that occurs after you notify us by telephone or in writing. You will call us at 800.877.2345, Monday through Friday, between 7:30 a.m. and 3:30 p.m. (PT), or 800.543.5073, after hours/weekends/holidays. Your liability for unauthorized use may be zero in accordance with Visa International Incorporated regulations.

SPECIAL RULES BY VISA: You have zero liability for unauthorized purchases on your Visa which is provided under the following conditions: your account is in good standing, you have exercised reasonable care in safeguarding your card from risk of loss or theft, and you have not reported two or more incidents of unauthorized use in the past 12 months.

ILLEGAL USE OF CARD: Your card may not be used directly or indirectly for: 1) any illegal activity or transaction; or 2) any gambling, gaming, betting or similar activity or transaction. Further, you may not utilize your Card and/or Account for the purchase of any goods or services on the Internet that involve gambling, gaming, betting or any similar transaction or activity. However, in the event that a charge or a transaction described in this paragraph is approved, you will still be responsible for such charges.

PREPAYMENT OR IRREGULAR PAYMENTS: Although you need only pay your minimum scheduled payments, you understand you have the right to repay your entire loan at any time without penalty. You understand that you will only be charged FINANCE CHARGES to the date you repay your entire loan. You may make larger payments without penalty and this may reduce the total amount of FINANCE CHARGES you will pay. Any partial payment of your loan will not delay your next scheduled payment due date(s). You understand that any payment that (a) delays or (b) accelerates the reduction of your loan balance will (a) increase or (b) decrease your FINANCE CHARGES.

DEFAULT: You will be in default if: 1) you do not pay your minimum scheduled payments on time; 2) you fail to live up to or otherwise breach any of the terms and conditions of this Agreement or any other loan or line of credit (except any loan, line of credit or other agreement secured by real property or where otherwise prohibited by federal or state law or regulation) you may have with us; 3) your creditworthiness is impaired; 4) the value of the security is impaired; 5) you die, become insolvent or are the subject of bankruptcy or receivership proceedings; or 6) there is a change of ownership of all or any part of the security. If you are in default, we may terminate this Agreement and demand immediate payment of the entire loan without notice to you. In the event of your default, and upon termination of your credit privileges, with proper notice you understand and agree that FINANCE CHARGES may accrue at an ANNUAL PERCENTAGE RATE of 18% until you repay your entire loan.

ACCELERATION AND COLLECTION COSTS: If you default, we may demand payment of the unpaid balance, FINANCE CHARGES,

EXHIBIT 4 PAGE 2 OF 6

Late Charges, Over Limit Charges and Collection Costs, if any. You understand and agree that FINANCE CHARGES at the applicable ANNUAL PERCENTAGE RATE permitted under this Agreement will continue to accrue, until you repay your entire loan. You also agree to pay our reasonable attorney fees and court costs.

**FUTURE ADVANCES AND PURCHASES:** You may request advances and make purchases in accordance with current loan policies up to your credit limit. You understand that all advances requested by you are subject to our approval.

**RESPONSIBILITY:** You agree to repay us according to the terms of this Agreement for all advances, purchases, FINANCE CHARGES, Over Limit Charges, and Late Charges, if any, arising from the use of the Account by you or any other person you permit to use your Account, even if that person exceeds your permission. Any person using the Account is jointly and severally responsible with you.

**CREDIT LIMIT:** We will establish a self-replenishing line of credit for you. You will not let the New Balance exceed this credit limit. You agree to advise us of any change in your financial condition, which may affect your credit worthiness. You may request an increase in your credit limit, but credit limit increases must be approved by our loan officer.

**ELECTRONIC FUND TRANSACTIONS:** In the event a use of your Card or the account number of the card constitutes an electronic funds transaction, the terms and conditions of our Electronic Services Disclosure and Agreement expands or amends this Agreement.

**TRANSACTION SLIPS:** Your statement will identify the merchant, electronic terminal or financial institution at which transactions were made. Sales, Cash Advance, credit or other slips cannot be returned with the statement. You will retain the copy of such slips furnished at the time of the transaction in order to verify your monthly statement. We may make a reasonable charge for paper and electronic copies of slips you request.

**MERCHANT DISPUTES:** We are not responsible for the refusal of any participating merchants or financial institutions to honor your Card. We are subject to certain defenses, other than tort claims, arising out of goods and services you have purchased with the Card only if you have made a good faith attempt but have been unable to obtain satisfaction from the plan merchant, and (a) your purchase was made in response to an advertisement we sent or participated in sending to you, or (b) your purchase cost more than $50.00 and was made from a participating merchant in your state or within 100 miles of your current mailing address. Any other dispute must be resolved by you directly with the participating merchant.

**FOREIGN TRANSACTIONS:** If you effect a transaction with a VISA CREDIT CARD in a currency other than U.S. dollars, Visa will convert the transaction amount into a U.S. dollar amount by using its currency conversion procedure. Under the currency conversion procedure that Visa currently uses, the non-U.S. dollar transaction amount is converted into a U.S. dollar amount by multiplying the transaction amount in the non-U.S. dollar currency by a currency conversion rate. The currency conversion rate that Visa typically uses is either a government-mandated rate, or a wholesale rate provided to Visa increased by a percentage (currently 1% subject to change — see Schedule of Fees). The currency conversion rate that Visa uses for a particular transaction is the rate Visa uses for the applicable currency when the transaction is processed. This rate may differ from the rate in effect when the transaction occurred or when it is posted to your account.

**RETURNS AND ADJUSTMENTS:** Merchants and others who honor the Card may give credit for returns or adjustments, and they will do so by sending us a credit slip, which will be posted to your Account. For sixty (60) days, we will hold any credit or payment that exceeds what you owe us and apply this credit balance against future purchases and cash advances. If the credit or payment is in excess of $1.00, we will refund it to you upon written request or automatically transfer the funds to your checking or savings account after sixty (60) days.

**PAYMENTS MARKED "PAID IN FULL":** We may accept checks, money orders, or other types of payment marked "paid in full" or using other language to indicate full satisfaction of a debt, without being bound by such language or waiving any rights under this Agreement. Full satisfaction of indebtedness shall be accepted by us only in a written agreement, signed by an authorized employee of the Credit Union.

**SURRENDER OF CARD(S):** The Card(s) remain our property, and, if we request, you must surrender to us all cards we have issued on your Account.

**LOST OR STOLEN CARD, NOTIFICATION AND LIABILITY:** You will notify us AT ONCE if you believe that the Card, Account number, PIN or any combination of the three has been lost or stolen by immediately calling us at 800.877.2345, Monday through Friday, between 7:30 a.m. and 3:30 p.m. (PT); or after hours/weekends/holidays at 800.543.5073. Telephoning is the best way of keeping your losses down. You understand that your total liability to us shall not exceed $50.00 for any Account and/or Card transactions resulting from the lost, theft or other unauthorized use of the Account and/or Card that occurs prior to the time you give notice to us.

**AUTOMATIC OVERDRAFT PROTECTION:** We may clear any overdrafts from your Checking Account by an advance from your VISA CREDIT Card Account up to the amount required to clear your overdraft or in the amount available on your Credit Line, whichever is less, in other such increments as we may, from time to time, determine subject to the terms of this Agreement. If you are not eligible to receive an advance from us under this Agreement, your checks may be returned and your Account could be closed.

**DELAY IN ENFORCEMENT:** We can delay enforcing any of our rights under this Agreement without losing them.

**GOVERNING LAW:** You understand and agree that this Agreement is made in California and shall be governed by the laws of the State of California to the extent that California law is not inconsistent with controlling federal laws including Regulation Z and the Credit Card Accountability, Responsibility, and Disclosure Act. You also understand that California's choice of law rules shall not be applied if that would result in the application of non-California law.

**CHANGE IN TERMS:** This Agreement is the contract which applies to all transactions on your Account even though the rules, cash advances, credit or other slips you sign or receive may contain different

5/1/13  3:08 PM

EXHIBIT 4 PAGE 3 OF 6

terms. You understand that we may amend, modify, add to, or delete from this Agreement any of its terms and conditions including the method of application and the amount of periodic FINANCE CHARGES, effective as to any unpaid balance outstanding and any subsequent advance, by mailing or delivering a notice of the change to you at your last known address. You also understand that any such notice will be mailed or delivered at least forty-five (45) days prior to the effective date of the change as required by federal or other law. Notice of a change in terms is required, but may be sent as late as the effective date of the change where the change has been agreed to, in writing by you, or the periodic FINANCE CHARGE has been increased because of your delinquency or default. A "Right to Cancel" statement will accompany the advanced notice of changes to your Card program.

LIMITATIONS ON APR INCREASES: We will not be allowed to increase the APR, fees, or finance charge during the first year of a new credit card account unless one of the following exceptions applies: 1) an increased APR, that will apply after a disclosed period of time, was disclosed at account opening, 2) an increase in an APR due to the completion of a workout arrangement or failure to comply with a workout arrangement; or 3) If a minimum payment is more than 60 days late, and we provide a 45-day advance notice of the increased APR. Promotional APRs will be at least 6 months in length.

CREDIT INFORMATION: You authorize us to investigate your credit standing when opening, renewing or reviewing your Account, and you authorize us to disclose information regarding your Account to credit bureaus and other parties to the extent permitted by law.

TERMINATION: We may terminate this Agreement upon adverse reevaluation of your credit worthiness or your failure to live up to any of the terms of this Agreement. Either you or we may terminate this Agreement for other good cause. In no event shall any termination relieve you of your obligation to repay fees incurred or sums already borrowed, collection costs, Late Charges, if any, Over Limit Charges, if any, and periodic FINANCE CHARGES.

YOUR BILLING RIGHTS: This notice contains important information about your rights and responsibilities under the Fair Credit Billing Act.

NOTIFICATION IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR STATEMENT: If you think your statement is wrong, or if you need more information about a transaction on your statement, you must write to us on a separate sheet at the address listed on your statement. You should write to us as soon as possible. We must hear from you no later than sixty (60) days after we send you the first statement on which the error or problem appears. You can telephone us, but doing so will not preserve your rights. In your letter, you should give us the following information:

* Your name and account number.

* The dollar amount of the specified error.

* Describe the error and explain if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

YOUR RIGHTS AND OUR RESPONSIBILITIES AFTER WE RECEIVE YOUR WRITTEN NOTICE: We must acknowledge your

letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the statement was correct. After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including FINANCE CHARGES, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of the statement that are not in question.

If we find that we made a mistake on your statement, you will not have to pay any FINANCE CHARGES related to any questioned amount. If we did not make a mistake, you may have to pay FINANCE CHARGES, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your statement. We must tell you the name of anyone to whom we reported you. We must tell anyone we report you to that the matter has been settled between you and us when the matter is resolved.

If we do not follow these rules, we cannot collect the first $50.00 of the questioned amount, even if your bill was correct.

SPECIAL RULE FOR CREDIT CARD PURCHASES
If you have a problem with the quality of property or services that you purchased with a credit card and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. These are two limitations on this right: (a) you must have made the purchase in your home state, or, if not within your home state, within 100 miles of your current mailing address; and (b) the purchase must have been more than $50.00. These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

DXCC0513_Visa_Select_Card_Agreement_Disclosure 042813.indd

EXHIBIT 4 PAGE 4 OF 6



**FARMERS INSURANCE**
# FEDERAL CREDIT UNION
P.O. Box 60030
City of Industry, CA 91716-0030

*Statement of Account*

**Visa Select** (Open-End)

| Card Number | Account Number | Period Ending |
|---|---|---|
| XXXX-XXXX-XXXX-0314 | ▇▇▇▇▇ | 09/25/17 |

| | 1 |
New Balance: $19,131.27
Past Due Amount: $378.00
Minimum Payment Due: $761.00
Payment Due Date: 10/20/17
Payment Due Time: 5:00PM (PT)

**800.877.2345 • F 323.209.6739 • www.figfcu.org**
☐ *Check here if your mailing address, email address or telephone number has changed and add your new information below:*

┌─────────────────────────┐
│  Payment Enclosed       │
│  $                      │
└─────────────────────────┘
• Check Payable to: FIGFCU
• Return this portion with your payment
• Write account number on check

RICHARD S HOLLEY
27 MILL LANE
BRANCHVILLE NJ 07826



---

Visa Select (Open-End)
Account Number: ▇▇▇▇▇
Credit Card Number: xxxx-xxxx-xxxx-0314

*Statement of Account*

Period Ending: 09/25/17
Page: 1 of 2

| SUMMARY OF ACCOUNT ACTIVITY | |
|---|---|
| Summary Description | TOTALS |
| Previous Balance: | 18,866.04 |
| (-) Payments: | 0.00 |
| (-) Other Credits: | 0.00 |
| (+) Purchases: | 100.58 |
| (+) Cash Advances: | 0.00 |
| (+) Balance Transfers: | 0.00 |
| (+) Other Debits: | 0.00 |
| (+) FEES CHARGED: | 25.00 |
| (+) INTEREST CHARGED: | 139.65 |
| (=) New Balance: | 19,131.27 |
| Past Due Amount: | 378.00 |
| Credit Limit: | 19,000.00 |
| Credit Available: | -131.27 |
| Statement Closing Date: | 09/25/17 |
| Days in Billing Cycle: | 31 |

## PAYMENT INFORMATION

New Balance: **$19,131.27**
Minimum Payment Due: **$761.00**
Payment Due Date: **10/20/17**

**Late Payment Warning:**
If we do not receive your minimum payment by the due date listed, you may have to pay a $25.00 late fee.

**Minimum Payment Warning:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Only the minimum payment | 22 Year(s) | $29,386 |
| $606 | 3 Year(s) | $21,819 *(Savings = $7,567)* |

*If you would like information about Credit Counseling Services, call 877.847.2155*

QUESTIONS? Member Service: 800.877.2345    Billing inquiries to: FIGFCU, P.O. Box 36911, Los Angeles, CA 90036-0911
**Lost / Stolen Credit Card: 800.877.2345**

---

### TRANSACTIONS

| Trans. Date | Posting Date | Trans. Amount | Transaction Description |
|---|---|---|---|
| 08/26/17 | 08/28/17 | 67.25 | CARTER'S #387 |
| 08/29/17 | 08/30/17 | 33.33 | COSTCO WHSE #0315 |

### FEES

| Trans. Date | Posting Date | Trans. Amount | Transaction Description |
|---|---|---|---|
| 09/25/17 | 09/25/17 | 25.00 | Late Fee |
| | | 25.00 | TOTAL FEES FOR THIS PERIOD |

### INTEREST CHARGED

| | | |
|---|---|---|
| 139.65 | Interest Charged on Purchases |
| 0.00 | Interest Charged on Cash Advances |
| 139.65 | TOTAL INTEREST FOR THIS PERIOD |

### YEAR-TO-DATE TOTALS

Total Fees Paid: $25.00
Total Interest Paid: $1,229.82

**EXHIBIT 4** PAGE 5 OF 6



FARMERS INSURANCE
# FEDERAL CREDIT UNION

P.O. Box 60030
City of Industry, CA 91716-0030

*Visa Select*

Account Number: ██████████ Statement Period: 08/26/17 thru 09/25/17
Card Number: xxxx-xxxx-xxxx-0314 ⌄   Page: 2 of 2

## INTEREST CHARGE CALCULATION

| Description of Balance Type | Annual Percentage Rate (APR) | Balance Subject To Interest Rate | Interest Charged |
|---|---|---|---|
| PURCHASES | 8.99% | $18,289.79 | $139.65 |
| CASH ADVANCES | 8.99% | $0.00 | $0.00 |

Your Annual Percentage Rate is the annual interest rate on your account.

EXHIBIT 4 PAGE 6 OF 6

# NOTE

MIN: 762778

JULY 1, 2013       LOS ANGELES       CALIFORNIA

[Date]            [City]            [State]

Loan Number: ██204

27 MILL LN, BRANCHVILLE, NEW JERSEY 07826

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 79,200.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is FIG FEDERAL CREDIT UNION, A FEDERAL CREDIT UNION

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 12.000 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on AUGUST 1 2013 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JULY 1, 2033 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 4601 WILSHIRE BLVD, SUITE 110, LOS ANGELES, CALIFORNIA 90010

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 875.00

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

EXHIBIT 5 PAGE 1 OF 15

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of      15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep

---

EXHIBIT 5 PAGE 2 OF 15

Recording requested / LSI
When recorded return to :
Custom Recording Solutions
5 Peters Canyon Road Ste. 200
Irvine, CA 92606  W16635255
800-756-3524 Ext. 5011
~~After Recording Return To:~~
FIG FEDERAL CREDIT UNION
4601 WILSHIRE BLVD, SUITE 110
LOS ANGELES, CALIFORNIA 90010
Loan Number: 154204

This Instrument Prepared By:

Kathy Balian



———————————— [Space Above This Line For Recording Data] ————————————

# MORTGAGE

**MIN:** ▆▆▆▆              **MERS Phone: 888-679-6377**

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated   JULY 1, 2013                , together with all Riders to this document.
**(B)** "Borrower" is   RICHARD STEWART HOLLEY AND BETH ANN HOLLEY, HUSBAND AND WIFE AS JOINT TENANTS

Borrower is the mortgagor under this Security Instrument.
**(C)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D)** "Lender" is   FIG FEDERAL CREDIT UNION

Lender is a   FEDERAL CREDIT UNION                                                    organized
and existing under the laws of   CALIFORNIA
Lender's address is   4601 WILSHIRE BLVD, SUITE 110, LOS ANGELES,
CALIFORNIA 90010

**(E)** "Note" means the promissory note signed by Borrower and dated   JULY 1, 2013
The Note states that Borrower owes Lender   SEVENTY-NINE THOUSAND TWO HUNDRED AND 00/100                                           Dollars (U.S. $ 79,200.00            ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JULY 1, 2033                  .
**(F)** "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)** "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

EXHIBIT 5 PAGE 3 OF 15

**(H)** "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Planned Unit Development Rider
☐ Balloon Rider      ☐ Biweekly Payment Rider
☐ 1-4 Family Rider      ☐ Second Home Rider
☐ Condominium Rider      ☐ Other(s) [specify]

**(I)** "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** "Escrow Items" means those items that are described in Section 3.

**(M)** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

COUNTY      of      SUSSEX    :
[Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]

NEW JERSEY--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3031 01/01      Page 2 of 13      DocMagic EForms
www.docmagic.com

EXHIBIT 5 PAGE 4 OF 15

SEE EXHIBIT A OF LEGAL DESCRIPTION

which currently has the address of                    27 MILL LN
                                                          [Street]

       BRANCHVILLE                   , New Jersey      07826        ("Property Address"):
       [City]                                          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

DocMagic EFormss
www.docmagic.com

EXHIBIT 5 PAGE 5 OF 15

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA,

EXHIBIT 5 PAGE 6 OF 15

Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

EXHIBIT 5 PAGE 7 OF 15

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may

NEW JERSEY--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3031 01/01                    Page 6 of 13                    *DocMagic eForms*
www.docmagic.com

EXHIBIT 5 PAGE 8 OF 15

attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.  Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share

EXHIBIT 5 PAGE 9 OF 15

of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

EXHIBIT 5 PAGE 11 OF 15

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations

EXHIBIT 5 PAGE 12 OF 15

to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at §§ 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender**

EXHIBIT 5 PAGE 13 OF 15

shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

|  |  |
|---|---|
| _____ (Seal) | _____ (Seal) |
| R. STEWART HOLLEY        -Borrower | BETH ANN HOLLEY        -Borrower |
| _____ (Seal) | _____ (Seal) |
|                          -Borrower |                          -Borrower |
| _____ (Seal) | _____ (Seal) |
|                          -Borrower |                          -Borrower |

Witness:                                    Witness:

NEW JERSEY--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3031 01/01                    Page 12 of 13                    DocMagic *eForms*
www.docmagic.com

EXHIBIT 5 PAGE 14 OF 15

—————————————— [Space Below This Line For Acknowledgment] ——————————————

State of NEW JERSEY

County of Sussex , ss

I CERTIFY that on July 2, 2013 , R. STEWART HOLLEY AND BETH

ANN HOLLEY

personally came before me and stated to my satisfaction that this person (or if more than one, each person):
(a)  was the maker of the attached instrument; and
(b)  executed this instrument as his or her own act.

Notary's Signature                                              Date

LAURA J. DELEA
Commission # 2017098
Notary Public, State of New Jersey
My Commission Expires
August 27, 2016

Notary's printed or typed name

My commission expires: _____

EXHIBIT 5 PAGE 15 OF 15

**PROMISSORY NOTE**
(New Jersey)

**US $122,800.00**                                                                 **May 31, 2017**

FOR VALUE RECEIVED, the undersigned, **JMH INVESTMENTS, LLC, a New Jersey limited liability company** (together with such party's or parties' successors and assigns, "**Borrower**"), jointly and severally (if more than one) promises to pay to the order of **FARMERS INSURANCE GROUP FEDERAL CREDIT UNION, a federally chartered credit union**, the principal sum of **ONE HUNDRED TWENTY-TWO THOUSAND EIGHT HUNDRED AND 00/100 DOLLARS (US $122,800.00)**, with interest on the unpaid principal balance, as hereinafter provided.

      1.      **Defined Terms.**

      (a)     In addition to defined terms found elsewhere in this Note, as used in this Note, the following definitions shall apply:

        **Business Day:** Any day other than a Saturday, a Sunday or any other day on which Lender or the national banking associations are not open for business.

        **Default Rate:** An annual interest rate equal to **five percentage points (5%)** above the Fixed Interest Rate. However, at no time will the Default Rate exceed the Maximum Interest Rate.

        **Disbursement Date:** The date of the initial disbursement of Loan proceeds hereunder.

        **First Payment Due Date:** July 5, 2017.

        **Fixed Interest Rate:** The annual interest rate of **4.5 percent (4.5%)**.

        **Indebtedness:** The principal of, interest on, or any other amounts due at any time under, this Note, the Mortgage or any other Loan Document, including late charges, default interest, and advances to protect the security of the Mortgage under Section 12 of the Mortgage or any other applicable provision of the Mortgage or any other Loan Document or as permitted by law.

        **Lender:** The holder(s) from time to time of this Note.

        **Loan:** The loan evidenced by this Note.

        **Maturity Date:** The earlier of (i) **June 5, 2027**, and (ii) the date on which the unpaid principal balance of this Note becomes due and payable by acceleration or otherwise pursuant to the Loan Documents or the exercise by Lender of any right or remedy under any Loan Document.

        **Maximum Interest Rate:** The rate of interest that results in the maximum amount of interest allowed by applicable law.

        **Mortgage:** That certain Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of the date of this Note, executed by Borrower to or for the benefit of Lender and securing this Note, which Mortgage encumbers certain real property commonly known as **91 TRINITY STREET, NEWTON, NJ 07860**.

        **Payment Due Date:** The First Payment Due Date and any subsequent date on which a monthly installment of interest or principal and interest is due and payable pursuant to Section 3.

        **Property Jurisdiction:** The jurisdiction in which the Land is located.

      (b)    "**Event of Default**" and other capitalized terms used but not defined in this Note shall have the meanings given to such terms in the Mortgage.

Prepared by LoanDocSolutions®
New Jersey Promissory Note
Loan No.: 16686476971

EXHIBIT 6 PAGE 1 OF 37

2.      **Address for Payment.** All payments due under this Note shall be payable at **P.O. Box 36911, Los Angeles, CA 90036-0911, Attn: Commercial Loan Department,** or such other place as may be designated by written notice to Borrower from or on behalf of Lender. By separate document Borrower may authorize Lender to deduct all payments due under this Note, plus any and all required monthly Imposition Deposits, from Borrower's checking account by means of ACH automatic debit transfers.

3.      **Payments.**

(a)      Interest will accrue on the outstanding principal balance of this Note at the Fixed Interest Rate, subject to the provisions of Section 8.

(b)      Interest under this Note shall be computed, payable and allocated on the basis of an actual/365 interest calculation schedule (interest is payable for the actual number of days in each month based upon a daily rate calculated by dividing the applicable Fixed Interest Rate by 365). The amount of each installment attributable to principal and the amount attributable to interest will vary based upon the number of days in the monthly period for which such installment is paid. Each monthly payment of principal and interest will first be applied to pay in full interest due, and the balance of the monthly payment paid by Borrower will be credited to principal.

(c)      Accrued interest will be payable in arrears.

(d)      Beginning on the First Payment Due Date, and continuing until and including the monthly installment due on the Maturity Date, principal and accrued interest shall be payable by Borrower in consecutive monthly installments due and payable on the fifth (5th) day of each calendar month. The amount of the monthly installment of principal and interest payable pursuant to this Section 3(d) shall be **SIX HUNDRED EIGHTY-TWO AND 56/100 DOLLARS (U.S. $682.56).**

(e)      All remaining Indebtedness, including all principal and interest, shall be due and payable by Borrower on the Maturity Date. All payments under this Note shall be made in immediately available U.S. funds. Any amount added to principal pursuant to the Loan Documents shall bear interest at the applicable rate or rates specified in this Note and shall be payable with such interest upon demand by Lender and absent such demand, as provided in this Note for the payment of principal and interest. In the event any check given by Borrower to Lender as a payment on this Note is dishonored, or in the event there are insufficient funds in Borrower's designated account to cover any preauthorized monthly debit from Borrower's checking account, then, without limiting any other charges or remedies, Borrower shall pay to Lender a processing fee of **$25.00** (but not more than the maximum amount allowed by law) for each such event.

4.      **Application of Payments.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender may apply the amount received to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Borrower agrees that neither Lender's acceptance of a payment from Borrower in an amount that is less than all amounts then due and payable nor Lender's application of such payment shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.

5.      **Security.** The Indebtedness is secured by, among other things, the Mortgage and reference is made to the Mortgage for other rights of Lender as to collateral for the Indebtedness.

6.      **Acceleration.** If an Event of Default has occurred and is continuing, the entire unpaid principal balance, any accrued interest, and all other amounts payable under this Note and any other Loan Document, shall at once become due and payable, at the option of Lender, without any prior notice to Borrower (except if notice is required by applicable law, then after such notice). Lender may exercise this option to accelerate regardless of any prior forbearance.

7.      **Late Charge.**

(a)      If any installment of interest or principal and interest or other amount payable under this Note, the Mortgage or any other Loan Document is not received in full by Lender within **ten (10)** days after the installment or other amount is due (unless applicable law requires a longer period of time before a late charge may be imposed, in which event such longer period shall be substituted), Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to

EXHIBIT 6 PAGE 2 OF 37

**five percent (5%)** of such installment or other amount due (unless applicable law requires a lesser amount be charged, in which event such lesser amount shall be substituted).

(b)    Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan and that it is extremely difficult and impractical to determine those additional expenses. Borrower agrees that the late charge payable pursuant to this Section 7 represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional expenses Lender will incur by reason of such late payment. The late charge is payable in addition to, and not in lieu of, any interest payable at the Default Rate pursuant to Section 8.

8.    **Default Rate.**

(a)    So long as (i) any monthly installment under this Note remains past due for **thirty (30)** days or more or (ii) any other Event of Default has occurred and is continuing, then notwithstanding anything in Section 3 to the contrary, interest under this Note shall accrue on the unpaid principal balance from the Payment Due Date of the first such unpaid monthly installment or the occurrence of such other Event of Default, as applicable, at the Default Rate.

(b)    From and after the Maturity Date, the unpaid principal balance and all accrued interest shall continue to bear interest at the Default Rate until and including the date on which the entire principal balance is paid in full.

(c)    Borrower acknowledges that (i) its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, (ii) during the time that any monthly installment under this Note is delinquent for **thirty (30)** days or more, Lender will incur additional costs and expenses arising from its loss of the use of the money due and from the adverse impact on Lender's ability to meet its other obligations and to take advantage of other investment opportunities; and (iii) it is extremely difficult and impractical to determine those additional costs and expenses. Borrower also acknowledges that, during the time that any monthly installment under this Note is delinquent for **thirty (30)** days or more or any other Event of Default has occurred and is continuing, Lender's risk of nonpayment of this Note will be materially increased and Lender is entitled to be compensated for such increased risk. Borrower agrees that the increase in the rate of interest payable under this Note to the Default Rate represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional costs and expenses Lender will incur by reason of Borrower's delinquent payment and the additional compensation Lender is entitled to receive for the increased risks of nonpayment associated with a delinquent loan. During any period that the Default Rate is in effect the additional interest accruing over and above the rate provided for in Section 1(a) shall be immediately due and payable in addition to the regularly scheduled principal and interest payments.

9.    **Full Recourse Personal Liability.**  Borrower shall have full recourse personal liability under this Note, the Mortgage and all other Loan Documents for the repayment of the Indebtedness and for the performance of any and all other obligations of Borrower under this Note, the Mortgage and all other Loan Documents.

10.    **Voluntary Prepayments.**  Borrower may voluntarily prepay all or part of the unpaid principal balance of this Note at any time without payment of penalty or premium.  Any prepayment of less than the unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

11.    **Costs and Expenses.**  To the fullest extent allowed by applicable law, Borrower shall pay: (a) all expenses and costs, including Attorneys' Fees and Costs incurred by Lender or any Loan Servicer as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents (whether or not any lawsuit or other proceeding is instituted), including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding; and (b) all expenses and costs, including Attorneys' Fees and Costs, incurred by Lender or any Loan Servicer in connection with the servicing of the Loan, including without limitation responding to requests from Borrower, and expenses and costs incurred in connection with potential defaults or other legal questions regarding the Loan.

12.    **Forbearance.**  Any forbearance by Lender in exercising any right or remedy under this Note, the Mortgage, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of that or any other right or remedy.  The acceptance by Lender of any payment after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other

payments or to exercise any right or remedy with respect to any failure to make prompt payment.  Enforcement by Lender of any security for Borrower's obligations under this Note shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

**13.      Waivers.**  Borrower and all endorsers and guarantors of this Note and all other third party obligors waive presentment, demand, notice of dishonor, protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace, and diligence in collecting the Indebtedness.

**14.      Loan Charges.**  Neither this Note nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the Maximum Interest Rate.  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation.  The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of this Note.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of this Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

**15.      Purpose of Indebtedness.**  Borrower represents and warrants to Lender that the proceeds of this Note will be used solely for business, commercial investment, or similar purposes, and that no portion of it will be used for agricultural, personal, family, or household purposes.

**16.      Counting of Days.**  Except where otherwise specifically provided, any reference in this Note to a period of "days" means calendar days, not Business Days.

**17.      Governing Law.**  This Note shall be governed by the laws of the Property Jurisdiction.

**18.      Construction.**  The captions and headings of the Sections of this Note are for convenience only and shall be disregarded in construing this Note.  Any reference in this Note to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Note or to a Section of this Note.  All Exhibits attached to or referred to in this Note are incorporated by reference in this Note.  Any reference in this Note to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.  Use of the singular in this Note includes the plural and use of the plural includes the singular.  As used in this Note, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation."  The use of one gender includes the other gender, as the context may require.  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document in this Note shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Note or any other Loan Document), and (b) any reference in this Note to any Person shall be construed to include such Person's successors and assigns.

**19.      Notices; Written Modifications.**

(a)      All notices, demands and other communications required or permitted to be given pursuant to this Note shall be given in accordance with Section 31 of the Mortgage.

(b)      Any modification or amendment to this Note shall be ineffective unless in writing signed by the party sought to be charged with such modification or amendment.

**20.      Consent to Jurisdiction and Venue.**  Borrower agrees that any controversy arising under or in relation to this Note may be litigated in the Property Jurisdiction.  The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have non-exclusive jurisdiction over all controversies that shall arise under or in relation to this Note.  Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue or defense to venue to which it might be entitled by virtue of domicile, habitual residence, inconvenient forum or otherwise.

EXHIBIT 6 PAGE 4 OF 37

However, nothing in this Note is intended to limit any right that Lender may have to bring any suit, action or proceeding relating to matters arising under this Note in any court of any other jurisdiction.

     **21.**    **Counterparts.** This Note may be executed in any number of counterparts each of which shall be deemed an original, but all such counterparts together shall constitute but one Note.

     **22.**    **Document Imaging.** Lender shall be entitled, in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents, items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this Note and the other Loan Documents, and Lender may destroy or archive the paper originals. Borrower waives (i) any right to insist or require that Lender produce paper originals, (ii) agrees that such images shall be accorded the same force and effect as the paper originals, (iii) agrees that Lender is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agrees that any executed facsimile (faxed), scanned, or other imaged copy of this Note or any other Loan Document shall be deemed to be of the same force and effect as the original manually executed document.

     **23.**    **WAIVER OF TRIAL BY JURY.** BORROWER AND LENDER EACH (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

     **ATTACHED EXHIBIT.** The Exhibit noted below is attached to and made a part of this Note:

        Exhibit "A"      Modifications to Note

     **IN WITNESS WHEREOF,** and in consideration of Lender's agreement to lend Borrower the principal amount set forth above, Borrower has signed and delivered this Note under seal (where applicable) or has caused this Note to be signed and delivered by its duly authorized representative under seal (where applicable). Where applicable law so provides or allows, Borrower intends that this Note shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER:**

JMH INVESTMENTS, LLC,
a New Jersey limited liability company,

By: _____
    RICHARD STEWART HOLLEY,
    Member / Manager

By: _____
    BETH A. HOLLEY,
    Member / Manager

(SEAL)

EXHIBIT 6 PAGE 5 OF 37

## EXHIBIT "A"

### MODIFICATIONS TO NOTE

The following modifications are made to the text of the Note that precedes this Exhibit "A":

DISCOUNT RATE FOR DIRECT DEPOSIT ACCOUNT RELATIONSHIP. IN CONSIDERATION OF A 0.25% DISCOUNT RATE ON THE COMMERCIAL REAL ESTATE LOAN BY FARMERS INSURANCE GROUP FEDERAL CREDIT UNION. The Borrower/Member shall maintain a direct deposit account relationship with a minimum balance of $500.00 or more with Farmers Insurance Group Federal Credit Union. In any event that the direct deposit account is closed or cancelled, the Fixed Interest Rate applicable to the Loan will increase by 0.25%.

BORROWER'S INITIALS: _____

EXHIBIT 6 PAGE 6 OF 37

*31*

*uut*

*330*

| SUSSEX COUNTY RECORDING COVER PAGE | Official Use Only – Barcode |
|---|---|
| **Honorable Jeffrey M. Parrott**<br>**Sussex County Clerk**<br><br>This cover page is required to be part of any document affecting land title being recorded in Sussex County, New Jersey. It is part of the recorded instrument and permanent record and should not be detached from the original document. | 2017061301012092B   1/31<br>06/13/2017 02:23:16 PM  MTG<br>Bk: 9504 Pg: 258<br>Jeffrey M. Parrott, County Clerk<br>Sussex County, NJ |

| Record & Return To: | Official Use Only – Realty Transfer Fee |
|---|---|
| **FARMERS INSURANCE GROUP FEDERAL CREDIT UNION**<br>242 E. Airport Drive, Suite 211<br>San Bernardino, CA  92408<br>Attn:  CRE Loan Department | |

| Date of Document: | Type of Document: |
|---|---|
| May 31, 2017 | MORTGAGE, ASSIGNMENT OF RENTS, ETC |

| First Party Name: | Second Party Name: |
|---|---|
| JMH INVESTMENTS, LLC, A New Jersey Limited Liability Company | FARMERS INSURANCE GROUP FEDERAL CREDIT UNION, A Federally Chartered Credit Union |

Additional Parties To Be Indexed:

| PROPERTY INFORMATION (MANDATORY FOR DEEDS) | |
|---|---|
| Block:<br>15.01 | Lot:<br>22 |
| Municipality:<br>TOWN OF NEWTON | |
| Consideration: | |
| Mailing Address of Grantee: | |

| THIS SECTION PERTAINS TO ASSIGNMENTS, RELEASES, SATISFACTIONS, DISCHARGES, ETC. WHICH REQUIRE YOU PROVIDE THE ORIGINAL INSTRUMENT'S BOOK & PAGE RECORDING INFORMATION. | |
|---|---|
| Original Book: | Original Page: |

---

**SUSSEX COUNTY RECORDING COVER PAGE**

Do not detach this page from the original document as it
contains important recording information and is part of the permanent record.

---

**EXHIBIT 6** PAGE 7 OF 37

*PREPARED BY, AND AFTER RECORDING*
*RETURN TO:*

FARMERS INSURANCE GROUP FEDERAL CREDIT UNION
242 E. AIRPORT DRIVE, SUITE 211
SAN BERNARDINO, CA 92408
Attn: CRE Loan Department

Tax Parcel Number(s): **15-00015-01-00022**

Space Above for Recorder's Use

## MORTGAGE,
## ASSIGNMENT OF RENTS, SECURITY AGREEMENT
## AND FIXTURE FILING

### (NEW JERSEY)

**A.**     THIS MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "**Instrument**") is dated as of **May 31, 2017**, and is given by **JMH INVESTMENTS, LLC, a New Jersey limited liability company**, whose address is **91 Trinity Street, Newton, NJ 07860**, as mortgagor ("**Borrower**"), in favor of **FARMERS INSURANCE GROUP FEDERAL CREDIT UNION, a federally chartered credit union**, whose address is **P.O. Box 36911, Los Angeles, CA 90036-0911**, Attn: **Commercial Loan Department**, as mortgagee ("**Lender**"). Borrower's organizational identification number is **0450143865.**

**B.**     Borrower is indebted to Lender in the principal amount of **ONE HUNDRED TWENTY-TWO THOUSAND EIGHT HUNDRED AND 00/100 DOLLARS (US $122,800.00)**, as evidenced by Borrower's Promissory Note payable to Lender, dated as of the date of this Instrument, and maturing on the earlier of (i) **June 5, 2027**, and (ii) the date on which the unpaid principal balance of the Note becomes due and payable by acceleration or otherwise pursuant to the Loan Documents or the exercise by Lender of any right or remedy under any Loan Document (the "**Maturity Date**").

**C.**     TO SECURE TO LENDER the repayment of the Indebtedness, and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in the Loan Documents, Borrower mortgages, warrants, grants, conveys and assigns to Lender, the Mortgaged Property, including the Land located in **Sussex** County, State of **New Jersey** and described in Exhibit "A" attached to this Instrument.

**D.**     Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered except as shown on the Schedule of Title Exceptions. Borrower covenants that Borrower will warrant and defend generally the title to the Mortgaged Property against all claims and demands, subject to any easements and restrictions listed in the Schedule of Title Exceptions.

New Jersey Mortgage

EXHIBIT 6 PAGE 8 OF 37

**Covenants.** In consideration of the mutual promises set forth in this Instrument, Borrower and Lender covenant and agree as follows:

    **1.**     **DEFINITIONS.** The following terms, when used in this Instrument (including when used in the above recitals), shall have the following meanings:

    (a)     "**Assignment**" means, collectively, the provisions of Sections 3 and 4 of this Instrument relating to the assignment of rents and leases affecting the Mortgaged Property.

    (b)     "**Attorneys' Fees and Costs**" means (i) fees and out-of-pocket costs of Lender's and Loan Servicer's attorneys, as applicable (whether or not any lawsuit or other proceeding is instituted), including costs of Lender's and Loan Servicer's allocable costs of in-house counsel, support staff costs, costs of preparing for litigation, computerized research, telephone and facsimile transmission expenses, mileage, deposition costs, postage, duplicating, process service, videotaping and similar costs and expenses; (ii) costs and fees of expert witnesses, including appraisers; and (iii) investigatory fees. As used in this Instrument and in the Note, "Attorneys' Fees and Costs" shall include those awarded by an appellate court.

    (c)     "**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. Section 101 et seq., as amended from time to time.

    (d)     "**Borrower**" means all Persons identified as "Borrower" in paragraph A of this Instrument, together with their successors and assigns.

    (e)     "**Borrower Certificate**" means that certain Borrower Certificate dated the same date as this Instrument, executed by Borrower in favor of Lender.

    (f)     "**Collateral Agreement**" means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing a fund to assure the completion of repairs or improvements specified in that agreement, or assuring reduction of the outstanding principal balance of the Indebtedness if the occupancy of or income from the Mortgaged Property does not increase to a level specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account.

    (g)     "**Controlling Entity**" means an entity which owns, directly or indirectly through one or more intermediaries, (A) a general partnership interest or a Controlling Interest of the limited partnership interests in Borrower (if Borrower is a partnership or joint venture), (B) a manager's interest in Borrower or a Controlling Interest of the ownership or membership interests in Borrower (if Borrower is a limited liability company), or (C) a Controlling Interest of any class of voting stock of Borrower (if Borrower is a corporation).

    (h)     "**Controlling Interest**" means (i) 51 percent or more of the ownership interests in an entity, or (ii) a percentage ownership interest in an entity of less than 51 percent, if the owner(s) of that interest actually direct(s) the business and affairs of the entity without the requirement of consent of any other party.

    (i)     "**Environmental Permit**" means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

    (j)     "**Event of Default**" means the occurrence of any event listed in Section 22.

    (k)     "**Fixtures**" means all property owned by Borrower which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.

    (l)     "**Governmental Authority**" means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property or over Borrower.

    (m)     "**Guarantor**" means each guarantor identified in that certain Guaranty dated the same date as this Instrument, as well as any other or future guarantor of all or any portion of the Indebtedness.

EXHIBIT 6 PAGE 9 OF 37

    (n)    **"Guaranty"** means that certain Guaranty dated the same date as this Instrument, and each and every other guaranty executed by any Guarantor in favor of Lender.

    (o)    **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

    (p)    **"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to Hazardous Materials or the protection of human health or the environment and apply to Borrower or to the Mortgaged Property. Hazardous Materials Laws include, but are not limited to, the Federal Water Pollution Control Act, 33 U.S.C. Section 1251 *et seq.*, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, as amended by the Superfund Amendments Reauthorization Act of 1986, the Materials Transportation Act, 49 U.S.C. Section 1801 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, the Emergency Planning and Community Right-to-Know Act of 1986, as amended, the Solid Waste Disposal Act, as amended, the Clean Air Act, as amended, the Safe Drinking Water Act, as amended, the Occupational Safety and Health Act, as amended, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, and their state analogs.

    (q)    **"Impositions"** and **"Imposition Deposits"** are defined in Section 7(a).

    (r)    **"Improvements"** means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

    (s)    **"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under, the Note, this Instrument or any other Loan Document, including late charges, default interest, and advances to protect the security of this Instrument under Section 12 of this Instrument or any other applicable provision of this Instrument or any other Loan Document or as permitted by law.

    (t)    **"Initial Owners"** means, with respect to Borrower or any other entity, the Person(s) that (i) on the date of the Note, or (ii) on the date of a Transfer to which Lender has consented, own in the aggregate 100% of the ownership interests in Borrower or that entity.

    (u)    **"Land"** means the land described in Exhibit "A".

    (v)    **"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property, and all modifications, extensions or renewals.

    (w)    **"Lender"** means the Person or Persons identified as "Lender" in paragraph A of this Instrument, or any subsequent holder of the Note.

    (x)    **"Loan"** means the loan evidenced by the Note and secured by this Instrument.

    (y)    **"Loan Documents"** means the Note, this Instrument, the Assignment, the Borrower Certificate, all guaranties, all indemnity agreements, all Collateral Agreements, O&M Plans, and any other documents now or in the future executed by Borrower, any Guarantor or any other Person in connection with the Loan, as such documents may be amended from time to time.

    (z)    **"Loan Servicer"** means the Person or Persons that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, this Instrument and any other Loan Document, and otherwise to service the Loan for the benefit of Lender. Unless otherwise specified in Section 2 of the Note, or unless Borrower receives notice to the contrary, the Loan Servicer means the Person or Persons identified as "Lender" in paragraph A of this Instrument.

    (aa)    **"Mortgaged Property"** means all of Borrower's present and future right, title and interest in and to all of the following: (1) the Land; (2) the Improvements; (3) the Fixtures; (4) the Personalty; (5) all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

EXHIBIT 6 PAGE 10 OF 37

(6) all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirement; (7) all awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof; (8) all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations; (9) all proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; (10) all Rents and Leases; (11) all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan; (12) all funds on deposit pursuant to any separate agreement between Borrower and Lender (including, without limitation, all Imposition Deposits) for the purpose of establishing replacement reserves for the Mortgaged Property, to fund any water and sewer charges, premiums for fire or other hazard insurance, rent loss insurance or other insurance required by Lender, taxes, assessments, vault rentals, or other charges or expenses required by Lender to protect the Mortgaged Property, establishing a fund to assure the completion of repairs or improvements specified in that agreement, or assuring reduction of the outstanding principal balance of the Indebtedness if the occupancy of or income from the Mortgaged Property does not increase to a level specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account; (13) all refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Instrument is dated); (14) all tenant security deposits which have not been forfeited by any tenant under any Lease and any bond or other security in lieu of such deposits; and (15) all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property.

(bb)    **"Mortgaged Property UCC Collateral"** means any of the Mortgaged Property which, under applicable law, may be subjected to a security interest under the Uniform Commercial Code, whether such Mortgaged Property is owned now or acquired in the future; and all products and cash and non-cash proceeds thereof.

(cc)    **"Note"** means the Promissory Note described in paragraph B of this Instrument, including all schedules, riders, allonges and addenda, as such Promissory Note may be amended from time to time.

(dd)    **"O&M Plan"** shall have the meaning as defined in Section 18 of this Instrument.

(ee)    **"Person"** means any natural person, sole proprietorship, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, limited liability limited partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), endowment fund or any other form of entity.

(ff)    **"Personalty"** means all: (i) accounts (including deposit accounts); (ii) equipment and inventory owned by Borrower which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, including furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software); (iii) other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements; (iv) any operating agreements relating to the Land or the Improvements; (v) any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements; (vi) all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land or the Improvements and including subsidy or similar payments received from any sources, including a Governmental Authority; and (vii) any rights of Borrower in or under letters of credit.

(gg)    **"Property Insurance"** is defined in Section 19.

(hh)    **"Property Jurisdiction"** is defined in Section 30(a).

(ii)    **"Rents"** means all rents, revenues and other income of the Land or the Improvements, including parking fees, laundry and vending machine income and fees and charges for other services provided at the Mortgaged Property, whether now due, past due, or to become due, and deposits forfeited by tenants.

EXHIBIT 6 PAGE 11 OF 37

(jj)    "Schedule of Title Exceptions" means title exceptions approved by Lender and shown in the schedule of exceptions to coverage in the title policy issued to Lender contemporaneously with the recordation of this Instrument and insuring Lender's interest in the Mortgaged Property.

(kk)    "Taxes" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements.

(ll)    "Transfer" is defined in Section 21.

**2.    UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.**

(a)    This Instrument is also a security agreement under the Uniform Commercial Code for the Mortgaged Property UCC Collateral, and Borrower, as debtor, hereby grants to Lender, as secured party, a security interest in the Mortgaged Property UCC Collateral. Borrower hereby authorizes Lender to prepare and file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest and Borrower agrees, if Lender so requests, to execute and deliver to Lender such financing statements, continuation statements and amendments. Without limiting the generality of the foregoing, Borrower authorizes Lender to file any financing statement that describes the collateral as "all assets" of Borrower, or words to similar effect. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements and/or amendments that Lender may require. Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the Mortgaged Property UCC Collateral. Unless Borrower gives notice to Lender within 30 days after the occurrence of any of the following, and executes and delivers to Lender modifications or supplements of this Instrument (and any financing statement which may be filed in connection with this Instrument) as Lender may require, Borrower shall not (i) change its name, identity, structure or jurisdiction of organization; (ii) change the location of its place of business (or chief executive office if more than one place of business); or (iii) add to or change any location at which any of the Mortgaged Property UCC Collateral is stored, held or located. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the Mortgaged Property UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Instrument constitutes a financing statement with respect to any part of the Mortgaged Property that is or may become a Fixture, if permitted by applicable law.

**3.    ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the "Mortgaged Property" as that term is defined in Section 1. However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Instrument.

(b)    After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Instrument. From and after the occurrence of an Event of Default, and without the necessity of

EXHIBIT 6 PAGE 12 OF 37

Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically terminate and Lender shall without notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Borrower shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender, no tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

(c)     Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents (other than an assignment of Rents securing indebtedness that will be paid off and discharged with the proceeds of the Loan), that Borrower has not performed, and Borrower covenants and agrees that it will not perform, any acts and has not executed, and shall not execute, any instrument which would prevent Lender from exercising its rights under this Section 3, and that at the time of execution of this Instrument there has been no anticipation or prepayment of any Rents for more than one (1) month prior to the due dates of such Rents. Borrower shall not collect or accept payment of any Rents more than one (1) month prior to the due dates of such Rents.

(d)     If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of waste, enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable. Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property. Immediately upon appointment of a receiver or immediately upon Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including computer files and other records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents. In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property. Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under this Section 3 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

(e)     If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received. Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under this Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)     If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 12.

(g)     Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Instrument.

New Jersey Mortgage                                                                                    Page 6

EXHIBIT 6 PAGE 13 OF 37

**4.    ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.**

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the "Mortgaged Property" as that term is defined in Section 1. However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Instrument.

(b)    Until Lender gives notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section 4 or any other provision of this Instrument), including the right, power and authority to modify the terms of any Lease or extend any Lease. In no event, however, shall Borrower have the right to terminate any lease or to modify the terms of any lease so as to decrease the rent or shorten the term of the lease without the prior written consent of Lender. Any purported termination or modification of any lease without Lender's prior written consent in violation of the preceding sentence shall constitute an Event of Default and shall be void and of no force or effect. Upon the occurrence of an Event of Default, the permission given to Borrower pursuant to the first sentence of this Section 4(b) to exercise rights, power and authority under Leases shall automatically terminate. Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)    Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and the Improvements. The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Instrument or to expend any money or to incur any expenses. Lender shall not be liable in any way for any injury or damage to person or property sustained by any Person in or about the Mortgaged Property. Prior to Lender's actual entry into and taking possession of the Mortgaged Property, Lender shall not (i) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (ii) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property; or (iii) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property. The execution of this Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)    Upon delivery of notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)    Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each Lease then in effect.

(f)    Borrower further covenants with Lender that (i) all Leases shall be written on a standard form of lease that has been or will be approved in writing in advance by Lender; (ii) upon request, Borrower shall furnish Lender with executed copies of all Leases and all amendments thereto; (iii) no material changes may be made to the Lender-approved standard lease without the prior written consent of Lender; (iv) all renewals of Leases and all proposed Leases shall provide for rental rates comparable to existing local market rates and shall be arm's-length transactions; (v) all Leases shall provide that (A) they are subordinate to this Instrument and any other indebtedness now or hereafter secured by the Mortgaged Property, (B) lessees agree to attorn to Lender (such attornment to be effective upon Lender's acquisition of title to the Mortgaged Property), (C) lessees agree to execute such further evidences of attornment as Lender may from time to time request, (D) the attornment of the lessees shall not be terminated by foreclosure, (E) Lender may, at Lender's option, accept or reject such attornment, and (F)

New Jersey Mortgage

EXHIBIT 6 PAGE 14 OF 37

lessees agree to execute and acknowledge a subordination, attornment and non-disturbance agreement in form and content acceptable to Lender; and, two times in any calendar year, as Lender may request, a certificate signed by lessee confirming and containing such factual certifications and representations deemed appropriate by Lender; (vi) Borrower shall not grant any purchase options without the prior written approval of Lender; and (vii) all new Leases shall be subject to the prior written approval of Lender.  Lender acknowledges that Lender has reviewed and approved the Leases in effect as of the date of initial disbursement of the Loan.

(g)     Borrower shall not receive or accept Rent under any Lease for more than one (1) month in advance.

5.     **PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS.**  Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and the other Loan Documents and shall perform, observe and comply with all other provisions of the Note and the other Loan Documents.

6.     **FULL RECOURSE PERSONAL LIABILITY.**  Borrower shall have full recourse personal liability under the Note, this Instrument and all other Loan Documents for the repayment of the Indebtedness and for the performance of any and all other obligations of Borrower under the Note, this Instrument and all other Loan Documents.

7.     **DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.**

(a)     Unless this requirement is waived in writing by Lender, or as otherwise provided in this Section, Borrower shall deposit with Lender on the day monthly installments of principal or interest, or both, are due under the Note (or on another day designated in writing by Lender), until the Indebtedness is paid in full, an additional amount estimated by Lender to be sufficient to accumulate with Lender the entire sum required to pay, when due, the items marked "COLLECT" below, plus, at Lender's discretion, a contingency reserve of up to one-sixth of such estimate.  Lender will not initially require Borrower to make Imposition Deposits with respect to any items marked "DEFERRED" or "NOT APPLICABLE" below.

| | |
|---|---|
| [DEFERRED] | Property Insurance premiums or other insurance premiums required by Lender under Section 19 |
| [DEFERRED] | Taxes |
| [DEFERRED] | water and sewer charges (that could become a lien on the Mortgaged Property) |
| [DEFERRED] | assessments or other charges (that could become a lien on the Mortgaged Property) |

The amounts deposited under the preceding sentence are collectively referred to in this Instrument as the "**Imposition Deposits**".  The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this Instrument as "**Impositions**".  The amount of the Imposition Deposits shall be sufficient to enable Lender to pay each Imposition before the last date upon which such payment may be made without any penalty or interest charge being added.  Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, Insurance premiums and each other Imposition.

(b)     Imposition Deposits shall be held by Lender or in a bank, credit union or other financial institution designated by Lender.  Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing.  Unless applicable law requires, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits.  As additional security for all of Borrower's obligations under this Instrument and the other Loan Documents, Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits and all proceeds of, and all interest and dividends on, the Imposition Deposits.  Any amounts deposited with Lender under this Section 7 shall not be trust funds, nor shall they operate to reduce the Indebtedness, unless applied by Lender for that purpose under Section 7(e).

(c)     If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender.  Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender.  Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

(d)     If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender, plus at Lender's discretion, a contingency reserve of up to one-sixth of such estimate, the excess shall be credited against future installments of Imposition Deposits.  If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by Lender to be necessary, plus, at Lender's discretion, a contingency reserve of up to one-sixth of such estimate, Borrower shall pay to Lender the amount of the deficiency within 15 days after notice from Lender.

EXHIBIT 6 PAGE 15 OF 37

(e)    If an Event of Default has occurred and is continuing, Lender may apply any Imposition Deposits, in any amounts and in any order as Lender determines, in Lender's discretion, to pay any Impositions or as a credit against the Indebtedness. Upon payment in full of the Indebtedness, Lender shall refund to Borrower any Imposition Deposits held by Lender.

(f)    If Lender does not collect an Imposition Deposit with respect to an Imposition either marked "DEFERRED" in Section 7(a) or pursuant to a separate written waiver by Lender, then at least thirty (30) days before the date each such Imposition is due, or on the date this Instrument requires each such Imposition to be paid, Borrower must provide Lender with proof of payment of each such Imposition for which Lender does not require collection of Imposition Deposits. Lender may revoke its deferral or waiver and require Borrower to deposit with Lender any or all of the Imposition Deposits listed in Section 7(a), regardless of whether any such item is marked "DEFERRED" in such section, upon notice to Borrower, (i) if Borrower does not timely pay any of the Impositions as required by this Instrument, (ii) if Borrower fails to provide timely proof to Lender of such payment as required by this Instrument, or (iii) at any time from and after the occurrence of an Event of Default or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

(g)    In the event of a Transfer prohibited by or requiring Lender's approval under Section 21, Lender's waiver or deferral of the collection of any Imposition Deposit in this Section 7 may be modified or rendered void by Lender at Lender's sole option and discretion by notice to Borrower and the transferee(s) as a condition of Lender's approval of such Transfer.

**8.    COLLATERAL AGREEMENTS.** Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement.

**9.    APPLICATION OF PAYMENTS.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Neither Lender's acceptance of an amount which is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Instrument and the Note shall remain unchanged.

**10.    COMPLIANCE WITH LAWS AND ORGANIZATIONAL DOCUMENTS.**

(a)    Borrower shall comply with all laws, ordinances, regulations and requirements of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, regulations, requirements and covenants pertaining to health and safety, construction of improvements on the Mortgaged Property, fair housing, zoning and land use, and Leases. Borrower also shall comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits.

(b)    Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 10.

(c)    Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property. Borrower represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

(d)    Borrower shall at all times comply with all laws, regulations and requirements of any Governmental Authority relating to Borrower's formation, continued existence and good standing in the Property Jurisdiction.

(e)    If Borrower is not a natural person: (A) Borrower, and any Sub-Entity, shall maintain its existence as long as any portion of the Indebtedness remains unpaid; and (B) Borrower shall give written notice to Lender within ten (10) days after any dissolution or event triggering dissolution of Borrower or any Sub-Entity (which shall constitute an Event of Default under clause (A) of this sentence). As used in this Section 10, "Sub-Entity" shall include any managing or controlling entities, including any of the following that is not a natural person: (i) any manager or member of a limited liability company and any Sub-Entity thereof, (ii) any general partner of a general or limited partnership or limited liability partnership and any Sub-Entity thereof. To the extent not in conflict with the provisions of this Instrument and the other Loan Documents, Borrower shall at all times comply with its organizational documents, including but not limited to its partnership agreement (if Borrower is a partnership), its by-laws (if Borrower is a corporation or housing cooperative corporation or association) or its operating agreement (if Borrower is a limited liability company, joint venture or tenancy-in-common). If Borrower is not a natural person, then: (A) Borrower shall at all times comply with all laws, regulations and requirements of any Governmental Authority relating to Borrower's formation,

EXHIBIT 6 PAGE 16 OF 37

continued existence and good standing in the state or commonwealth of Borrower's formation; (B) if the state or commonwealth of Borrower's formation is not the Property Jurisdiction, Borrower shall register or qualify as a foreign entity in the Property Jurisdiction and maintain such registration or qualification in good standing; (C) Borrower shall promptly provide Lender with copies of any amendments or supplements to Borrower's and any Sub-Entity's organizational documents; and (D) within ten (10) days after request by Lender, Borrower shall furnish evidence satisfactory to Lender that Borrower and any Sub-Entity is/are in good standing in its/their state(s) or commonwealth(s) of organization, and, if different, the Property Jurisdiction.

**11.**    **USE OF PROPERTY.**    Unless required by applicable law, Borrower shall not (a) except for any change in use approved by Lender, allow changes in the use for which all or any part of the Mortgaged Property was being used at the time this Instrument was executed, (b) convert, in whole or in part, any non-residential income producing units to non-income producing units, (c) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property, or (d) establish any condominium or cooperative regime with respect to the Mortgaged Property.  Borrower acknowledges that Lender has not agreed to grant any partial releases or reconveyances of any portion of the Mortgaged Property, and that the release and reconveyance of the lien of this Instrument shall only be granted by Lender upon full repayment of the Indebtedness.

**12.**    **PROTECTION OF LENDER'S SECURITY.**

(a)    If Borrower fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out of pocket expenses of attorneys, accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 19, (4) payment of amounts which Borrower has failed to pay under Sections 15 and 17, and (5) advances made by Lender to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a **"Prior Lien"**).

(b)    Any amounts disbursed by Lender under this Section 12, or under any other provision of this Instrument that treats such disbursement as being made under this Section 12, shall be added to, and become part of, the principal component of the Indebtedness, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the **"Default Rate"**, as defined in the Note.

(c)    Nothing in this Section 12 shall require Lender to incur any expense or take any action.

**13.**    **INSPECTION.**  Lender, its agents, representatives, and designees may make or cause to be made entries upon and inspections of the Mortgaged Property (including environmental inspections and tests) during normal business hours, or at any other reasonable time.  Borrower shall within five (5) days after written request by Lender provide the name, phone number, address and email address of a contact person for Borrower or for a property management company managing the Mortgaged Property to arrange such inspection.  Such contact person shall meet Lender's inspector(s) at the Mortgaged Property at the time specified by Lender and shall provide Lender's inspector(s) with access to all areas of the Mortgaged Property as Lender's inspector's may require to complete such inspection.  At any time when an Event of Default has occurred and is continuing, the cost of such inspections shall be paid by Borrower upon written demand by Lender and if not paid within thirty (30) days after such written demand, and, until paid, shall be added to and constitute a part of the Indebtedness as provided in Section 12.

**14.**    **BOOKS AND RECORDS; FINANCIAL REPORTING.**

(a)    Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property.  The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)    Borrower and Guarantor shall furnish to Lender all of the following:

(1)    within one hundred twenty (120) days after the end of each fiscal year of Borrower, a statement of income and expenses for Borrower's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Mortgaged Property for that

EXHIBIT 6 PAGE 17 OF 37

~~fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of that fiscal year;~~

(2)  within one hundred twenty (120) days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a rent schedule for the Mortgaged Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender;

(3)  at any time upon Lender's request, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(4)  within one hundred twenty (120) days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Borrower and any Controlling Entity and the interest held by each, if Borrower or a Controlling Entity is a corporation, all officers and directors of Borrower and the Controlling Entity, and If Borrower or a Controlling Entity is a limited liability company, all managers who are not members;

(5)  upon Lender's request, quarterly income and expense statements for the Mortgaged Property;

(6)  upon Lender's request at any time when an Event of Default has occurred and is continuing, monthly income and expense statements for the Mortgaged Property;

(7)  within ten (10) days after Lender's request, a current monthly property management report for the Mortgaged Property, showing the number of inquiries made and rental applications received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender;

(8)  within ten (10) days after Lender's request, a balance sheet, a statement of income and expenses for Borrower and each Guarantor and a statement of changes in financial position of Borrower and each Guarantor for Borrower's or such Guarantor's most recent fiscal year; and

(9)  within thirty (30) days after filing, copies of all business federal and state income tax returns filed by JMH INVESTMENTS LLC, (or, if Borrower or any Guarantor is a "disregarded entity" for federal tax purposes, the federal and state returns filed by the owner of Borrower or such Guarantor).

(10)  within thirty (30) days after filing, copies of all personal federal and state income tax returns filed and updated personal financial statement(s) for RICHARD S. HOLLEY and BETH A. HOLLEY, (or, if Borrower or any Guarantor is a "disregarded entity" for federal tax purposes, the federal and state returns filed by the owner of Borrower or such Guarantor).

(11)  within thirty (30) days after filing, copies of all business federal and state income tax returns filed by THE STEWART HOLLEY AGENCY, LLC, (or, if Borrower or any Guarantor is a "disregarded entity" for federal tax purposes, the federal and state returns filed by the owner of Borrower or such Guarantor).

(c)    Each of the statements, schedules, documents, items and reports required by Section 14(b) shall be certified to be complete and accurate by each individual Borrower, an individual (or individuals) having authority to bind each entity Borrower and (for guarantor information and documents) each Guarantor, and shall be in such form and contain such detail as Lender may reasonably require. Lender may, at Lender's discretion, require that any statements, schedules or reports be audited at Borrower's expense by independent certified public accountants acceptable to Lender.

(d)    In the event Borrower or any Guarantor fails to deliver such statements, schedules, documents, items and reports within the time frames provided in Section 14(b) above, then such failure shall constitute an Event of Default and, in addition to any other remedies which may be available to Lender as a result of such Event of Default, Borrower shall pay a late charge equal to two percent (2%) of the monthly payment amount for each late submission of financial reports to compensate Lender or its servicer for the additional administrative expense caused by such failure or delay whether or not Borrower is entitled to any notice and opportunity to cure such failure prior to the exercise of any of the remedies. Such late charge shall be charged each month that any financial statements remain delinquent. The late charge shall be immediately payable from Borrower upon demand by Lender and, until paid, shall be added to and constitute a part of the Indebtedness as provided in

EXHIBIT 6 PAGE 18 OF 37

Section 12. In no event shall the financial statement late charge constitute a cure of Borrower's or any Guarantor's default in failing to provide financial statements, nor limit Lender's remedies as a result of such default. In addition to such financial statement late charge and any other remedies which may be available to Lender as a result of such Event of Default, Lender shall have the right: (1) to increase the interest rate under the Note to the Default Rate provided for in the Note as long as such financial statements remain delinquent, and (2) to have Borrower's or any Guarantor's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness as provided in Section 12.

(e)    If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation.

(e)    Borrower authorizes Lender to obtain a credit report on Borrower at any time.

### 15.    TAXES; OPERATING EXPENSES.

(a)    Subject to the provisions of Section 15(c) and Section 15(d), Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)    Subject to the provisions of Section 15(c), Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)    As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notices that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition. If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable. Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notices as provided above.

(d)    Borrower, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition.

(e)    Borrower shall promptly deliver to Lender a copy of all notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments in accordance with Section 7(f).

### 16.    LIENS; ENCUMBRANCES.  Borrower acknowledges that the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance (a "Lien") on the Mortgaged Property (other than the lien of this Instrument and the liens and encumbrances reflected on the Schedule of Title Exceptions) or on certain ownership interests in Borrower, whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Instrument, is a "Transfer" which constitutes an Event of Default under Section 21 of this Instrument.

### 17.    PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.  Borrower (a) shall not commit waste or permit impairment or deterioration of the Mortgaged Property, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, (e) shall provide for professional management of the Mortgaged Property by a property manager satisfactory to Lender under a contract approved by Lender in writing, and (f) shall give notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument. Borrower shall not (and shall not permit any tenant or other Person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except in connection with the replacement of tangible Personalty.

EXHIBIT 6 PAGE 19 OF 37

18.    ENVIRONMENTAL HAZARDS.

(a)    Except for matters covered by a written plan of operations and maintenance approved in writing by Lender (an "O&M Plan") or matters described in Section 18(b), Borrower shall not cause or permit any of the following:

(1)    the presence, use, generation, release, treatment, processing, storage (including storage in above ground and underground storage tanks), handling, or disposal of any Hazardous Materials on or under the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property;

(2)    the transportation of any Hazardous Materials to, from, or across the Mortgaged Property;

(3)    any occurrence or condition (including soil and groundwater conditions) on the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property, which occurrence or condition is or may be in violation of Hazardous Materials Laws; or

(4)    any violation of or noncompliance with the terms of any Environmental Permit with respect to the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property.

The matters described in clauses (1) through (4) above are referred to collectively in this Section 18 as "Prohibited Activities or Conditions".

(b)    Prohibited Activities and Conditions shall not include the safe and lawful use and storage of quantities of (1) pre-packaged supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable properties, (2) cleaning materials and other items sold in pre-packaged containers and used by tenants and occupants of the Mortgaged Property; and (3) petroleum products used in the operation and maintenance of motor vehicles from time to time located on the Mortgaged Property's parking areas, so long as all of the foregoing are used, stored, handled, transported and disposed of in compliance with Hazardous Materials Laws.

(c)    Borrower shall take all commercially reasonable actions (including the inclusion of appropriate provisions in any Leases executed after the date of this Instrument) to prevent its employees, agents, and contractors, and all tenants and other occupants from causing or permitting any Prohibited Activities or Conditions. Borrower shall not lease or allow the sublease or use of all or any portion of the Mortgaged Property to any tenant or subtenant by any user that, in the ordinary course of its business, would cause or permit any Prohibited Activity or Condition.

(d)    If an O&M Plan has been established with respect to Hazardous Materials, Borrower shall comply in a timely manner with, and cause all employees, agents, and contractors of Borrower and any other Persons present on the Mortgaged Property to comply with the O&M Plan. All costs of performance of Borrower's obligations under any O&M Plan shall be paid by Borrower, and Lender's out-of-pocket costs incurred in connection with the monitoring and review of the O&M Plan and Borrower's performance shall be paid by Borrower upon demand by Lender. Any such out-of-pocket costs of Lender which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 12.

(e)    Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

(1)    Borrower has not at any time engaged in, caused or permitted any Prohibited Activities or Conditions;

(2)    to the best of Borrower's knowledge after reasonable and diligent inquiry, no Prohibited Activities or Conditions exist or have existed;

(3)    except to the extent previously disclosed by Borrower to Lender in writing, the Mortgaged Property does not now contain any underground storage tanks, and, to the best of Borrower's knowledge after reasonable and diligent inquiry, the Mortgaged Property has not contained any underground storage tanks in the past. If there is an underground storage tank located on the Mortgaged Property which has been previously disclosed by Borrower to Lender in writing, that tank complies with all requirements of Hazardous Materials Laws;

(4)    Borrower has complied with all Hazardous Materials Laws, including all requirements for notification regarding releases of Hazardous Materials. Without limiting the generality of the foregoing, Borrower has obtained all Environmental Permits required for the operation of the Mortgaged Property in accordance with Hazardous Materials Laws now in effect and all such Environmental Permits are in full force and effect;

New Jersey Mortgage                                                                                              Page 13

EXHIBIT 6 PAGE 20 OF 37

(5)    no event has occurred with respect to the Mortgaged Property that constitutes, or with the passing of time or the giving of notice would constitute, noncompliance with the terms of any Environmental Permit;

(6)    there are no actions, suits, claims or proceedings pending or, to the best of Borrower's knowledge after reasonable and diligent inquiry, threatened that involve the Mortgaged Property and allege, arise out of, or relate to any Prohibited Activity or Condition;

(7)    Borrower has not received any complaint, order, notice of violation or other communication from any Governmental Authority with regard to air emissions, water discharges, noise emissions or Hazardous Materials, or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property;

(8)    there are no liens arising under or pursuant to any Hazardous Materials Laws affecting the Mortgaged Property and there are no facts, circumstances, or conditions that could reasonably be expected to restrict, encumber, or result in the imposition of special conditions under any Hazardous Materials Law with respect to the ownership, occupancy development, use, or transferability of the Mortgaged Property;

(9)    there has been no written environmental audit, investigation, assessment, review, sampling or analysis conducted by Borrower of the Mortgaged Property which in any such case has not been delivered to Lender prior to the date hereof; and

(10)    at the time of acquiring the Mortgaged Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Mortgaged Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Mortgaged Property has been or is now being used for any Prohibited Activities or Conditions.

The representations and warranties in this Section 18 shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loan, until the Indebtedness has been paid in full.

(f)    Borrower shall promptly notify Lender in writing upon the occurrence of any of the following events:

(1)    Borrower's discovery of any Prohibited Activity or Condition;

(2)    Borrower's receipt of or knowledge of any complaint, order, notice of violation or other communication from any Governmental Authority or other Person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Mortgaged Property or any other property of Borrower that is adjacent to the Mortgaged Property; and

(3)    any representation or warranty in this Section 18 becomes untrue after the date of this Agreement.

Any such notice given by Borrower shall not relieve Borrower of, or result in a waiver of, any obligation under this Instrument, the Note, or any other Loan Document.

(g)    Borrower shall pay promptly the costs of any environmental inspections, tests or audits ("**Environmental Inspections**") required by Lender in connection with any foreclosure or deed in lieu of foreclosure, or as a condition of Lender's consent to any Transfer under Section 21, or required by Lender following a reasonable determination by Lender that Prohibited Activities or Conditions may exist. Any such costs incurred by Lender (including the fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial or administrative process or otherwise) which Borrower fails to pay promptly shall become an additional part of the Indebtedness as provided in Section 12. The results of all Environmental Inspections made by Lender shall at all times remain the property of Lender and Lender shall have no obligation to disclose or otherwise make available to Borrower or any other party such results or any other information obtained by Lender in connection with its Environmental Inspections. Lender hereby reserves the right, and Borrower hereby expressly authorizes Lender, to make available to any party, including any prospective bidder at a foreclosure sale of the Mortgaged Property, the results of any Environmental Inspections made by Lender with respect to the Mortgaged Property. Borrower consents to Lender notifying any party (either as part of a notice of sale or otherwise) of the results of any of Lender's Environmental Inspections. Borrower acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the results of any of its Environmental Inspections and that the release of such results to prospective bidders at a foreclosure sale of the Mortgaged Property may have a material and adverse effect upon the amount which a party may bid at such sale. Borrower agrees that Lender shall have no liability whatsoever as a result of delivering the results of any of its Environmental Inspections to any third party, and Borrower hereby releases and forever discharges Lender from any and all

EXHIBIT 6 PAGE 21 OF 37

claims, damages, or causes of action, arising out of, connected with or incidental to the results of, the delivery of any of Lender's Environmental Inspections.

(h)    If any investigation, site monitoring, containment, clean-up, restoration or other remedial work ("**Remedial Work**") is necessary to comply with any Hazardous Materials Law or order of any Governmental Authority that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property under any Hazardous Materials Law, Borrower shall, by the earlier of (1) the applicable deadline required by Hazardous Materials Law or (2) 30 days after notice from Lender demanding such action, begin performing the Remedial Work, and thereafter diligently prosecute it to completion, and shall in any event complete the work by the time required by applicable Hazardous Materials Law.  If Borrower fails to begin on a timely basis or diligently prosecute any required Remedial Work, Lender may, at its option, cause the Remedial Work to be completed, in which case Borrower shall reimburse Lender on demand for the cost of doing so. Any reimbursement due from Borrower to Lender shall become part of the Indebtedness as provided in Section 12.

(i)    Borrower shall cooperate with any inquiry by any Governmental Authority and shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition.

(j)    Borrower shall indemnify, hold harmless and defend (i) Lender, (ii) any prior owner or holder of the Note, (iii) the Loan Servicer, (iv) any prior Loan Servicer, (v) the officers, directors, shareholders, partners, employees and trustees of any of the foregoing, and (vi) the heirs, legal representatives, successors and assigns of each of the foregoing (collectively, the "**Indemnitees**") from and against all proceedings, claims, damages, liabilities, obligations, demands, causes of action, losses, fines, penalties and costs (whether initiated or sought by Governmental Authorities or private parties), including fees and out of pocket expenses of attorneys and expert witnesses, investigatory fees, and remediation costs, whether incurred in connection with any judicial or administrative process or otherwise, arising directly or indirectly from any of the following:

(1)    any breach of any representation or warranty of Borrower in this Section 18;

(2)    any failure by Borrower to perform any of its obligations under this Section 18;

(3)    the existence or alleged existence of any Prohibited Activity or Condition;

(4)    the presence or alleged presence of Hazardous Materials on or under the Mortgaged Property or any property of Borrower that is adjacent to the Mortgaged Property;

(5)    the actual or alleged violation of any Hazardous Materials Law; and

(6)    any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to any Hazardous Materials.

(k)    Counsel selected by Borrower to defend Indemnitees shall be subject to the approval of those Indemnitees. However, any Indemnitee may elect to defend any claim or legal or administrative proceeding at Borrower's expense.

(l)    Borrower shall not, without the prior written consent of those Indemnitees who are named as parties to a claim or legal or administrative proceeding (a "**Claim**"), settle or compromise the Claim if the settlement (1) results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Lender of a written release of those Indemnitees, satisfactory in form and substance to Lender; or (2) may materially and adversely affect Lender, as determined by Lender in its discretion.

(m)    Borrower's obligation to indemnify the Indemnitees shall not be limited or impaired by any of the following, or by any failure of Borrower or any Guarantor to receive notice of or consideration for any of the following:

(1)    any amendment or modification of any Loan Document;

(2)    any extensions of time for performance required by any Loan Document;

(3)    any provision in any of the Loan Documents limiting Lender's recourse to property securing the Indebtedness, or limiting the personal liability of Borrower or any other party for payment of all or any part of the Indebtedness;

(4)    the accuracy or inaccuracy of any representations and warranties made by Borrower under this Instrument or any other Loan Document;

(5)    the release of Borrower or any other Person, by Lender or by operation of law, from performance of any obligation under any Loan Document;

(6)    the release or substitution in whole or in part of any security for the Indebtedness; and

(7)    Lender's failure to properly perfect any lien or security interest given as security for the Indebtedness.

(n)    Borrower shall, at its own cost and expense, do all of the following:

EXHIBIT 6 PAGE 22 OF 37

    (1)      pay or satisfy any judgment or decree that may be entered against any Indemnitee or Indemnitees in any legal or administrative proceeding incident to any matters against which Indemnitees are entitled to be indemnified under this Section 18;

    (2)      reimburse Indemnitees for any expenses paid or incurred in connection with any matters against which Indemnitees are entitled to be indemnified under this Section 18; and

    (3)      reimburse Indemnitees for any and all expenses, including fees and out of pocket expenses of attorneys and expert witnesses, paid or incurred in connection with the enforcement by Indemnitees of their rights under this Section 18, or in monitoring and participating in any legal or administrative proceeding.

    (o)      In any circumstances in which the indemnity under this Section 18 applies, Lender may employ its own legal counsel and consultants to prosecute, defend or negotiate any claim or legal or administrative proceeding and Lender, with the prior written consent of Borrower (which shall not be unreasonably withheld, delayed or conditioned) may settle or compromise any action or legal or administrative proceeding. Borrower shall reimburse Lender upon demand for all costs and expenses incurred by Lender, including all costs of settlements entered into in good faith, and the fees and out of pocket expenses of such attorneys and consultants.

    (p)      The provisions of this Section 18 shall be in addition to any and all other obligations and liabilities that Borrower may have under applicable law or under other Loan Documents, and each Indemnitee shall be entitled to indemnification under this Section 18 without regard to whether Lender or that Indemnitee has exercised any rights against the Mortgaged Property or any other security, pursued any rights against any Guarantor, or pursued any other rights available under the Loan Documents or applicable law. If Borrower consists of more than one Person, the obligation of those Persons to indemnify the Indemnitees under this Section 18 shall be joint and several. The obligation of Borrower to indemnify the Indemnitees under this Section 18 shall survive any repayment or discharge of the Indebtedness, any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure, and any release of record of the lien of this Instrument.

    **19.**    **PROPERTY AND LIABILITY INSURANCE.**

    (a)      Borrower shall keep the Improvements insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire, windstorm and allied perils, general boiler and machinery coverage, and business income coverage. Lender's insurance requirements may change from time to time throughout the term of the Indebtedness. If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage. In the event any updated reports or other documentation are reasonably required by Lender in order to determine whether such additional insurance is necessary or prudent, Borrower shall pay for all such documentation at its sole cost and expense. If any of the Improvements is located in an area that is either (i) identified by the Federal Emergency Management Agency (or any successor to that agency) ("**FEMA**") as an area having special flood hazards or (ii) designated by FEMA as Zone D, and if flood insurance is available in that area, Borrower shall insure such Improvements against loss by flood. If Lender so requires, such insurance shall also include business income/rental value insurance for all relevant perils to be covered in the amount required by Lender, but in no case less than the effective gross income attributable to the Mortgaged Property for the preceding 12 months, as determined by Lender in Lender's discretion. All insurance required pursuant to this Section 19(a) shall be referred to as "**Property Insurance**". All policies of Property Insurance must include a non-contributing, non-reporting mortgagee clause in favor of, and in a form approved by, Lender, and shall provide that the insurer will notify Lender in writing of cancelation of policies at least 10 days before the cancelation of the policy by the insurer for nonpayment of the premium or nonrenewal and at least 30 days before cancelation by the insurer for any other reason.

    (b)      All premiums on insurance policies required under this Section 19 shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment. All such policies shall also be in a form approved by Lender. Borrower shall deliver to Lender a legible copy of each insurance policy (or duplicate original) and Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums. At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender a legible copy of each renewal policy (or a duplicate original) in a form satisfactory to Lender.

    (c)      Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require. All policies for general liability insurance must contain a standard additional insured provision, in favor of, and in a form approved by, Lender.

New Jersey Mortgage                                              Page 16

**EXHIBIT 6** PAGE 23 OF 37

(d)       All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time require, shall be in such form and contain such endorsements as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender.

(e)       Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Instrument requires Borrower to maintain.

(f)       In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender. Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 19 shall require Lender to incur any expense or take any action. Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender (the "**Restoration**"), or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar properties.

(g)       Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; and (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty.

(h)       If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, Lender shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

**20.       CONDEMNATION.**

(a)       Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect (a "**Condemnation**"). Borrower shall appear in and prosecute or defend any action or proceeding relating to any Condemnation unless otherwise directed by Lender in writing. Borrower authorizes and appoints Lender as attorney in fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action. Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

(b)       Lender may apply such awards or proceeds, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, to the restoration or repair of the Mortgaged Property or to the payment of the Indebtedness, with the balance, if any, to Borrower. Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness shall not extend or postpone the due date of any monthly installments referred to in the Note, Section 7 of this Instrument or any Collateral Agreement, or change the amount of such installments. Borrower agrees to execute such further evidence of assignment of any awards or proceeds as Lender may require.

**21.       TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER [NO RIGHT TO TRANSFER].**

(a)       "**Transfer**" means (A) a sale, assignment, transfer or other disposition (whether voluntary, involuntary or by operation of law); (B) the granting, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law); (C) the issuance or other creation of an ownership interest in a legal entity, including a partnership interest, interest in a limited liability company or corporate stock; (D) the withdrawal, retirement, removal or involuntary resignation of a partner in a partnership or a member or manager in a limited liability company; or (E) the merger,

EXHIBIT 6 PAGE 24 OF 37

dissolution, liquidation, or consolidation of a legal entity or the reconstitution of one type of legal entity into another type of legal entity. For purposes of defining the term "Transfer," the term "partnership" shall mean a general partnership, a limited partnership, a joint venture and a limited liability partnership, and the term "partner" shall mean a general partner, a limited partner and a joint venturer.

(b)    "Transfer" does not include: (i) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under this Instrument, (ii) the Mortgaged Property becoming part of a bankruptcy estate by operation of law under the Bankruptcy Code; or (iii) a lien against the Mortgaged Property for local taxes and/or assessments not then due and payable.

(c)    The occurrence of any of the following events shall not constitute an Event of Default under this Instrument, notwithstanding any provision of this Section 21 to the contrary:

    (i)    a Transfer to which Lender has consented;

    (ii)    a Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person (unless such death itself is an Event of Default under Section 22(n) of this Instrument);

    (iii)    the grant of a leasehold interest in accordance with the terms of this Instrument or otherwise approved in writing by Lender;

    (iv)    a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality, which are free of liens, encumbrances and security interests other than those created by the Loan Documents or consented to by Lender;

    (v)    the creation of a mechanic's, materialman's, or judgment lien against the Mortgaged Property which is released of record or otherwise remedied to Lender's satisfaction within 60 days of the date of creation; and

    (vi)    if Borrower is a housing cooperative, corporation or association, the Transfer of more than 49 percent of the shares in the housing cooperative or the assignment of more than 49 percent of the occupancy agreements or leases relating thereto by tenant shareholders of the housing cooperative or association to other tenant shareholders.

(d)    The occurrence of any of the following Transfers shall not constitute an Event of Default under this Instrument, provided that Borrower has notified Lender in writing within 30 days following the occurrence of any of the following, and such Transfer does not constitute an Event of Default under any other Section of this Instrument:

    (i)    a change of Borrower's name, provided that UCC financing statements and/or amendments sufficient to continue the perfection of Lender's security interest have been properly filed and copies have been delivered to Lender;

    (ii)    a change of the form of Borrower not involving a transfer of Borrower's assets and not resulting in any change in liability of any Initial Owner, provided that: (A) UCC financing statements and/or amendments sufficient to continue the perfection of Lender's security interest have been properly filed and copies have been delivered to Lender, (B) Lender has been provided, in advance, for Lender's review and approval, all proposed filings, amendments and other documents pertaining to such change in form, and (C) Borrower shall pay for attorneys' fees, and other out of pocket costs of Lender for the review of such documents and any filings, including any title endorsement costs if Lender in its discretion requires an endorsement or endorsements to Lender's title policy;

    (iii)    the merger of Borrower with another entity when Borrower is the surviving entity;

    (iv)    [intentionally omitted]; and

    (v)    the grant of an easement, if before the grant Lender determines that the easement will not materially affect the operation or value of the Mortgaged Property or Lender's interest in the Mortgaged Property, and Borrower pays to Lender, upon demand, all costs and expenses, including Attorneys' Fees and Costs, incurred by Lender in connection with reviewing Borrower's request.

(e)    The occurrence of any of the following events shall constitute an Event of Default under this Instrument:

    (i)    a Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property (including without limitation the creation or existence of any Lien as provided in Section 16 of this Instrument);

EXHIBIT 6 PAGE 25 OF 37

(ii)    if Borrower is a limited partnership, a Transfer of (A) any general partnership interest, or (B) limited partnership interests in Borrower that would cause the Initial Owners of Borrower to own less than a Controlling Interest of all limited partnership interests in Borrower;

(iii)    if Borrower is a general partnership or a joint venture, a Transfer of any general partnership or joint venture interest in Borrower;

(iv)    if Borrower is a limited liability company, (A) a Transfer of any membership interest in Borrower which would cause the Initial Owners to own less than a Controlling Interest of all the membership interests in Borrower, (B) a Transfer of any membership or other interest of a manager in Borrower that results in a change of manager, or (C) a change of a nonmember manager;

(v)    if Borrower is a corporation, (A) the Transfer of any voting stock in Borrower which would cause the Initial Owners to own less than a Controlling Interest of any class of voting stock in Borrower or (B) if the outstanding voting stock in Borrower is held by 100 or more shareholders, one or more transfers by a single transferor within a 12-month period affecting an aggregate of 5% or more of that stock;

(vi)    if Borrower is a trust, (A) a Transfer of any beneficial interest in Borrower which would cause the Initial Owners to own less than a Controlling Interest of all the beneficial interests in Borrower, (B) the termination or revocation of the trust, or (C) the removal, appointment or substitution of a trustee of Borrower; and

(vii)    a Transfer of any interest in a Controlling Entity which, if such Controlling Entity were Borrower, would result in an Event of Default under any of Sections 21(e)(i) through (vi) above.

Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default in order to exercise any of its remedies with respect to an Event of Default under this Section 21.

22.    **EVENTS OF DEFAULT.** The occurrence of any one or more of the following shall constitute an Event of Default under this Instrument:

(a)    any failure by Borrower to pay or deposit when due any amount required by the Note, this Instrument or any other Loan Document;

(b)    any failure by Borrower to maintain the insurance coverage required by Section 19 or to provide any financial information or documents required by Section 14;

(c)    any failure by Borrower to comply with the provisions of Section 33;

(d)    fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners or managers or any Guarantor in connection with (A) the application for or creation of the Indebtedness, (B) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (C) any request for Lender's consent to any proposed action, including a request for disbursement of funds under any Collateral Agreement;

(e)    any event or condition that under the terms of this Instrument is specified as constituting an Event of Default, including, without limitation, any Event of Default under Section 21;

(f)    the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property;

(g)    any failure by Borrower to perform any of its obligations under this Instrument (other than those specified in Sections 22(a) through (f)), as and when required, which continues for a period of 30 days after notice of such failure by Lender to Borrower. However, no such notice or grace period shall apply in the case of any such failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Instrument, result in harm to Lender, impairment of the Note or this Instrument or any other security given under any other Loan Document;

(h)    any failure by Borrower or any Guarantor to perform any of its obligations as and when required under any Loan Document other than this Instrument which continues beyond the applicable cure period, if any, specified in that Loan Document;

(i)    any exercise by the holder of any debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable;

(j)    should any representation or warranty contained in this Instrument, the Borrower Certificate, any other Loan Document, or any other document submitted by Borrower to Lender be or become false or misleading in any material respect;

New Jersey Mortgage                                                                                          Page 19

EXHIBIT 6 PAGE 26 OF 37

(k)      if the Mortgaged Property is subject to any covenants, conditions and/or restrictions, land use restriction agreements or similar agreements, Borrower fails to perform any of its obligations under any such agreement as and when required, and such failure continues beyond any applicable cure period;

(l)      Borrower or any Guarantor makes a general assignment for the benefit of creditors, voluntarily files for bankruptcy protection under the Bankruptcy Code or voluntarily becomes subject to any reorganization, receivership, insolvency proceeding or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights, or an involuntary case is commenced against Borrower or any Guarantor by any creditor (other than Lender) of Borrower or any Guarantor pursuant to the Bankruptcy Code or other federal or state law affecting debtor and creditor rights to which Borrower or any Guarantor voluntarily becomes subject, and is not dismissed or discharged within 60 days after filing;

(m)      Borrower, any member, manager, officer, shareholder, general partner or trustee of Borrower, any Guarantor or any member, manager, officer, shareholder, general partner or trustee of any Guarantor, purports to revoke or dispute the validity of, or Borrower's or any Guarantor's liability under, any of the Loan Documents or any Guaranty; and

(n)      Borrower (if Borrower is a natural person) or any member, shareholder, partner or trustee of Borrower (if such member, shareholder, partner or trustee is a natural person), or any Guarantor who is a natural person, dies or becomes incompetent (unless, in the case of the death or incapacity of any member, shareholder or partner of Borrower, the Transfer of such member's, shareholder's or partner's Interest in Borrower would not have been an Event of Default under Section 21); provided, however, that in the event of the death of any such person, Borrower (or such deceased person's executor, administrator or successor trustee) may within thirty (30) days after such death, present to Lender credit application(s) for proposed substitute borrower(s), member(s), shareholder(s), partner(s), trustee(s) or guarantor(s) on Lender's required forms, together with such supporting financial information as Lender may require, and in such event Lender, in its sole, absolute and unfettered discretion after review of such application(s) and supporting information, may waive such Event of Default, and provided further that such waiver may, in the case of the death or incompetence of Borrower or any Guarantor, require, as a condition of such waiver, that one or more substitute borrowers or guarantors assume unconditionally the obligations of such deceased person under the Loan Documents and/or guaranty, in a manner satisfactory to Lender. In such event Borrower or the successor Borrower(s) shall execute such documentation as Lender may require and shall pay all of Lender's Attorneys' Fees and Costs and other out of pocket costs in connection with such assumption.

**23.      REMEDIES CUMULATIVE.** Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

**24.      FORBEARANCE.**

(a)      Lender may (but shall not be obligated to) agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, any Guarantor or any other third party obligor, to take any of the following actions: extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Instrument, the Note, or any other Loan Document; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Instrument, the Note, or any other Loan Document.

(b)      Any forbearance by Lender in exercising any right or remedy under the Note, this Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any awards or proceeds under Sections 19 and 20 shall not operate to cure or waive any Event of Default.

**25.      LOAN CHARGES.** If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any charge provided for in any Loan Document, whether considered separately or together with other charges levied in connection with any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the

EXHIBIT 6 PAGE 27 OF 37

Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all indebtedness which constitutes interest, as well as all other charges levied in connection with the Indebtedness which constitute interest, shall be deemed to be allocated and spread over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

26.    **WAIVER OF STATUTE OF LIMITATIONS.**  Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce any Loan Document.

27.    **WAIVER OF MARSHALLING.**  Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument, the Note, any other Loan Document or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

28.    **FURTHER ASSURANCES.**  Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Instrument and the Loan Documents.

29.    **ESTOPPEL CERTIFICATE.**  Within ten (10) days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any Person designated by Lender, as of the date of such statement, (i) that the Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications); (ii) the unpaid principal balance of the Note; (iii) the date to which interest under the Note has been paid; (iv) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Instrument or any of the other Loan Documents (or, if Borrower is in default, describing such default in reasonable detail); (v) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents; and (vi) any additional facts requested by Lender.

30.    **GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)    This Instrument, and any Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (the "**Property Jurisdiction**").

(b)    Borrower agrees that any controversy arising under or in relation to the Note, this Instrument, or any other Loan Document may be litigated in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have non-exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the Indebtedness, or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue, or defense to venue to which it might be entitled by virtue of domicile, habitual residence, inconvenient forum or otherwise.

31.    **NOTICE.**

(a)    All notices, demands and other communications ("**notice**") under or concerning this Instrument shall be in writing. Each notice shall be addressed to the intended recipient at its address set forth in paragraph A of this Instrument, and shall be deemed given on the earliest to occur of (1) the date when the notice is received by the addressee; (2) the first Business Day after the notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested. As used in this Section 31, the term "Business Day" means any day other than a Saturday, a Sunday or any other day on which Lender is not open for business.

(b)    Any party to this Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 31. Each party agrees that it will not refuse or reject delivery of any notice given in accordance with this Section 31, that it will acknowledge, in writing, the receipt of any notice upon request by the other party and that any notice rejected or refused by it shall be deemed for purposes of this Section 31 to have

EXHIBIT 6 PAGE 28 OF 37

been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

(c)      Any notice under the Note and any other Loan Document which does not specify how notices are to be given shall be given in accordance with this Section 31.

**32.      SALE OF NOTE; CHANGE IN SERVICER.**  The Note or a partial interest in the Note (together with this Instrument and the other Loan Documents) may be sold one or more times without prior notice to Borrower.  A sale may result in a change of the Loan Servicer.  There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given notice of the change.

**33.      SINGLE ASSET BORROWER.**  Until the Indebtedness is paid in full, Borrower (a) shall not acquire any real or personal property other than the Mortgaged Property and personal property related to the operation and maintenance of the Mortgaged Property; (b) shall not operate any business other than the management and operation of the Mortgaged Property; and (c) shall not maintain its assets in a way difficult to segregate and identify.

**34.      SUCCESSORS AND ASSIGNS BOUND.**  This Instrument shall bind, and the rights granted by this Instrument shall inure to, the respective successors and assigns of Lender and Borrower.  However, a Transfer not permitted by Section 21 shall constitute an Event of Default.

**35.      JOINT AND SEVERAL LIABILITY.**  If more than one Person signs this Instrument as Borrower, the obligations of such Persons under this Instrument, the Note and other Loan Documents shall be joint and several.

**36.      RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY.**

(a)      The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Instrument shall create any other relationship between Lender and Borrower.

(b)      No creditor of any party to this Instrument and no other Person shall be a third party beneficiary of this Instrument or any other Loan Document.  Without limiting the generality of the preceding sentence, (1) any arrangement (a "**Servicing Arrangement**") between Lender and any Loan Servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third party beneficiary of any Servicing Arrangement, and (3) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

**37.      SEVERABILITY; ENTIRE AGREEMENT; AMENDMENTS.**  The parties intend that the provisions of this Instrument and all other Loan Documents shall be legally severable.  If any term or provision of this Instrument, or any other Loan Document, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Instrument or of such other Loan Document shall not be affected thereby, and each term and provision shall be valid and be enforceable to the fullest extent permitted by law.  This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument.  This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**38.      CONSTRUCTION.**  The captions and headings of the Sections of this Instrument are for convenience only and shall be disregarded in construing this Instrument.  Any reference in this Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Instrument or to a Section of this Instrument.  All Exhibits attached to or referred to in this Instrument are incorporated by reference into this Instrument.  Any reference in this Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.  Use of the singular in this Instrument includes the plural and use of the plural includes the singular.  As used in this Instrument, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation."  The use of one gender includes the other gender, as the context may require.  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document in this Instrument shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Instrument or any other Loan Document), and (b) any reference in this Instrument to any Person shall be construed to include such Person's successors and assigns.

**39.      LOAN SERVICING.**  All actions regarding the servicing of the Loan, including the collection of payments, the giving and receipt of notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary.  If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such notice from Lender shall govern.

EXHIBIT 6  PAGE 29 OF 37

40. **DISCLOSURE OF INFORMATION.** Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including but not limited to trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of similar mortgage loans, as well as governmental regulatory agencies having regulatory authority over Lender. Borrower irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including but not limited to any right of privacy.

41. **NO CHANGE IN FACTS OR CIRCUMSTANCES.** All information in the application for the loan submitted to Lender (the "**Loan Application**") and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects. There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate.

42. **SUBROGATION.** If, and to the extent that, the proceeds of the Loan, or subsequent advances under Section 12, are used to pay, satisfy or discharge a Prior Lien, such Loan proceeds or advances shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

43. **[Intentionally Omitted]**

44. **ACCELERATION; REMEDIES.** At any time during the existence of an Event of Default, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may foreclose this Instrument by judicial proceeding and may invoke any other remedies permitted by New Jersey law, provided in equity or provided in this Instrument or in any other Loan Document. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including Attorneys' Fees and Costs permitted by Rules of Court, costs of documentary evidence, abstracts and title reports.

45. **FIXTURE FILING.** This Instrument is also a fixture filing under the Uniform Commercial Code of New Jersey.

46. **RELEASE.** Upon payment of the Indebtedness, Lender shall cancel this Instrument. Borrower shall pay to Lender the actual cost charged by the county recording officer to record the cancellation of the mortgage plus Lender's reasonable costs incurred in canceling this Instrument.

47. **NO CLAIM OF CREDIT FOR TAXES.** Borrower will not make or claim credit on or deduction from the principal or interest on the sums secured by this Instrument by reason of any municipal or governmental taxes, assessments or charges assessed upon the Mortgaged Property, or claim any deduction from the taxable value of the Mortgaged Property by reason of this Instrument.

48. **LOAN SUBJECT TO MODIFICATION.** This Instrument is subject to "modification" as such term is defined in N.J.S.A. 46:9-8.1 et seq. and shall be subject to the priority provisions thereof.

49. **TRUE AND CORRECT COPY.** BORROWER HEREBY DECLARES THAT BORROWER HAS READ THIS INSTRUMENT, HAS RECEIVED A COMPLETELY FILLED-IN COPY OF IT WITHOUT CHARGE THEREFOR, AND HAS SIGNED THIS INSTRUMENT AS OF THE DATE AT THE TOP OF THE FIRST PAGE.

50. **INTERPRETATION.** It is the intention of Borrower and Lender that if any provision of this Instrument or any other Loan Document is capable of two (2) constructions, one of which would render the provision void, and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid. Borrower acknowledges that Lender has attempted in good faith to assure that this Instrument, the Note and all other Loan Documents are in compliance with applicable laws of the Property Jurisdiction and federal laws. Nevertheless, in the event that any provision of this Instrument, the Note or any other Loan Document is not in compliance with any such laws, then the non-complying provision shall be deemed to be deleted or modified to the extent necessary to assure legal compliance. Similarly, in the event any language or disclosure required by applicable laws of the Property Jurisdiction is not contained in the Loan Documents, then the Loan Documents shall be deemed to have been supplemented to add such language or disclosure, or, at Lender's option, Lender may provide such additional language or disclosure. In either event, such legal requirement shall thereby be satisfied and such noncompliance shall be deemed to have been cured for all purposes. Within ten (10) days after written request by Lender, Borrower agrees to execute such documentation as Lender may require to cure any legal compliance issues or deficiencies in the Loan Documents.

51. **FUTURE ADVANCES.** In addition to the Indebtedness, this Instrument shall (to the extent allowed by applicable law) also secure payment of the principal, interest and other charges due on all other future loans or advances made by Lender to Borrower (or any successor in interest to Borrower as the owner of all or any part of the Mortgaged Property) when

EXHIBIT 6 PAGE 30 OF 37

the promissory note evidencing such loan or advance specifically states that it is secured by this Instrument ("**Future Advances**"), including all extensions, renewals and modifications of any such Future Advances.

52.    **AGREEMENT TO PROVIDE ADDITIONAL DOCUMENTS.** Borrower agrees to execute and acknowledge such additional documents as may be necessary or desirable in order to carry out the intent and purpose of this Instrument and the other Loan Documents, to confirm or establish the lien hereof, or to correct any clerical errors or legal deficiencies. Without limiting the foregoing, Borrower agrees to execute a replacement Note in the event the Note is lost or destroyed and to execute an amended or corrected and restated substitute Note to correct any clerical or other errors which may be discovered in the original Note. Failure of Borrower to comply with any request by Lender pursuant to this Section or under Section 28 above within ten (10) days after written request by Lender shall constitute a material Event of Default hereunder.

53.    **EXECUTION IN COUNTERPARTS.** This Instrument may be executed in multiple counterparts, and the separate signature pages and notary acknowledgments may then be combined into a single original document for recordation.

54.    **PAYMENT OF CLOSING COSTS.** If for any reason the escrow or closing agent fails to reserve and pay for all of Lender's fees, legal, documentation, appraisal, title, recording and other closing costs incurred in connection with the closing and funding of the Loan, then Borrower shall pay or reimburse Lender for any such unpaid fees or costs within ten (10) days after written demand by Lender itemizing the unpaid fees and costs. Failure of Borrower to so pay or reimburse Lender for any such unpaid fees and costs within ten (10) days after written demand by Lender shall constitute an Event of Default and, without limiting any other remedies of Lender, Lender may immediately instate the Default Rate under the Note until such amounts are received by Lender.

55.    **OBLIGATION TO PAY AT DEFAULT RATE.** Borrower agrees that it is the intention of Borrower and Lender that in the event of a foreclosure or other action to enforce the terms of any or all of the Loan Documents, and the entry of a judgment in such foreclosure or other enforcement action ("**Judgment**"), Borrower's obligation to pay Lender interest at the Default Rate (as defined in the Note), any taxes, insurance, premiums or other charges advanced by Lender, or attorney's fees or other costs and expenses incurred by Lender with respect to any or all of the Loan Documents, whether paid or incurred before or after the entry of such Judgment, will not be deemed to have merged into the Judgment and will survive the entry of such Judgment and continue in full force and effect until all such sums have been paid in full to Lender.

56.    **ADDITIONAL ENVIRONMENTAL PROVISIONS.** In addition to the representations and warranties of Borrower in Section 18, Borrower represents, warrants, and covenants as follows:

(a)    None of the real property owned and/or occupied by Borrower and located in New Jersey, including the Mortgaged Property, has been used, is now being used, or, without the prior express written consent of Lender, will in the future be used as a "Major Facility," as that term is defined in N.J.S.A. 58:10-23.11b.

(b)    If any real property owned by Borrower and located in New Jersey, including the Mortgaged Property, is used in the future, with the prior express written consent of Lender, as a Major Facility, then Borrower shall furnish the New Jersey Department of Environmental Protection with all the information required by N.J.S.A. 58:10-23.11d1 through 11d17 inclusive with respect to that property. Borrower further covenants and agrees that, so long as Borrower owns or operates any real property located in New Jersey which is used as a Major Facility, Borrower shall duly file or cause to be filed with the Director or the Division of Taxation in the New Jersey Department of the Treasury, a tax report or return and shall pay or make provision in accordance with and pursuant to N.J.S.A. 58:10-23.11h.

(c)    No lien has been attached to any revenues or any real or any personal property owned by Borrower and located in New Jersey, including the Mortgaged Property, as a result of the administrator of the New Jersey Spill Compensation Fund expending monies from such fund to pay for "Damages," as that term is defined in N.J.S.A. 58:10-23.11g, and/or "Clean up and Removal Costs," as that term is defined in N.J.S.A. 58:10-23.11b, arising from an intentional or unintentional action or omission by Borrower or any previous owner and/or operator of such real property resulting in the releasing, spilling, pumping, pouring, emitting, emptying or dumping of any Hazardous Materials into the waters of New Jersey or onto land from which it might flow or drain into such waters or into waters outside the jurisdiction of New Jersey where damage may have resulted to the lands, waters, fish, shellfish, wildlife, biota, air and other resources owned, managed, held in trust or otherwise controlled by New Jersey.

(d)    In connection with any purchase of the Mortgaged Property or any other real property acquired by Borrower on or after January 1, 1984, Borrower required that the seller of such real property, including the Mortgaged Property, comply with the applicable provisions of the New Jersey Industrial Site Recovery Act, formerly known as the Environmental Cleanup Responsibility Act (N.J.S.A. 13:1K-6 et seq.), as amended, and the seller did comply with such provisions.

New Jersey Mortgage                                                                                          Page 24

EXHIBIT 6 PAGE 31 OF 37

(e)    If there is a lien filed against the Mortgaged Property by the New Jersey Department of Environmental Protection pursuant to and in accordance with the provisions of N.J.S.A. 58:10-23.11f, as a result of the administrator of the New Jersey Spill Compensation Fund having expended monies from such fund to pay for "Damages," as that term is defined in N.J.S.A. 58:10-23.11g, and/or "Cleanup and Removal Costs," as that term is defined in N.J.S.A. 58:10-23.11b, arising from an intentional or unintentional action or omission of Borrower, resulting in the releasing, spilling, pumping, pouring, emitting, emptying or dumping of any Hazardous Materials into the waters of New Jersey or onto lands from which it might flow or drain into such waters, within 30 days from the date that Borrower is given notice that the lien has been placed against the Mortgaged Property or within such shorter period of time if New Jersey has commenced steps to cause the Mortgaged Property to be sold pursuant to the lien, Borrower will take one of the following actions:

(i)    pay the claim and remove the lien from the Mortgaged Property, or

(ii)    furnish one of the following to Lender:

(A)    a bond reasonably satisfactory to Lender and the title company which issued the title policy accepted by Lender contemporaneously with the execution and recordation of this Instrument, in the amount of the claim out of which the lien arises;

(B)    a cash deposit in the amount of the claim out of which the lien arises; or

(C)    other security reasonably satisfactory to Lender in an amount sufficient to discharge the claim out of which the lien arises.

(f)    Borrower hereby agrees that if the provisions of the New Jersey Industrial Site Recovery Act (N.J.S.A. 13:1K-6 et seq.) become applicable to all or any portion of the Mortgaged Property subsequent to the date of this Instrument, Borrower shall give prompt Notice to Lender of such applicability, and Borrower shall take immediate requisite action to ensure full compliance with such Act.

57.    **BALLOON PAYMENT NOTICE.**  The Note secured hereby provides for a balloon payment of the entire Indebtedness upon the Maturity Date of the Note.

58.    **DOCUMENT IMAGING.**  Lender shall be entitled, in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents, items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this Instrument and the other Loan Documents, and Lender may destroy or archive the paper originals. Borrower waives (i) any right to insist or require that Lender produce paper originals, (ii) agrees that such images shall be accorded the same force and effect as the paper originals, (iii) agrees that Lender is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (iv) further agrees that any executed facsimile (faxed), scanned, or other imaged copy of this Instrument or any other Loan Document shall be deemed to be of the same force and effect as the original manually executed document.

[The balance of this page is intentionally left blank.]

EXHIBIT 6 PAGE 32 OF 37

59. ~~WAIVER OF TRIAL BY JURY. BORROWER AND LENDER EACH (A) COVENANTS AND AGREES NOT~~ TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

**ATTACHED EXHIBIT.** The following Exhibit is attached to this instrument:
Exhibit "A"        Description of the Land

THIS MORTGAGE SECURES A FIXED RATE PROMISSORY NOTE.  THIS MORTGAGE IS A FIRST MORTGAGE. NO FURTHER ENCUMBRANCES MAY BE RECORDED AGAINST THE MORTGAGED PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF LENDER.  FAILURE TO COMPLY WITH THIS PROVISION SHALL CONSTITUTE AN EVENT OF DEFAULT AND AT LENDER'S OPTION THE LOAN SHALL IMMEDIATELY BECOME DUE AND PAYABLE.  CONSENT TO ONE FURTHER ENCUMBRANCE SHALL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO REQUIRE SUCH CONSENT TO FUTURE OR SUCCESSIVE ENCUMBRANCES.

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Instrument under seal (where applicable) or has caused this Instrument to be signed and delivered by its duly authorized representative under seal (where applicable).  Where applicable law so provides or allows, Borrower intends that this Instrument shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER:**

**JMH INVESTMENTS, LLC,**
a New Jersey limited liability company

By: _____
    RICHARD STEWART HOLLEY,
    Member / Manager

By: _____
    BETH A. HOLLEY,
    Member / Manager

(SEAL)

New Jersey Mortgage                                                    Page 26

**EXHIBIT 6** PAGE 33 OF 37

State of New Jersey )
                    ) ss.
County of Sussex    )

On May 31, 2017, before me, Laura J. Delea Notary Public, personally
appeared **RICHARD STEWART HOLLEY**,

☑ personally known to me - **OR** –

☐ proved to me on the basis of satisfactory evidence

to be the person(s) who executed the within instrument as
**Member / Manager** on behalf of **JMH INVESTMENTS, LLC,
a New Jersey limited liability company**, the limited liability
company therein named, and acknowledged to me that the
limited liability company executed the same for the purposes
therein stated.

WITNESS my hand and official seal.

_____
Signature of Notary Public

Place Notary Seal and/or Any Stamp Above

Other Required Information (Printed Name of Notary, Residence, etc.)

```
LAURA J. DELEA
Commission # 2017098
Notary Public, State of New Jersey
My Commission Expires
August 27, 2021
```

**EXHIBIT 6** PAGE 34 OF 37

State of New Jersey                    )
                                       )  ss.
County of _Sussex_                     )

On _May 31_, **2017**, before me, _Laura J Delea_ Notary Public, personally appeared **BETH A. HOLLEY**,

☑ personally known to me - **OR –**

☐ proved to me on the basis of satisfactory evidence

to be the person(s) who executed the within instrument as **Member / Manager** on behalf of **JMH INVESTMENTS, LLC, a New Jersey limited liability company**, the limited liability company therein named, and acknowledged to me that the limited liability company executed the same for the purposes therein stated.

WITNESS my hand and official seal.

_____
Signature of Notary Public

_____
Other Required Information (Printed Name of Notary, Residence, etc.)

Place Notary Seal and/or Any Stamp Above

2017061301012892G
06/13/2017  02:23:16 PM
MTG
NUMBER OF PAGES : 31
Recording Fee : $330.00

LAURA J. DELEA
Commission # 2017098
Notary Public, State of New Jersey
My Commission Expires
August 27, 2018

**EXHIBIT 6** PAGE 35 OF 37

# TITLE INSURANCE COMMITMENT
*Issued by* **Cornerstone Abstract & Title Agency, LLC**
## AGENT FOR OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY

### AMENDED May 19, 2017

**Commitment Number: CAT7008**

## SCHEDULE C
## LEGAL DESCRIPTION

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the the Municipality of Town of Newton, in the County of Sussex, State of New Jersey:

All that certain lot, piece or parcel of land situate, lying and being in the Town of Newton, County of Sussex, State of New Jersey, and is described as follows

Commencing from a point making the 2nd corner of original Tax Lot 34 as found in a deed of conveyance from George R. Osorio and Linda A. Osorio, both married, to Shawn Szoludko, dated 10/29/2001, and recorded 11/9/2001 in the Sussex County Clerk's Office in Newton, NJ in Deed Book 2586, page 307 &c, said point also marks the 8th corner of Tax Lot 36.01 as found in a deed of conveyance from Kevin R. Smith and Suzanne Molfetto-Smith, husband and wife to Joseph Lombardi and Lorraine Lombardi, husband and wife, dated 7/21/2004, recorded 7/26/2004 in the Sussex County Clerk's Office in Newton, NJ in Deed book 2841, page 65 &c, said point also marks the Northeasterly right-of-way line to Trinity Street, having varying paved roadbed surface widths from 30' to 33' curbline to curbline, and a 50' wide right-of-way, said point is also distant southeast 64 degrees 58 minutes 40 seconds 0.31 feet from a small PK nail found flush in a paved driveway, also being distant Southeast 89 degrees 58 minutes 40 seconds 0.48 feet from a MAG nail, also found flush in said paved driveway, returning to said point;thence

(a) leaving the original boundaries of said Lombardi and continues as said Northeasterly right-of-way line and as the 1st course, reversed and in part, of said Szoludko's original deed and the 4th course Southeast 33 degrees 39 minutes 00 seconds 5.12 feet to a 1/4" square dock spike (6" in length) with identification disc set down about 0.05 feet in said paved driveway, said dock spike marking a point in the 1st course of said Szoludko's deed and said Northeasterly right-of-way line, also marking the new division line between Tax Lot 34 and Tax Lot 36.01, and being the point of beginning; thence

(1) leaving said Northeasterly right-of-way line and continues as said new line Northeast 57 degrees 45 minutes 20 seconds 166.17 feet to a new 1/2" threaded iron rod (24" in length) set up about 0.2" with an identification cap and wooden witness stake marking the Northerly end of said new division line, also marking the common boundary line with Tax Lot 35 (lands now or formerly owner by Joseph Roselli, in accordance with the Sussex County tax records at the time of the Minor Subdivision creating this parcel), from said road set; thence

(2) leaving said new division line and continues as said Lombardi's original 2nd course Southeast 35 degrees 57 minutes 50 seconds 43.41 feet to an old 1/4" iron pin found down about 0.1" with old survey flagging and a new wooden witness stake marking said Lombardi's original 3rd corner and with said Roselli; thence

(3) continuing as said Lombardi's original 3rd course and common with said Roselli Southwest 52 degrees 02 minutes 52 seconds 168.35 feet to a point marking said Lombardi's 4th corner and another common corner with said Roselli, also marking a point in said Northeasterly right-of-way line, said point being distant Northeast 52 degrees 02 minutes 52 seconds 1.30 feet from an old 1/2" iron pin found down about 0.2" with old survey flagging, said point also being distant South 37 degrees 02 minutes 27 seconds 15.45 feet from 1 7/8" iron pin found down about 0.3" with survey flagging, from said point; thence

EXHIBIT 6 PAGE 36 OF 37

SCHEDULE C (continued)
Legal Description

Commitment No. CAT7008

(4) leaving said lands of Roselli and continues as said Lombardi's 4th course and said Szoludko's original 1st course, in part, and said Northeasterly right-of-way line Northwest 33 degrees 39 minutes 00 seconds 60.08 feet to the point and place of beginning.

Being further described in accordance with a survey prepared by Michael A. Catalano, L.S. dated 1/25/08 as follows:

Beginning at a point in the easterly line of Trinity Street, 50 feet wide, where the same is intersected by the dividing line between Lot 35.01 on the south and Lot 34 on the north in Block 802; said point of beginning being North 33 degrees 08 minutes 00 seconds West, measured along said easterly line distant 169.02 feet from an iron pipe driven into the ground at the intersection of said easterly line with the northerly line of lands formerly of Erie Lackawanna Railway Company, now lands of the Town of Newton; said iron pipe being the second corner of a tract of land described in a deed of conveyance from George A. Green, III, Executor and Irma L. Green, h/w to Mary T. Maggio in trust for the heirs of Joseph Roselli, dated 1/5/1988 and recorded in the Sussex County Clerk's Office on 1/6/1988 in Book 1531 of Deeds, page 271; and runs thence

(1) North 33 degrees 08 minutes 00 seconds West, along the easterly line of Trinity Street, distant 60.08 feet to a point in a line of Lot 36.01; thence

(2) North 57 degrees 40 minutes 32 seconds East, along said Lot 36.01, distant 166.67 feet to a point in a line of the aforementioned Lot 35.01; thence

(3) South 35 degrees 54 minutes 00 seconds East, along said Lot 35.01, distant 43.41 feet to an iron pin found driven into the ground; thence

(4) South 52 degrees 00 minutes 00 seconds West, still along said Lot 35.01, distant 169.36 feet to the point and place of beginning.

FOR INFORMATION PURPOSES ONLY:  BEING known as Tax Lot 22, Tax Block 15.01 on the Official Tax Map of Town of Newton, Sussex County, State of New Jersey.

EXHIBIT 6 PAGE 37 OF 37